**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| WAL-MART PUERTO RICO, INC.,       ) | |
|       ) | |
|       Plaintiff,    ) | |
|       ) | |
|   v.      ) | Case No. _____ |
|       ) | |
| JUAN C. ZARAGOZA-GÓMEZ, in his official  ) | |
| capacity as Secretary of the Treasury of the   ) | |
| Commonwealth of Puerto Rico,   ) | |
|       ) | |
|       Defendant.   ) | |

**ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

This is a civil action challenging the legality of certain new Puerto Rico tax laws, which violate the Commerce Clause, Equal Protection Clause, and Bill of Attainder Clause of the U.S. Constitution, and the Federal Relations Act, 48 U.S.C. § 741a.  Plaintiff Wal-Mart Puerto Rico, Inc. (referred to as "Wal-Mart PR"), by and through its undersigned counsel, alleges as follows:

**INTRODUCTION**

1.     Wal-Mart PR is a critical contributor to the economy of Puerto Rico.  More Puerto Ricans work for Wal-Mart PR than for any other private employer.  Wal-Mart PR collects more sales tax on behalf of the Commonwealth than any other company or entity.  Every year, Wal-Mart PR purchases $1.6 billion dollars of products from Puerto Rican vendors and suppliers.  Wal-Mart PR supports the local community by providing millions of dollars of grants each year to charitable causes in Puerto Rico.  Wal-Mart PR has been a very good corporate citizen and a backbone of the local economy.  Unfortunately, in response to the Commonwealth's current financial crisis, the government of Puerto Rico has shortsightedly and illegally targeted Wal-Mart PR with an extraordinarily onerous and unconstitutional "income"

tax. This tax is not a tax on income at all, but rather a tax on Wal-Mart PR's purchases of goods from Wal-Mart distribution centers located in the mainland United States.

2.     On May 29, 2015, the Governor of Puerto Rico signed into law Act 72-2015 ("Act 72"), legislation that increased the Tangible Property Component of the corporate Alternative Minimum Tax ("AMT")—i.e., the component that taxes the value of property transferred to an entity doing business in Puerto Rico from a related party outside of Puerto Rico—from 2% to 6.5% for entities that have gross revenues of more than $2.75 billion from a trade or business in the Commonwealth. There is an important exemption to this tax, in favor of local business: Property transferred from a related party located in Puerto Rico is exempt from the Tangible Property Component of the AMT.

3.     Act 72's dramatic increase in the Tangible Property Component of the AMT— which by definition affects only commerce flowing into Puerto Rico from outside Puerto Rico— has raised Wal-Mart PR's estimated income tax to an astonishing and unsustainable 91.5% of its net income. On information and belief, Wal-Mart PR is the only entity in Puerto Rico that bears this heavy tax burden, as it is the only company that falls into the new AMT's highest tax bracket. The 91.5% effective tax rate is three times the average effective tax rate that Wal-Mart's affiliated companies pay worldwide, and on information and belief it is one of the highest—if not the highest—taxes in the world.

4.     Act 72's increase in the Tangible Property Component of the AMT discriminates against interstate commerce generally and targets Wal-Mart PR specifically. This dramatic and singular impact on Wal-Mart PR is no accident. As was widely reported in Puerto Rico at the time of the passage of Act 72, the new tax law specifically targeted "megastores" with mainland-based related entities—meaning Wal-Mart PR, and (a very few) others.

5.      Puerto Rico's AMT facially discriminates against interstate commerce without the rigorous justification that the U.S. Constitution and the Federal Relations Act require.  It expressly distinguishes between a transfer from a related entity that is doing business in Puerto Rico (such a transfer is not taxed; it is exempt from the Tangible Property Component), and a transfer from a related entity that is located outside Puerto Rico (this transfer is taxed).  The AMT thus violates the Commerce Clause and the Equal Protection Clause of the U.S. Constitution and the Federal Relations Act, 48 U.S.C. § 741a.

6.      Swift federal adjudication of these straightforward claims is necessary in light of the unsustainable tax burden Wal-Mart PR faces and the tenuous fiscal condition of the Commonwealth.  Adjudicating these claims by seeking a refund through the Commonwealth's administrative and judicial processes would be slow—likely more than six years—impractical, and inefficient.   Wal-Mart PR cannot sustain its operations for a lengthy period of time with a 91.5% tax burden, and with no certainty that the Government would even be financially capable of refunding the taxes when Wal-Mart PR prevails at the end of the process.  Wal-Mart PR would have to review and reconsider its operations if it must pay the confiscatory 91.5% tax for years before it can seek vindication of its federal rights in a federal court.  In light of Puerto Rico's acute financial troubles, including its acknowledged difficulty in paying far smaller tax refunds, depriving Wal-Mart PR of the ability to challenge the AMT in this Court will greatly increase the likelihood that Wal-Mart PR will never recover the enormous tax refunds to which it will be entitled.  Federal jurisdiction exists where, as here, the taxpayer is unable to obtain an effective remedy through the Commonwealth courts.

7.      Time is of the essence because the collection of this unconstitutional tax, if not enjoined by the Court, will continue for years and will have a devastating effect on Wal-Mart PR

(and on the Puerto Rican economy).  No business can operate for long in an environment where 91.5% of its net income is confiscated through taxes.  No Government should be permitted to drive a company—the largest private employer—out of business through a special tax applicable at its highest rate only to that company.  Only this Court can stop that from happening.

## PARTIES

8.     Plaintiff Wal-Mart Puerto Rico, Inc., is a Puerto Rican corporation with its headquarters in Caguas.  Plaintiff owns and operates Walmart Stores, Walmart Supercenters, Sam's Clubs, Super Ahorros, and Amigos stores in Puerto Rico.  Wal-Mart PR is ultimately owned by Wal-Mart Stores Inc., a Delaware corporation headquartered in Bentonville, Arkansas. The corporate family is collectively referred to as "Wal-Mart."

9.     Defendant Juan C. Zaragoza-Gómez is the Secretary of Treasury of Puerto Rico and is sued in his official capacity only.  The Secretary can be served by delivering a summons to the Secretary's agent located at the headquarters of the Treasury Department and to the Secretary of Justice of the Commonwealth of Puerto Rico.

## JURISDICTION

10.     This Court has jurisdiction over this action pursuant to the federal question statute, 28 U.S.C. § 1331, because this is a civil action arising under the Constitution and laws of the United States.  Wal-Mart PR brings this suit under 42 U.S.C. § 1983, which provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  Therefore, this Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3).  This Court may grant declaratory and related relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because the challenged taxes are collected in this District.

## FACTS

### Wal-Mart PR's Operations in Puerto Rico

12.     Wal-Mart provides quality products at competitive prices in retail stores throughout Puerto Rico, the mainland United States, and other parts of the world.  Each week, over 245 million people shop at more than 11,000 Wal-Mart stores in 28 different countries.

13.     In Puerto Rico, Wal-Mart PR operates 55 Walmart Stores, Walmart Supercenters, Sam's Clubs, Super Ahorros, and Amigos stores.  Wal-Mart PR employs nearly 15,000 people in Puerto Rico, making it the largest private employer in the Commonwealth.

14.     Wal-Mart PR is also the single largest private sales tax collector in Puerto Rico, collecting approximately $100 million in sales tax annually.

15.     Wal-Mart PR is integral to the Puerto Rican economy in other ways.  Annually, Wal-Mart PR purchases more than $1.6 billion in products from Puerto Rican suppliers; of that amount, $500 million is spent on products manufactured or grown in Puerto Rico.  Each year, Wal-Mart PR employees participate in the company's Volunteerism Always Pays (VAP) program, through which the company gives financial support to the charitable organizations where its associates volunteer their time.  In Fiscal Year 2015[1] alone, Wal-Mart PR associates donated 19,220 hours of volunteer service to the Commonwealth's non-profit organizations, fire

---

[1] Wal-Mart's fiscal year ends on January 30, 2015.  Throughout this complaint, fiscal years are named for the year in which they end.  Thus, Fiscal Year 2015 refers to the 12 month period beginning February 1, 2014, and ending on January 30, 2015.

and police departments, schools, and churches.  Through this program and others, Wal-Mart PR

each year gives nearly $3 million to charities in Puerto Rico.

**Wal-Mart's Global Distribution System**

16.     Wal-Mart Stores, Inc. possesses a global distribution system that handles supply,

logistics, transportation, and distribution for thousands of Wal-Mart stores across the world.

This system makes use of dozens of distribution centers, including two in Puerto Rico.

17.     A significant percentage of Wal-Mart PR's inventory originates with third-party

suppliers located outside Puerto Rico.  These suppliers typically sell their goods, not to Wal-Mart

PR directly, but instead to a different entity in Wal-Mart's global logistical system.  Wal-Mart

PR then purchases these goods from the related Wal-Mart entity.  All of those related entities are

distribution centers located in the mainland United States.  In Fiscal Year 2015, Wal-Mart PR

paid approximately $685 million for the goods shipped to it by these related entities.

18.     Wal-Mart PR also pays for services that it receives from related entities outside

Puerto Rico.  For example, related entities in the mainland United States provide management

services and information-technology services to Wal-Mart PR.  In Fiscal Year 2015, Wal-Mart

PR paid approximately $2.4 million for the services it received from related entities located

outside Puerto Rico.

19.     Both federal and Puerto Rican tax law provide standards that Wal-Mart PR must

follow when accounting for the payments it makes for goods and services it receives from related

entities.  For example, federal tax law requires that such a "controlled transfer" (i.e., a transfer

between two taxpayers under common control) must be valued in accordance with an "arms

length" standard.  *See, e.g.*, 26 U.S.C. § 482; 26 C.F.R. § 1.482-1 *et seq.* (providing detailed U.S.

Treasury guidance on how to apply the "arms length" standard).  "In determining the true taxable

income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer

dealing at arm's length with an uncontrolled taxpayer." *Id.* § 1.482-1(b)(1); *see also* Puerto Rico

Department of the Treasury, Regulation to Implement the Provisions of Sections 1046 and 1047

of Act No. 120 of October 31, 1994, Issued under Section 6130 of the Internal Revenue Code,

No. 6246 (December 22, 2000) ("Regulation") (same "arms length" standard under Puerto Rican

tax law).[2]

20.     Wal-Mart PR complies with the tax laws described in paragraph 19.

**Puerto Rico's Discriminatory Corporate Alternative Minimum Tax**

21.     Since 2011, Puerto Rico's corporate Alternative Minimum Tax ("AMT") has

been by its express terms a tax on interstate commerce, not a tax on income.  Like the federal

AMT, Puerto Rico's AMT must be paid whenever a "tentative minimum tax" exceeds the

taxpayer's "regular" income tax.[3]  In other words, if the tentative minimum tax is larger, then the

corporation pays the excess as AMT, in addition to its regular tax liability.  Unlike the federal

AMT—which still uses the taxpayer's regular income as the starting point for calculating the

---

[2] The Regulation was issued under Section 1047 of the Puerto Rico Internal Revenue Code of 1994, as amended ("1994 Code").  Section 6191.01(a) of the Puerto Rico Internal Revenue Code of 2011, as amended ("2011 Code") provides that Regulations issued under the 1994 Code will be in full force and effect under the 2011 Code for identical sections of the 1994 Code, until new regulations under the 2011 Code are issued.  Section 1040.09 of the 2011 Code is the successor provision to Section 1047 of the 1994 Code and is the current provision that grants the authority to the Secretary of the Treasury to regulate the tax treatment of transfers between affiliates. To this date, no regulations have been issued under the provisions of Section 1040.09 of the 2011 Code.   Since Section 1040.09 of 2011 Code is identical to its predecessor provision (i.e., identical to Section 1047 of the 1994 Code), the Regulation is in full force and effect with respect to the provisions of Section 1040.09 of the 2011 Code, as provided by Section 6191.01(a) of the 2011 Code.

[3] By "regular" income tax, this Complaint refers to the "normal tax" (20% of net income, in Wal-Mart PR's tax bracket) plus a "surtax" (which is currently approximately 19% of net income, in Wal-Mart PR's tax bracket).  The "regular" income tax is thus equivalent to the "tax liability (continued…)

"tentative minimum tax"[4]—Puerto Rico's AMT bases one of its two measures of "tentative minimum tax" not on the taxpayer's income, but rather on payments the taxpayer has made to related entities outside Puerto Rico.[5]

22.    The AMT's "tentative minimum tax" has two components: a Tangible Property Component and an Expenses Component.  Until Act 72 increased the rate, the AMT's Tangible Property Component captured up to 2% of the amount that the taxpayer paid for goods purchased from related entities outside Puerto Rico (e.g., a payment by Wal-Mart PR to a Wal-Mart Distribution Center located in the mainland United States, in exchange for a shipment of merchandise).[6]  The Expenses Component captures 20% of the amount that the taxpayer pays in expenses to related entities outside Puerto Rico (e.g., a payment by Wal-Mart PR to Wal-Mart headquarters located in the mainland United States, in exchange for information-technology

---

[4] "While closely following the rules of the regular [income tax] system, the [federal corporate] AMT has a broader definition of income and a less generous set of deductions. . . .  The starting point for the determination of income for AMT purposes is the corporation's regular taxable income.  Regular taxable income is modified by a series of additional computations, termed adjustments and preferences. . . .  AMT['s tentative minimum tax] is calculated by applying the 20 percent tax rate to the AMT measure of income."  *Alternative Minimum Tax, Corporate*, NTA Encyclopedia of Taxation and Tax Policy (Joseph J. Cordes, Robert D. Ebel & Jane G. Gravelle eds.),http://www.taxpolicycenter.org/taxtopics/encyclopedia/alternative-minimum-tax corporate.cfm.

[5] Puerto Rico's second (more traditional) measure of "tentative minimum tax" is based on the taxpayer's income.  Since 2011, the corporate taxpayer has been required to use whichever of the two measures is greater.  In that time, Wal-Mart PR has never been required to pay an AMT based on this income-based measure of "tentative minimum tax."  This Complaint therefore, for simplicity's sake, will refer only to the other measure of "tentative minimum tax," based on interstate transfers.

[6] More specifically, the Tangible Property Component applies to "purchases of personal property from a related person," unless "the seller or transferor is subject to income tax in Puerto Rico on such transaction."  Law 30073, 2011-PRIRC § 1022.03(b)(2)(B) & (d)(6).  This complaint uses the phrase "outside Puerto Rico" as shorthand for "not subject to income tax in Puerto Rico."  The Transfer Pricing Component was enacted in 2011; at that time, its rate was 1%.

before alternative minimum tax," entered on line 15, Part III of Puerto Rico's most recent income tax Form 480.20.

support services).[7]   The Expenses Component applies even to expenses for which the Puerto Rican taxpayer is not entitled to a full deduction.[8]   For Wal-Mart PR, the Tangible Property Component has a much larger effect than the Expenses Component:  As described further below, Wal-Mart PR estimates that 99% of its AMT in Fiscal Year 2016 will be due to the Tangible Property Component; just 1% will be due to the Expenses Component.

23.     The AMT discriminates against interstate commerce because it only applies to *interstate* transfers of goods and services.  If a Puerto Rican corporation (like Wal-Mart PR) receives products or services from a related entity that is domiciled in the mainland United States (like a Wal-Mart Distribution Center), then the Puerto Rican corporation must increase its "tentative minimum tax" based on the cost of the goods or services it has purchased, and may be required to pay increased AMT as a result.  However, if the same corporation were to buy the same products or services from a related entity domiciled in Puerto Rico, then that purchase would not affect the "tentative minimum tax" or the corporation's AMT.  The effect is to discriminate against *interstate* transfers by making them more expensive than transfers within Puerto Rico.[9]

---

[7] More specifically, the Expenses Component applies to "expenses incurred or paid to a related person . . . if such expenses are  . . . not subject to income tax" in Puerto Rico.  Law 30073, 2011-PRIRC § 1022.03(b)(2)(A).  Here again, this Complaint uses the phrase "outside Puerto Rico" as shorthand for "not subject to income tax in Puerto Rico."  The Expenses Component was enacted in 2013.

[8] For example, management fees, which may be paid by a Puerto Rican affiliate to its headquarters located outside Puerto Rico, may not be deducted in full from the Puerto Rican affiliate's Puerto Rico income tax.   Only 49% of those fees may be deducted (unless the Treasury grants a partial waiver for the taxpayer).  Nevertheless, all of the fees are taxed in the Expenses Component of the AMT.

[9] The Commonwealth may contend that the AMT levels the playing field in Puerto Rico by ensuring that companies with related entities outside Puerto Rico pay a tax that is equivalent to the income tax that companies wholly located in Puerto Rico must pay.  This is not the case, however.  Although wholly Puerto Rican parent companies must pay Puerto Rican income taxes

(continued…)

24.     Until recently, the AMT's tax on interstate commerce—though discriminatory in theory—had no effect on Wal-Mart PR in practice.  That is because, until Fiscal Year 2015, Wal-Mart PR's "tentative minimum tax" had always been lower than Wal-Mart PR's regular income tax, and therefore Wal-Mart PR had paid only the regular tax, and no AMT.

25.     In Fiscal Year 2015—the last tax year before Act 72 took effect—Wal-Mart PR's "tentative minimum tax" exceeded its regular tax for the first time since the AMT began to target interstate commerce in 2011.  As a result, Wal-Mart PR paid an AMT, in addition to Wal-Mart PR's regular tax liability.  This AMT was based entirely on Wal-Mart PR's purchases of goods and services from related entities in the mainland United States.  This payment represented approximately one-seventh of Wal-Mart PR's total income-tax burden in Fiscal Year 2015.[10]

### Act 72 Worsened the AMT's Unconstitutional Effects By Raising its Rate and Eliminating Waivers

26.     Act 72 drastically increased the rate of the Tangible Property Component of the AMT, and thereby transformed the AMT from a relatively harmless theoretical exercise into a very real and crushing burden on interstate commerce for companies like Wal-Mart PR.  Prior to Act 72, this Component's rate had been set (for all corporations) at 2% of the cost of goods purchased from related entities outside Puerto Rico.  Now, under Act 72, these rates vary depending on the gross revenues of the taxpayer, as set forth below:

---

on purchases made by their subsidiaries, discovery will show that the AMT tax on interstate transfers far exceeds the Commonwealth taxes that an equivalent Puerto Rican corporation would pay.  More importantly, companies with related entities outside Puerto Rico must also pay taxes in those other locations.  It is precisely for these reasons that the Constitution prohibits Puerto Rico and other states from charging different tax rates on interstate transactions.

[10] The bulk of Wal-Mart PR's tax burden, in both Fiscal Year 2015 and Fiscal Year 2014, was a tax on "gross receipts."  In Fiscal Year 2015, this tax was separate from, and in addition to, the regular tax and the AMT.  Although called an "operating tax" in Fiscal Year 2015, the tax on "gross receipts" may be considered part of Wal-Mart PR's total income-tax burden in that year.

| Gross Revenues | Tax Rate of Tangible Property Component of AMT |
|---|---|
| Equal to or more than $10 million, but less than $500 million | 2.5% |
| Greater than $500 million but less than $1.5 billion | 3.0% |
| Greater than $1.5 billion but less than $2 billion | 3.5% |
| Greater than $2 billion but less than $2.75 billion | 4.5% |
| Equal to or greater than $2.75 billion | 6.5% |

27.     Act 72 also worsened the unconstitutional effects of the AMT by eliminating the Treasury's power to grant waivers of the Tangible Property Component.  Prior to Act 72, the Treasury had power to reduce this Component's rate if the taxpayer presented evidence that the prices charged by its related entity outside Puerto Rico were "equal to or substantially similar to or lower than" the prices at which the related entity sold the same goods to "an unrelated person."   13 L.P.R.A. § 30073(d)(4).   These waivers did not render the Tangible Property Component constitutional, but they did provide a method for taxpayers to lower the Component's rate and thereby reduce its unconstitutional effects.  Act 72 eliminated the Treasury Secretary's authority to grant these waivers.[11]

28.     Puerto Rico's Governor, Alejandro García Padilla, concisely summed up Act 72's discriminatory effect in his address on September 9, 2015, in which he stated: "We imposed a tax on transfers of foreign stores."[12]

---

[11] The Secretary retains authority to grant partial waivers to the Expenses Component of the AMT.  However, the Secretary has construed this authority extremely narrowly, and has stated that the Treasury will only grant waivers for costs that are passed through the related entity and paid to a third party.  Puerto Rico Treasury Internal Revenue Circular Letter No. 13-23 (Nov. 18, 2013).  Therefore, services provided by the related entity itself (e.g., information technology services provided by Wal-Mart entities on the mainland) continue to be taxed at 20% and, according to the Circular Letter, are not eligible for a waiver.  *Id.*

[12] Gov. Alejandro García Padilla, Press Release, Governor Garcia Padilla Addresses Public on the Working Group for the Fiscal and Economic Recovery of Puerto Rico's 'Fiscal and
(continued…)

**Act 72 Drastically Increased Wal-Mart PR's Income Tax Burden, to a 91.5% Effective Rate**

29.     Act 72 more than tripled Wal-Mart PR's AMT Tangible Property Component rate, from 2% to 6.5%.  Upon information and belief, Wal-Mart PR is the sole entity in the Commonwealth that must pay this highest bracket (6.5%) of the Tangible Property Component.

30.     Wal-Mart PR began paying estimated taxes under Act 72 on July 15, 2015, less than two months after Act 72 became law.  (Although Wal-Mart's tax return for Fiscal Year 2016 is not due until May 2016, the company is required to make quarterly estimated tax payments in advance.)

31.     Wal-Mart PR estimates that Act 72 will cause its total tax liability to rise to approximately $45.1 million in Fiscal Year 2016, which is equal to 91.5% of Wal-Mart PR's estimated net income for this year.  Of that $45.1 million tax bill, $25.9 million, or 57.4%, is the unconstitutional AMT.  (By comparison, approximately one-seventh of Wal-Mart PR's total income tax liability in Fiscal Year 2015 was based on the unconstitutional AMT; and in previous years, Wal-Mart PR paid no AMT at all.)  Ninety-nine percent of the AMT that Wal-Mart PR will pay in Fiscal Year 2016 is due to the Tangible Property Component; just one percent is due to the Expenses Component.

32.     The 91.5% effective tax rate that Act 72 has imposed on Wal-Mart PR in Fiscal Year 2016 is a dramatic increase to the effective tax rates Wal-Mart PR has previously paid.

33.     In future years, Act 72 may cause Wal-Mart PR's effective tax rate to rise above 91.5%.  Further increases in this rate, even above 100%, are possible (even without any changes in the tax code) because Wal-Mart PR's "tentative minimum tax" is not based on the company's

---

Economic Growth Plan' (Sep. 9, 2015), http://www.bgfpr.com/documents/GovernorGarcia

(continued…)

income.  Therefore, if Wal-Mart PR's net income falls faster than its receipts of goods and services from related entities in the mainland United States, then the company's "tentative minimum tax" will come to constitute an even greater percentage of the company's (reduced) net income.[13]

### The Legislature's Discriminatory Intent

34.     Act 72's discrimination against interstate commerce was precisely the goal Puerto Rico's Legislature sought to accomplish.  The legislative history and the public statements by Act 72's sponsors demonstrate that Act 72 was intended to discriminate against taxpayers that are affiliated with large retail businesses headquartered outside of Puerto Rico.

35.     Act 72 was introduced on May 18, 2015.[14]  Without hearings or substantial debate, it passed the House on May 21, and the Senate on May 25, and was signed into law by the Governor on May 29, 2015.  However, the unconstitutional provisions of Act 72 were also present in a precursor bill,[15] which was introduced on February 11, 2015 and received several days of debate in committees of the House and Senate and on the floor of the House.  This precursor bill was narrowly defeated in a House vote on April 29, 2015.  In its final version, the precursor bill would have imposed the same increases in the Tangible Property Component rates

---

PadillaAddressontheFEGP.pdf (hereinafter *Governor's Working Group Press Release*).

[13]  Although the decrease in Wal-Mart PR's net income would cause the company's "regular" income tax to decrease by a corresponding amount, the "tentative minimum tax" would not necessarily decrease because the "tentative minimum tax" does not depend on income.  It depends only on the amount of goods and services transferred to Wal-Mart PR.  If that amount were to remain constant as income fell, then the "tentative minimum tax" would also remain constant, meaning that the tax *rate* would increase as income fell.

[14]  The Act 72 tax bill existed in two versions, which contained identical amendments to the AMT: House Bill 2482 and its Senate counterpart, Senate Bill 1402.

[15]  The precursor bill also existed in two versions, which also contained identical amendments to the AMT: House Bill 2329 and its Senate counterpart, Senate Bill 1304.

that Act 72 later enacted.[16] And, like Act 72, the precursor would have eliminated the Treasury Secretary's authority to grant waivers of the AMT. Because the precursor's AMT provisions were identical in important respects to Act 72, the legislative history of this precursor bill illustrates the purposes of Act 72, which became law just weeks after the precursor was defeated.

36.     The precursor bill received support from the Treasury Department and the Government Development Bank of Puerto Rico ("GDB"),[17] both of which accused "multinational chains" of evading Puerto Rico taxes by manipulating the prices paid between related entities in order to underreport their income in Puerto Rico.

37.     In his letter to the Legislature in support of Act 72's precursor, the Secretary of the Treasury—Defendant Zaragoza-Gómez—claimed that Puerto Rico's AMT

> currently accomplishes the purpose of leveling the adjustments or policies in sale prices to related entities. ***It is known to the Treasury Department that at present, multinational chains doing business in Puerto Rico report year after year net operational losses in their subsidiaries or branches in Puerto Rico, even though their sales in Puerto Rico exceed the sales in other countries.*** This is a result, in part, of the transfer policy of prices between related entities. Through some adjustments to the alternative minimum tax, part of these adjustments are reversed, thereby achieving the result that these multinationals contribute to the governmental collections.[18]

Secretary Zaragoza-Gómez again accused "multi-national chains" of tax evasion during his testimony before the Senate Treasury and Finance Committee on February 19, 2015, in response

---

[16] As originally proposed, the precursor legislation would have reduced the Tangible Property Component rate from 2% to 1.5%. This aspect of the legislation was changed during the Legislature's consideration of these bills. *See* Substitute House Bill 2329 (Apr. 29, 2015) (containing Tangible Property Component rates identical to those ultimately enacted in Act 72).

[17] The GDB's "function and responsibility" is to "act as the fiscal agent and financial advisor for the Government of the Commonwealth of Puerto Rico." Letter from Melba Acosta Febo, GDB President, to Hon. Jose R. Nadal Power, Chairman of the Senate Treasury and Finance Commission 1 (Mar. 12, 2015) (hereinafter *GDB Letter*).

to questioning from Representative Rafael Hernández, Chairman of the House Treasury and

Budget Committee:

> **Chairman Hernández:** Another subject that is presented, which is very, very important for this discussion, also highly technical, . . . [is] the so-called transfer pricing, the transfer of prices, among related entities. That is, two corporations, subsidiaries one of the other, or affiliates, contract between each other.  One sells products perhaps to the other, at an overprice. The profit is already there.  The other can claim losses because it paid too much and this is not reflected in its profit level at what is supposed.
>
> . . . .
>
> We have to look, above all, at whether these large chains use this type of scheme to not comply with the responsibility that they should have towards the country, towards the place where they are generating so much sales.  What can you tell me about this?
>
> **Mr. Zaragoza-Gómez:**  Yes, in fact, in the majority of the tax administrations in the world, this is their area of principal concern. . . .
>
> When jurisdictions like Puerto Rico, that do not give a preferential rate to the retail sale, well usually the practice [of the taxpayer] is to try to maintain the income as low as possible in Puerto Rico. We are currently in the process . . . [of] developing a regulation in the area of transfer pricing, similar to the one that has been done in most of the [other] countries.
>
> **Chairman Hernández:** The monitoring is extremely technical. It requires—
>
> **Mr. Zaragoza-Gómez:**  —an expert eye. And these lawsuits [against taxpayers] can last us years. Sometimes a decade, with this type of company. ***And therefore an alternate mechanism is to use the minimum alternative tax to establish a minimum payment. And that is what we are doing. . . .***
>
> **Chairman Hernández:** Yes, a simple mechanism to establish a minimum tax liability.[19]

---

[18]  Juan Zaragoza-Gómez, Treasury Sec'y, Letter to Hon. Rafael Hernandéz Montañez, Chairman, Treasury and Budget Committee, House of Representatives 16 (Feb. 18, 2015) (emphasis added) (hereinafter *Treasury Letter*).

[19] Transcript of Hearing before the Senate Treasury and Finance Committee on Senate Bill 1304, at 88-92 (Feb. 19, 2015) (emphasis added).

38.    Like Secretary Zaragoza-Gómez, Melba Acosta Febo, President of the Government Development Bank of Puerto Rico ("GDB"),[20] made similar (and similarly unsupported) allegations of tax evasion in her letter supporting Act 72's precursor.  President Acosta's letter, which was read aloud to the House Treasury and Budget Committee, claimed that "multinational corporations play[] with the transfer prices of the articles that they purchase from their parent company" and thereby commit "tax evasion."[21]  President Acosta's letter also claimed that this problem was caused "because Puerto Rico does not have a transfer pricing regulation like other nations."[22]  (This claim is perplexing—as noted above in paragraph 19, Puerto Rico *does* have a transfer pricing regulation, with which Wal-Mart PR complies.)[23] President Acosta made similar accusations during her testimony before the Senate Treasury and Finance Committee.[24]

39.    Secretary Zaragoza-Gómez's and President Acosta's sweeping accusations of universal tax evasion are untrue with regard to Wal-Mart PR.  Wal-Mart PR is innocent of this charge, which was made without any evidence.  Wal-Mart PR complies with the federal and Puerto Rican laws governing the pricing of goods and services transferred to Wal-Mart PR from related entities on the mainland.  *See* paragraph 19, *supra* (citing these laws).

---

[20] *See GDB Letter*, *supra* note 17, at 1.

[21] *Id.* at 11; *see also* Transcript of Hearing Before the House Treasury and Budget Commission on House Bill 2329, at 41, 57 (Feb. 18, 2015) (statement of Deputy Treasury Secretary Ángel Marzán Soto, reading President Acosta Febo's letter).

[22] *Id.*

[23] *See* note 2, *supra* (describing history of this Regulation).

[24] Transcript of Hearing before the Senate Treasury and Finance Committee on Senate Bill 1304, at 62-64 (Mar. 12, 2015) (testimony of President Acosta, paraphrasing arguments made in letter) ("[Tax] evasion occurs in many forms . . . [f]or example . . . the multi-national corporation that plays with the 'transfer prices' of the items it buys from its parent company, and that, in spite of having thousands of millions in sales, ends up paying less taxes than an individual taxpayer, this in part because Puerto Rico does not have a 'transfer pricing' regulation like in other nations.").

40.     Rather than policing its tax laws through the ordinary auditing process—as U.S. states successfully do—Puerto Rico through Act 72 has essentially created an irrebuttable presumption that all intra-corporate transfers to Puerto Rican companies from related entities in the mainland United States are fraudulently priced to evade taxes.   Though governments obviously are permitted to address potential tax evasion, they may not constitutionally do so through the blunt instrument of a tax that facially discriminates against interstate commerce by taxing all such transfers, without exception.

41.     In addition to punishing multi-national corporations for assumed tax evasion, Act 72's precursor also had an additional purpose:  To protect and promote local businesses.  In his introductory remarks to the House Treasury and Budget Committee on March 4, 2015, the Speaker of Puerto Rico's House of Representatives, Jaime Perelló Borras, told his colleagues that the purpose of the bill was to "promote" "local companies":

> Of course, when we talk about the local entrepreneur, about the local companies, our small and medium-sized merchants, about the products made in Puerto Rico, there is automatically raised a flag in favor of the discussion for a feeling and for a public policy of this House of Representatives, not to protect, but to promote the items of the economy, which are really the ones that not only generate jobs, but the wealth that they generate stays in Puerto Rico.  Any company that generates wealth and the wealth stays in Puerto Rico and is not repatriated the same day at 12:00 at night, automatically has a greater opening, even in any amendment or suggestion to improve this project, because in the long run that is what we are seeking, that this relationship of wealth will allow—and these reductions in the tax rates will allow that you can generate more jobs and expand your businesses in Puerto Rico.[25]

42.     On April 29, 2015, Speaker Perelló again spoke in favor of the precursor legislation, this time on the floor of the House, just prior to the House's vote on the bill.  Speaker Perelló explained that the bill's discriminatory increase in interstate corporations' AMT would

"do justice" because that increase would make it financially possible for the Legislature to lower the taxes of domestic Puerto Rican companies:

> [T]he money does not grow on trees.  From an "IVA" [Value Added Tax] of 16% in everything,[26] we have been able to reduce that to a 14% in what is sales and a 10% in what are goods and services. . . .  Why did we do it?  Because this delegation never stopped working.  **_Colleague Luis Vega Ramos [and others]_** **_presented us an alternative which they worked up to guarantee that principally_** **_certain large volume businesses in the transfer between their parent companies_** **_and the stores in Puerto Rico, the famous transfer pricing, which if we included_** **_this in the Bill it was going to generate sufficient money to do justice_** . . . to the sectors that we pursuant to public policy and belief want to stimulate, and want to protect and want to push forward.  If today we have been able to eliminate the "IVU" to education, we have eliminated the "IVU" to health, eliminated the "IVU" to the rent, or the CoBYS [a tax on goods and services] . . . **_we have been_** **_able to substitute it with measures that the colleagues have brought, such as the_** **_transfer pricing._**[27]

43.     In addition to their statements in the legislature, Speaker Perelló and others also spoke to local media about their intent to discriminate against interstate corporations in favor of local businesses.  For example, Speaker Perelló said that "these businesses ['megastores'] have to be treated differently from those whose earnings stay in Puerto Rico, and this is a sector that we are looking at, how they can contribute a bit more."[28]  Elsewhere, the Speaker stated that "it is time that this money [from the megastores] spend more time in Puerto Rican banks in order to help our economic development and the solidity of our economy . . . . [T]here is a consensus—at least in the House of Representatives—that [the mega chains] are going to contribute more than

---

[25] Transcript of Hearing Before the House Treasury and Budget Committee on House Bill 2329, at 9-11 (Mar. 4, 2015) (emphasis added).

[26] Part of the larger tax reform contemplated by Act 72's precursor, and enacted by Act 72, was to replace Puerto Rico's existing Sales and Use Tax ("Impuesto Sobre Ventas y Uso" or "IVU") with a Value-Added Tax ("Impuesto al Valor Agregado" or "IVA").

[27] Puerto Rico House of Representatives, Diary of Sessions 153 (Apr. 29, 2015) (emphasis added).

[28] Rebecca Banuchi, *Perelló Backs Proposals to Increase Collections*, EL NUEVO DÍA, Mar. 16, 2015.

they are contributing now. These companies sell thousands of millions a year and the great majority of this money goes to banks in the United States. It does not even stay sufficient time in Puerto Rico to help us in our economic development."[29] Similarly, Representative Luis Vega Ramos described the increase in the Tangible Property Component rate as a means of extracting "$300 million" from "mega chains," which would enable the Government to reduce by 1% the Value Added Tax ("IVA") that other Puerto Rican business would have to pay: "Those $300 million [collected from the 'megastores'] would be used exclusively to reduce the percentage of the IVA. . . . What we are asking is that these great megachains, with sales of dozens of millions of dollars per year, contribute reasonably."[30] Speaker Perelló's and Representative Vega's statements are further evidence of the Legislature's desire to intentionally discriminate against interstate commerce for the benefit of Puerto Rican companies and commerce. This protectionism is unconstitutional and a violation of the Federal Relations Act.

44. The timing of Act 72 also indicates the Legislature's intent to target interstate companies for discriminatory higher taxes, to the benefit of domestic companies. Specifically, Act 72 was enacted just months after the Legislature repealed a "gross receipts" income tax. For two years—2013 and 2014—this "gross receipts" tax had extracted a large additional income tax on the gross receipts (i.e., sales) of all large-revenue corporations. Though its rates were cripplingly high, at least this "gross receipts" tax applied equally to all businesses of the same size, regardless of whether a company was located entirely in Puerto Rico or was headquartered

---

[29] Nydia Bauzá, *Megastores Would Have To Deposit Profits in Puerto Rico*, EL NUEVO DÍA, Apr. 6, 2015.

[30] *Vega Ramos Advocates for Tax to Megastores To Reduce VAT*, EL NUEVO DÍA, Apr. 14, 2015. On March 16, 2015, Representative Vega Ramos had introduced a separate bill, which would have increased the Tangible Property Component to 6% for all interstate corporations. House Bill 2375 (Mar. 16, 2015).

outside Puerto Rico.  Just months after the "gross receipts" tax was repealed, the Legislature replaced it with Act 72—which enacted an even higher tax rate, but applied that rate only to interstate businesses like Wal-Mart PR, which purchase goods and services from related entities located outside Puerto Rico.

**Federal Jurisdiction Exists Because Wal-Mart PR's Unconstitutional AMT Is "Exorbitant"**

45.     The Butler Act ordinarily divests federal courts of jurisdiction over challenges to the assessment or collection of taxes imposed under Puerto Rican law.  *See* 48 U.S.C. § 872. Such challenges are usually adjudicated through refund claims in the Commonwealth administrative and judicial processes.  There are exceptions to this general rule, however.  For example, the First Circuit has held that "requiring a taxpayer to pay an exorbitant or effectively punitive tax in order to challenge it may present such a heavy burden that to decline federal equitable relief would be to deny judicial review altogether."  *Pleasures of San Patricio, Inc. v. Mendez-Torres*, 596 F.3d 1, 9 n.5 (1st Cir. 2010) (internal alterations and quotation marks omitted).

46.     The income tax that Wal-Mart PR is currently paying (and, in the absence of federal equitable relief, must continue to pay) is "exorbitant."  *Id.*  As described above, Act 72 has increased Wal-Mart PR's estimated effective tax rate to 91.5% of the company's net income. That effective rate could prove to be even higher than 91.5% if the company increases its transfers or if its net income falls.  Fully 57.4% of this tax is the direct result of the unconstitutional AMT, levied on Wal-Mart PR's purchases of goods and services from related entities located in the mainland United States.  An effective tax rate of 91.5% (or even higher) of income—the majority of which is unconstitutional—is "exorbitant," rendering federal jurisdiction over Wal-Mart PR's equitable claim appropriate.

### Federal Jurisdiction Exists Because in These Unique Circumstances the Commonwealth Courts Cannot Provide a "Plain, Speedy, and Efficient" Remedy

47.      In addition, the Butler Act does not apply when the Commonwealth courts do not provide a "plain, speedy, and efficient" remedy for the recovery of tax overpayments. *See Carrier Corp. v. Perez*, 677 F.2d 162, 164 (1st Cir. 1982).  This exception ensures that federal courts can exercise jurisdiction where a taxpayer would be unable to efficiently seek federal judicial review of federal constitutional claims by seeking a refund through the Commonwealth's administrative and judicial processes with ultimate review in the U.S. Supreme Court.  Thus, courts have long recognized that the factual circumstances particular to the taxpayer and the Commonwealth are relevant in assessing whether the Commonwealth's refund procedure provides a remedy sufficient to divest federal courts of jurisdiction over federal constitutional and statutory questions.

*48.*      Because of the unique factual circumstances of this case—in particular, because of the lengthy refund process and the Commonwealth's conceded inability to pay even much smaller refunds it currently owes to other taxpayers—the refund process does not provide a "plain, speedy, and efficient" remedy for Wal-Mart PR to vindicate its federal constitutional and statutory rights with respect to this particular tax.  *Perez*, 677 F.2d at 164.

### *The Commonwealth Courts Would Require Wal-Mart PR to Pay a 91.5% Income Tax for Approximately Six Years—And Even Then, Might Not Order a Full Refund*

49.      Prosecuting a refund claim through Puerto Rico's administrative and judicial processes, followed by a potential petition to the U.S. Supreme Court to vindicate Wal-Mart PR's federal rights, likely would take at least six years, and possibly longer.

50.      Wal-Mart PR cannot even begin this process until the spring of 2016, when Wal-Mart PR files its tax return for Fiscal Year 2016.  *See* Puerto Rico Internal Revenue Code of

2011, § 6021.02, *codified at* 13 L.P.R.A. § 33022 (refund cannot be requested until return is filed). Once the refund request is filed, the Treasury Department may not respond to it for several years. *See, e.g.*, *Philip Morris USA, Inc. v. Departamento de Hacienda*, No. KLAN201500575, slip op. at 11 (P.R. Tribunal de Apelaciones, Reg. Jud. San Juan, July 3, 2015) (Treasury Department had failed to either pay or deny eight distinct refund requests, some dating from January 2009, even though the relevant law was "crystal clear" in favor of the taxpayer's claimed exemption). If, as is common, the Treasury Department waits several years to rule on its refund request, Wal-Mart PR will have no power to force the Department to move more quickly. The Puerto Rico courts lack jurisdiction over tax refund requests until the Treasury has taken action, and those courts have refused to issue writs of mandamus to require the Treasury to adjudicate these requests promptly. *Id.* (affirming lower court's refusal to grant a writ of mandamus). If the Treasury Department, when it finally does act, rejects Wal-Mart PR's claims, then another three to four years would be required to adjudicate that rejection in the Puerto Rico courts, including proceedings before the Court of First Instance, the Court of Appeals, and the Puerto Rico Supreme Court. Therefore, if this Court were to decline jurisdiction, Wal-Mart PR would have to wait six or more years before it would even have the opportunity to seek a discretionary federal (i.e., U.S. Supreme Court) adjudication of its federal claims.

51. Although a six-year wait might be a sufficiently "plain, speedy, and efficient" remedy in a garden-variety tax dispute, *Carrier Corp.*, 677 F.2d at 164, this particular case is exceptional because the sum at stake here is enormous even for one tax year; over six years, that sum will reach stratospheric levels. Even assuming—conservatively—that the refund process takes six years, Wal-Mart PR would have to pay approximately $155 million in unconstitutional

taxes to continue operating during this time.[31]

52.    Even if Wal-Mart PR were to prevail in the Puerto Rican courts, those courts cannot be counted upon to award a full refund.  Five years ago, when faced with a similar case, the Supreme Court of Puerto Rico refused to order a full refund, despite ruling that the Commonwealth lacked authority to collect the tax at issue.  Instead, the Supreme Court of Puerto Rico found that the "difficult state of our country's public finances" required "judicial creativity" instead of an "immediate repayment":

> In spite of the result we have arrived at [namely, that the Commonwealth lacked authority to collect this tax], this Court is not unaware of the difficult state of the public finances of our country.  An immediate repayment of the funds concerned could erode the depleted state coffers even further.  There is no doubt that the situation is complex and demands judicial *creativity*, in such a way as to make it possible to design a remedy that permits restoring the taxpayers to their money and, at the same time, not being extremely prejudicial to the public fisc.  The possibilities are diverse and will depend on the understanding and the good faith with which both parties approach the execution of the judgment. . . .  In this tenor, we hope that—in light of the result that we arrive at today—the State and the protected class, together with the court of first instance, are able to invent an adequate remedy through which it is possible to attend justly and satisfactorily to the interests of both parties.

*Herrero y Otros v. Emmanueli*, 179 D.P.R. 277, 309 (P.R. 2010).

53.    Wal-Mart PR cannot reasonably be expected to continue doing business in its current manner in Puerto Rico for any extended period of time while paying 91.5% (or more) of its net income each year in income taxes, before it can vindicate its rights in the federal courts.

---

[31] Wal-Mart PR's most recent estimate of its tax burden in Fiscal Year 2016 is $45.1 million, of which 57.4%, or $25.9 million, is caused by the unconstitutional AMT.  *See* paragraph 31, *supra*. During six years of litigation in the Commonwealth courts, therefore, Wal-Mart PR would expect to pay six times $25.9 million, for a total of $155.4 million, in unconstitutional AMT.

### *Even If the Commonwealth Courts Were to Order a Refund, Puerto Rico Will Be Unable to Pay Refunds of the Unconstitutional Tax*

54.     There is a substantial risk that the Commonwealth, even if ordered to do so by the Puerto Rico courts, will be unable to refund the $155 million of unconstitutional tax payments that Wal-Mart PR would be forced to make during its six-year process of requesting a refund through Puerto Rico's administrative and court systems.

55.     Puerto Rico, according to Governor García Padilla, "faces a fiscal and economic crisis unprecedented in its recent history."[32]  Its finances, he said in June, are in a "death spiral," and its debts are "not payable."[33]  "This is not politics, this is math."[34]  On Tuesday, December 1, the Governor confirmed, in his written testimony submitted to the U.S. Senate Judiciary Committee, that the situation has gotten even worse since June: "The downward spiral of economic contraction and revenue declines is intensifying. In early November we revised our revenue forecast downward from $9.8 billion to $9.4 billion. Last month our revenues plummeted and, yesterday [November 30], we did a further downward revision to $9.2 billion."[35]  Governor García Padilla has pleaded for statutory changes that would allow the Commonwealth to "restructure" its debts.  In his oral testimony on Tuesday, December 1, he said:  "This is a

---

[32] *Governor's Working Group Press Release*, *supra* note 12, at 1.

[33]  Michael Corkery & Mary Williams Walsh, *Puerto Rico's Governor Says Island's Debts Are 'Not Payable,'* N.Y. TIMES, June 28, 2015, http://www.nytimes.com/2015/06/29/business/dealbook/puerto-ricos-governor-says-islands-debts-are-not-payable.html?_r=1.

[34] *Id.*

[35] Gov. Alejandro J. García Padilla, Written Testimony, U.S. Sen. Comm. on Judiciary, *Puerto Rico's Fiscal Problems: Examining the Source and Exploring the Solution* (Dec. 1, 2015), http://www.judiciary.senate.gov/imo/media/doc/Garcia-Padilla%20Testimony.pdf   (hereinafter *Governor's Testimony to the Judiciary Committee*).

distress call, from a ship of 3.5 million people that is adrift at sea."[36]

56.     The Commonwealth's internal advisors agree with its Governor: Puerto Rico is broke and will remain so for the foreseeable future.  According to the Commonwealth's own development bank (the GDB), "[d]uring the past eight years, the fiscal situation of the Government of the CWPR has presented an alarming picture.  Its sources of collection have not been able to effectively sustain the operation of the State."[37]  According to the Governor's Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group"), Puerto Rico faces, over the next five years, a "significant financing gap" of $27.8 billion.[38]  To close that "financing gap," the Working Group has developed a "Fiscal and Economic Growth Plan" (the "Plan").  The Plan recommends a range of measures to stimulate economic growth, enact structural reforms, enhance revenue, reduce expenses, and reform institutions.[39]  Yet even in the best-case scenario—in which all of the Plan's recommendations are adopted, and in which the Puerto Rican economy responds by growing as much as the Plan predicts that it will—the Working Group still foresees a "financing gap" of $14 billion over the next five years.[40]

57.     At least two outside advisors agree with these internal assessments.  Puerto Rico has hired the Honorable Steven W. Rhodes, a retired federal judge who oversaw Detroit's bankruptcy case, as an adviser.  He has said:  "There are way too many creditors and way too

---

[36] Mary Williams Marsh, *Puerto Rico Begins Choosing Which Debt Payments to Make*, NY TIMES DEALBOOK, Dec. 1, 2015, http://www.nytimes.com/2015/12/02/business/dealbook/puerto-rico-government-debt-bond-payment.html?_r=0.

[37] *GDB Letter*, *supra* note 17, at 2.

[38] Working Group for the Fiscal and Economic Recovery of Puerto Rico, *Puerto Rico Fiscal and Economic Growth Plan* 17 (Sep. 9, 2015), http://www.bgfpr.com/documents/PuertoRicoFiscalandEconomicGrowthPlan9.9.15.pdf (hereinafter *Working Group Plan*).

[39] *Id.* at 20.

[40] *Id.* at 62.

many kinds of debt.  They need Chapter 9 for the whole commonwealth."[41]  Similarly, Puerto Rico has commissioned Dr. Anne O. Kreuger, former First Deputy Managing Director of the International Monetary Fund ("IMF"), to prepare a report entitled "The Way Forward."  In that report, Dr. Krueger writes: "Even after factoring in a major fiscal effort [by Puerto Rico], a large residual financing gap persists into the next decade—implying a need for debt relief."[42]

58.     The Commonwealth is unable to borrow money to close the $14 billion "financing gap" that the Governor's Working Group foresees in even the best-case scenario. According to the Working Group, "access [to the bond market] on sustainable terms is not currently available to the Commonwealth."[43]   Dr. Krueger agrees that "[f]inancial markets . . . have cut off the Commonwealth from normal market access."[44]

59.     On October 21, President Obama's administration released a legislative proposal to address what it called Puerto Rico's "serious crisis that requires immediate congressional action."[45]  The first item in the legislative proposal was a law that would permit Puerto Rico to "restruct[ure] its debts."[46]  In a statement accompanying the proposal, Treasury Secretary Jacob Lew warned that "the Commonwealth's fiscal hole" has "deepened," and further warned that the

---

[41] Corkery & Walsh, *supra* note 33.

[42] Anne O. Krueger, Ranjit Teja & Andrew Wolfe, *Puerto Rico—A Way Forward* 21 (July 13, 2015),  http://www.bgfpr.com/documents/FinalUpdatedReport7-13-15.pdf  (hereinafter *Krueger Report*).

[43] *Working Group Plan*, *supra* note 38, at 12.

[44] *Krueger Report, supra* note 42, at 1.

[45] U.S. Treasury Sec'y Jacob J. Lew, National Economic Council Dir. Jeff Zients, Health and Human Services Sec'y Sylvia Mathews Burwell, Press Release, *Addressing Puerto Rico's Economic and Fiscal Crisis and Creating a Path to Recovery* (Oct. 21, 2015), https://www.whitehouse.gov/blog/2015/10/21/addressing-puerto-ricos-economic-and-fiscal-crisis-and-creating-path-recovery.

[46] *Id.*

island's "emergency actions to address these challenges" will "be exhausted this winter."[47]

60.    The Commonwealth has already ceased to pay at least some tax refunds.  In June 2015, one media outlet reported that "some checks that are being sent by the Department of the Treasury for reimbursements are bouncing because they have no funds."[48]   According to a second report, "the poor devils that complied with their tax liability in this country which is overwhelmed with cheats will only receive their reimbursement 'if something falls', as the Secretary of the Treasury, Juan Zaragoza, said."[49]  Yet another report noted that "[t]he cash flow problems of the government hold in suspense the payment of the reimbursements that are owed to the taxpayers, and the Secretary of the Treasury, Juan Zaragoza was unable to define . . . when the situation could normalize" and quoted Mr. Zaragoza-Gómez as stating that issuing refunds between $5 million and $7 million could "place the account (of the Department of the Treasury) in a dangerous level."[50]

61.    The Governor's Working Group concedes that $291 million in tax refunds that were due from tax year 2014 have still not been paid.  The Working Group refers to this non-payment as a "delay," and describes it as one of several "extraordinary liquidity measures" that Puerto Rico has taken so far this year.[51]  The Working Group's Plan acknowledges that these "delayed" refunds for tax year 2014 "will not be paid in full until February 2016, *at the earliest*" (emphasis added)—nearly a year after the filing deadline.[52]   In recent testimony before the U.S. Senate Committee on Finance, GDB President Acosta Febo acknowledged that the

---

[47] *Id.*

[48] *Reimbursement Checks of the Treasury Bounce*, Metro Puerto Rico, June 18, 2015.

[49] Benjamín Torres Gotay, *Things by Their Name: The Descent*, El Nuevo Día, June 11, 2015.

[50] Rebecca Banuchi, *Payment of Reimbursements in Danger*, El Nuevo Día, June 1, 2015.

[51] *Working Group Plan*, *supra* note 38, at 13.

[52] *Id.*

Commonwealth had "delay[ed] payment of tax refunds to residents."[53]   In his written testimony to the U.S. Senate Judiciary Committee on December 1, 2015, Governor García Padilla confirmed that "not paying tax refunds" remains one of the "measures" the Commonwealth is taking in order to "avoid[] a major default" on bonds that are backed by a constitutional guarantee of repayment.[54]

62.     In addition to failing to pay tax refunds, the Commonwealth has also begun to default on bonds not backed by a constitutional guarantee.   On August 3, 2015, the Commonwealth's public development bank (the GDB) failed to make a scheduled principal payment of approximately $58 million on bonds issued by the Public Finance Corporation ("PFC").[55]  GDB President Melba Acosta Febo explained that this default was "[d]ue to the lack of appropriated funds for this fiscal year" and was "a decision that reflects the serious concerns about the Commonwealth's liquidity."[56]  Two additional payments to the PFC's bondholders— due on September 1, 2015 and October 1, 2015—were also missed.[57]  In his written testimony submitted yesterday to the U.S. Senate Judiciary Committee, Governor Garcia Padilla indicated

---

[53] GDB President Melba Acosta Febo, Written Testimony to the U.S. Senate Committee on Finance, *Financial and Economic Challenges in Puerto Rico* (Sep. 29, 2015), http://www.finance.senate.gov/imo/media/doc/Melba%20Acosta-Febo%20U.S.%20Senate %20Testimony%29-29-2015%20(Final%20with%20exhibits).pdf. In her testimony, President Acosta Febo noted that "the situation in Puerto Rico has passed the tipping point" and she, too, requested Congressional intervention to permit Puerto Rico to undertake a Chapter 9-like process to restructure its debts.

[54] *Governor's Testimony to the Judiciary Committee*, *supra* note 35, at 1.

[55] Mary Williams Walsh, *Puerto Rico Defaults on Bond Payment*, N.Y. TIMES DEALBOOK, Aug. 3, 2015, http://www.nytimes.com/2015/08/04/business/dealbook/puerto-rico-decides-to-skip-bond-payment.html?nytmobile=0.

[56] GDB Press Release, Statement from Government Development Bank President Maria Acosta Febo on the Service of Public Finance Corporation (PFC) Bonds (Aug. 3, 2015), http://www.gdb-pur.com/documents/GDBStatementonPaymentofPFCBonds080315.pdf.

that the Commonwealth would continue to default on additional bonds not backed by a constitutional guarantee: "In light of the rapidly deteriorating revenue situation . . . I ordered the 'clawback' of revenues assigned to certain instrumentalities of the Commonwealth for the repayment of their debts. Together these instrumentalities have approximately $7 billion in bonds outstanding. In simple terms, we have begun to default on our debt . . . ."[58]  After the Governor's testimony, *The New York Times* reported that these additional defaults will occur on January 1, 2016, and will involve "highway bonds; bonds sold for general infrastructure, which are backed by a rum tax; and bonds that financed a convention center."[59]

63.     So far, Puerto Rico has avoided default on its so-called "General Obligation" bonds, which are guaranteed by the Puerto Rican Constitution.[60]   Puerto Rico has avoided this default at the cost of not paying tax refunds (among other measures).  However, the Governor and his advisors warn that even the General Obligation bonds may be at risk of non-payment. "The Working Group's projections suggest the Commonwealth cannot meet all of its debt service requirements as currently scheduled and must restructure its liabilities."[61]   "[A]vailable resources may be insufficient to service all principal and interest on debt that has a constitutional priority."[62]  Dr. Krueger agrees with the Working Group: "[T]he central government faces huge financing gaps even *with* substantial adjustment efforts.  There are limits to how much more

---

[57] Dawn Giel, *Puerto Rico Ends Talks with Bondholders as Deadline Looms*, CNBC.com (Oct. 21, 2015), http://www.cnbc.com/2015/10/21/puerto-rico-ends-talks-with-bondholders-as-deadline-looms.html.

[58] *Governor's Testimony to the Judiciary Committee*, *supra* note 35, at 2.

[59] Mary Williams Marsh, *Puerto Rico Begins Choosing Which Debt Payments to Make*, N.Y. TIMES DEALBOOK, Dec. 1, 2015, http://www.nytimes.com/2015/12/02/business/dealbook/puerto-rico-government-debt-bond-payment.html?_r=0.

[60] Constitution of Puerto Rico, art. VI, § 8.  These bondholders "shall first be paid" whenever the "available revenues" are "insufficient."  *Id.*

[61] *Working Group Plan*, *supra* note 38, at 64.

expenditures can be cut or taxes raised."[63]   In September, Governor García Padilla warned that "[t]he massive public debt of Puerto Rico is an impediment to growth.  It is time for the creditors to come to the table and share the burden of the sacrifices."[64]   On December 1, 2015, the Governor warned again that unless Congress granted new legal authority to restructure the General Obligation bonds, the Commonwealth faced a "very long and chaotic process."[65]

64.    In addition to "delayed" tax refunds and missed bond payments, the Commonwealth has also sought to avoid even court-ordered payments to its creditors.  In *Rio Grande Community Health Center, Inc. v. Armendariz*, a federal district court entered an order requiring the Commonwealth to pay $9.4 million owed to federal qualified health centers under Medicaid.  Puerto Rico sought to dissolve this order, contending to the First Circuit that "the Commonwealth's fiscal situation has deteriorated to an alarming level," that a downgrade in its credit ratings has adversely affected its "liquidity and ability to borrow," and that it "may be unable to honor all of its obligations as they come due."  *Rio Grande Cmty Health Ctr., Inc. v. Armendariz*, Case No. 15-1745, Defendant's Urgent Petition for Stay And/Or For Preliminary Injunction Pending Appeal, at 20-23 (1st Cir. June 23, 2015). The Commonwealth's financial circumstances are, in its appellate counsel's words, "very delicate," "precarious," and "dire."  *Id.* Though the First Circuit denied the relief sought, its opinion "acknowledge[d] the extreme financial distress in which the Commonwealth finds itself."  *Rio Grande Cmty. Health Ctr., Inc. v. Armendariz*, 792 F.3d 229, 232 (1st Cir. 2015).

---

[62] *Id.* at 65.
[63] *Krueger Report*, *supra* note 42, at 25.
[64] *Governor's Working Group Press Release*, *supra* note 12, at 2.
[65] *Governor's Testimony to the Judiciary Committee*, *supra* note 35, at 2.

65.     To sum up:  Numerous public statements—by Puerto Rico's Governor, by his Working Group, by the GDB, by the Commonwealth's outside advisors, and by its appellate counsel in briefing to the First Circuit—all demonstrate that there are concrete and substantial uncertainties regarding Wal-Mart PR's ability to ultimately collect the enormous refunds to which it would be entitled, if Wal-Mart PR were forced to seek refunds of the unconstitutional taxes through the Commonwealth's lengthy administrative and judicial refund processes.

66.     Because of the vast sum of money at issue and because of the uncertainty of the Commonwealth courts' willingness to order—and the Commonwealth's ability to pay—a refund of that enormous sum at the end of the lengthy post-payment litigation process, the Commonwealth's refund process is not a "plain, speedy, and efficient" remedy under the unique circumstances of this case.   Only prompt federal adjudication can prevent potentially irremediable harm to Wal-Mart PR.  This Court should retain and exercise federal jurisdiction over this federal constitutional and statutory challenge.

### CAUSES OF ACTION

### Count I - Violation of the Commerce Clause of
### Article I, Section 8 of the U.S. Constitution

67.     Wal-Mart PR hereby incorporates the allegations set forth above, all of which are fully re-alleged here.

68.     The Commerce Clause of the U.S. Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3. That affirmative grant of power to Congress also limits the power of state, territorial, and local governments to pass legislation affecting interstate commerce.

69.     The Commerce Clause prohibits state laws that discriminate against interstate commerce and engage in economic protectionism, i.e., measures designed to benefit local

economic interests by burdening out-of-state competitors. *See, e.g., W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201-02 (1994). "[A] law is discriminatory if it taxes a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 99 (1994) (internal alterations and quotation marks omitted). Even state taxes that are not facially discriminatory, but instead have either a discriminatory purpose or discriminatory effect, are presumptively unconstitutional. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984). A tax discriminates against interstate commerce if it creates the risk of double taxation of interstate acts but not intrastate acts. *Comptroller of Treasury of Maryland v. Wynne*, 135 S. Ct. 1787, 1795 (2015) (Maryland income tax violated Commerce Clause because it "might have resulted in the double taxation of income earned out of the State" and therefore "discriminated in favor of intrastate over interstate economic activity").

70.     Puerto Rico's AMT, by its very nature, discriminates against interstate commerce. The AMT is assessed only on purchases of goods and services from related entities located outside of Puerto Rico. By contrast, the AMT specifically exempts purchases from related entities that are located inside Puerto Rico. The legislative history of Act 72 demonstrates that this discriminatory effect was expressly contemplated by, and indeed, was the goal of, the Puerto Rico Legislature. The AMT is thus unconstitutional under the Commerce Clause.

71.     Defendant Zaragoza-Gómez enforces the AMT under color of Puerto Rican law and is therefore susceptible to relief under 42 U.S.C. § 1983 for violation of Wal-Mart PR's rights under the Commerce Clause.

## Count II - Violation of the Federal Relations Act, 48 U.S.C. § 741a

72.     Wal-Mart PR hereby incorporates the allegations set forth above, all of which are fully re-alleged here.

73.     Pursuant to Section 3 of the Federal Relations Act, "no discrimination [may] be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico."  The analysis under the Federal Relations Act is similar to the Commerce Clause analysis.  *See San Juan Trading Co. v. Sancho*, 114 F.2d 969, 974 (1st Cir. 1940).

74.     The AMT by its very nature discriminates against interstate commerce.  The AMT is assessed only on purchases of goods and services from related entities located outside of Puerto Rico.  By contrast, the AMT specifically exempts purchases from related entities that are located inside Puerto Rico.  The legislative history of Act 72 demonstrates that this discriminatory effect was expressly contemplated by, and indeed, was the goal of, the Puerto Rico Legislature.  Therefore, the AMT violates the Federal Relations Act.

75.     Defendant Zaragoza-Gómez enforces the AMT under color of Puerto Rican law and is therefore susceptible to relief under 42 U.S.C. § 1983 for violation of Wal-Mart PR's rights under the Federal Relations Act.

## Count III - Violation of the Equal Protection Clause of the
## Fifth and Fourteenth Amendments to the U.S. Constitution

76.     Wal-Mart PR hereby incorporates the allegations set forth above, all of which are fully re-alleged here.

77.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  This Clause is made applicable to the

Federal Government through the Due Process Clause of the Fifth Amendment.  U.S. Const. amend. V; *see Bolling v. Sharpe*, 347 U.S. 497 (1954).

78.    As the Supreme Court has held, "arbitrary and irrational discrimination violates the Equal Protection Clause under even [the] most deferential standard of review." *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988).  Indeed, providing "a shield against arbitrary classifications" is the "core concern" of the Equal Protection Clause. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 598 (2008).  The Supreme Court has recognized that states and localities violate the Equal Protection Clause when they use tax laws to "benefit domestic industry within the State . . . by grossly discriminating against foreign competitors."  *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 879 (1985).

79.    The AMT expressly benefits entities that are engaged in a trade or business exclusively located in Puerto Rico; the AMT discriminates against interstate corporations that are based outside of Puerto Rico.  The AMT is applied only on the purchases of goods and services purchased from related entities outside Puerto Rico.  Similar purchases, from entities located in Puerto Rico, are exempt from the tax.  This violates the Equal Protection Clause.

80.    Defendant Zaragoza-Gómez enforces the AMT under color of Puerto Rican law and is therefore susceptible to relief under 42 U.S.C. § 1983 for violation of Wal-Mart PR's rights under the Equal Protection Clause.

### Count IV - Violation of the Bill of Attainder Clauses of Article I, Section 9 and Section 10 of the U.S. Constitution

81.    Wal-Mart PR hereby incorporates the allegations set forth above, all of which are fully re-alleged here.

82.    The Bill of Attainder Clauses prohibit the federal government and state governments from passing bills of attainder.  U.S. Const. art. I, sec. 9, cl. 3; U.S. Const. art. I,

sec. 10, cl. 1.   In contemporary usage, the Bill of Attainder Clauses prohibit any "law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial."   *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 846–47 (1984).   That is, the Supreme Court has identified three elements of an unconstitutional bill of attainder: (1) "specification of the affected persons," (2) "punishment," and (3) "lack of a judicial trial."   *Id.* at 847.

83.     In purpose and effect, Act 72 has specified Wal-Mart as the sole taxpayer in the highest 6.5% tax bracket of the Tangible Property Component of the AMT.   Act 72 has further punished Wal-Mart PR for the presumed offense of "tax evasion," as alleged by Defendant Zaragoza-Gómez and GDB President Acosta in their letters to and testimony before the Legislature.   The size of the confiscation also indicates that its purpose is to punish, rather than to tax—a 91.5% effective income tax rate exceeds the bounds of reasonable taxation, and instead serves as punishment.   Far from providing anything like a "judicial trial" for this charge, Act 72 has done just the opposite, and has eliminated the one procedure that previously existed for a taxpayer to seek a waiver from the Tangible Property Component.

84.     Defendant Zaragoza-Gómez enforces the AMT under color of Puerto Rican law and is therefore susceptible to relief under 42 U.S.C. § 1983 for violation of Wal-Mart PR's rights under the Bill of Attainder Clause.

**Prayer for Relief**

WHEREFORE, Wal-Mart PR prays for judgment as follows:

A.     For a declaratory judgment that the AMT is unconstitutional and contrary to 47 U.S.C. § 741a.

B.     For an injunction against the enforcement of the AMT.

C.      For an award of attorneys' fees and court costs; and

D.      For all other relief to which Wal-Mart PR is justly entitled.

DATED: December 4, 2015                    Respectfully submitted,

                                           By:   s/Neal Manne
                                           Neal Manne (TX Bar No. 12937980)*
                                           Joseph S. Grinstein (TX Bar No. 24002188)*
                                           Vikram Swaruup (CA Bar No. 290869)*
                                           SUSMAN GODFREY LLP
                                           1000 Louisiana Street, Suite 5100
                                           Houston, Texas 77002
                                           Telephone:  (713) 651-9366
                                           Facsimile:  (713) 654-6666
                                           nmanne@susmangodfrey.com
                                           jgrinstein@susmangodfrey.com
                                           vswaruup@susmangodfrey.com

                                           Shawn Rabin (NY Bar No. 4814224)*
                                           Steven M. Shepard (NY Bar No. 5291232)*
                                           SUSMAN GODFREY LLP
                                           560 Lexington Avenue, Fifteenth Floor
                                           New York, New York 10022-6828
                                           Telephone: (212) 336-8330
                                           Facsimile: (212) 336-8340
                                           srabin@susmangodfrey.com
                                           sshepard@susmangodfrey.com

                                           By:   s/Juan A. Marqués-Díaz
                                           Juan A. Marqués-Díaz (USDC-PR No. 211803)
                                           Francisco G. Bruno (USDC-PR No. 117011)
                                           McCONNELL VALDÉS LLC
                                           PO Box 364225
                                           San Juan, Puerto Rico 00936-4225
                                           Telephone: (787) 250-2619/5608
                                           Fax: (787) 759-2772/620-8325

                                           * Motion for admission *pro hac vice* to be filed