1   UNITED STATES DISTRICT COURT
2   DISTRICT OF PUERTO RICO
3
4

WAL-MART PUERTO RICO, INC.,

    Plaintiff,

    v.

JUAN C. ZARAGOZA-GOMEZ, in his official
capacity as Secretary of the Treasury of the
Commonwealth of Puerto Rico,

    Defendant.

Civil No. 3:15-CV-03018 (JAF)

5
6   **OPINION AND ORDER**

7       The Commonwealth of Puerto Rico ("the Commonwealth" or "Puerto Rico") is

8   insolvent and no longer able to pay its debts as they become due.  The Treasury Single

9   Account, which functions as the Commonwealth's main operating account, will reach an

10  almost $1 billion negative balance by the end of June 2016.  The local Commissioner of

11  Financial Institutions has found that the Government Development Bank of Puerto Rico is

12  insolvent, too, which means that it may need to enter receivership.  The Puerto Rico Treasury

13  Department harbors significant doubt about the Commonwealth's very ability to persist as a

14  going concern.  And, in response to this dire situation, Puerto Rico has enacted laws and

15  regulations that effectively ensure that a large taxpayer, if forced to challenge a patently

16  unconstitutional tax by first paying it and then suing for a refund worth several tens of

17  millions of dollars, will not see the full refund for decades, if at all.

18       It gives us no pleasure, under these circumstances, to enjoin a revenue stream that

19  flows directly into Puerto Rico's general fisc.  For we, too, are citizens of this island, and we,

20  too, must suffer the consequences of the financial disarray on the horizon.  But, we are in this

1   position precisely because the Commonwealth's insolvency has left the plaintiff, Wal-Mart

2   Puerto Rico, Inc. ("Wal-Mart PR"), with nowhere else to turn.  Now that we are here, we

3   cannot shield ourselves from what we have learned, but must rule on the issues presented and

4   order the relief required by law.  In doing this, we agree wholeheartedly with the conclusion

5   reached by one of the expert witnesses at the hearing we held: "[A]t the end of the day, the

6   Commonwealth should not rely on revenue that it's not entitled to, to try to pay for essential

7   services."  (ECF No. 130 at 60.)

8          Wal-Mart PR is the largest private employer in the Commonwealth.  Comprised of

9   Walmart Supercenters, Walmart Discount Stores, Supermercados Amigo, Sam's Clubs, and,

10  until earlier this year, Super Ahorros, Wal-Mart PR currently operates forty-eight stores on

11  the island, employing around 14,300 local residents.[1]  Each employee of a Wal-Mart PR

12  store receives a minimum wage of at least $10 per hour, $2.75 higher than the minimum

13  wage set by law in Puerto Rico.  Wal-Mart PR sells around $3 billion of merchandise each

14  year and remits more sales tax to the Commonwealth than any other retailer.  It buys around

15  $1.6 billion of inventory from local vendors and suppliers each year.  It also buys over $700

16  million of inventory from its parent company, Wal-Mart Stores, Inc., and related affiliates in

17  the continental United States (jointly, "Wal-Mart Stores").  The Puerto Rico Treasury

18  Department ("Treasury") neither believes, nor suspects, that Wal-Mart PR uses these related-

19  party purchases to shift income or profit off of the island to avoid payment of Puerto Rico

20  income tax.  In fact, Wal-Mart PR regularly pays around $20 million in income tax each year

21  and is now paying more than $40 million.

---

[1] In January 2016, Wal-Mart PR closed four Supermercados Amigo and all three Super Ahorros in Puerto Rico due to their lack of profitability and bleak financial projections.  (ECF No. 126 at 34-35.)

1    Defendant Juan C. Zaragoza-Gómez ("Zaragoza") is the Puerto Rico Secretary of the

2    Treasury ("the Secretary").  Shortly after his appointment to Treasury in late 2014, he wrote

3    a letter to Rafael Hernández-Montañez ("Hernández"), Member of the Puerto Rico House of

4    Representatives and President of its Treasury and Budget Commission, advising the

5    Legislature to modify the Commonwealth's minimum alternative corporate income tax ("the

6    AMT") to "minimize its impact."  (Pl. Ex. 13 at 21.)  In the letter, dated February 18, 2015,

7    the Secretary acknowledged that the AMT's "purpose" at the time was to recapture some of

8    the income that certain "multi-national chains doing business in Puerto Rico" were suspected

9    of exporting off the island by purchasing goods and services from "related entities" at such a

10   high price that these chains "report year after year net operating losses in their subsidiaries or

11   branches in Puerto Rico, even though their sales in Puerto Rico exceed the sales in other

12   countries."  (Pl. Ex. 13 at 22.)  To make the AMT more accurately reflect the "fair portion of

13   the taxes" that these chains were allegedly "evad[ing]," Zaragoza wrote that the Legislature

14   needed to cut by 25% the 2% flat tax on interstate transfers of tangible property between

15   related companies or different offices of the same company and to eliminate the 20% flat tax

16   on expenses for interstate services between the same.[2]  (Pl. Ex. 13 at 2, 23.)

17        The Legislature had other plans, however, because Puerto Rico needed to raise $125

18   million in new revenue quickly to close a budget gap.  Treasury, under Secretary Zaragoza,

19   who did not agree with the Legislature's plan, was tasked with developing an amendment to

---

[2] The AMT is codified at 13 L.P.R.A. § 30073, and its tangible-property tax and its expenses tax are located in subsections (b)(2)(B) and (b)(2)(A), respectively, of that statute.  The most recent official English translation of the statute is found in the 2014 Cumulative Pocket Supplement for the 2013 volume of Title 13 of *Laws of Puerto Rico*.  Because this case involves the statute as it exists today, the parties agreed that the certified English translation in evidence as Plaintiff's Exhibit 77, and in the docket as ECF No. 100-3, represents a complete, accurate, and up-to-date translation of the statute.  (*See* ECF No. 130 at 198-99.)  This certified translation, however, does not refer to the statute as 13 L.P.R.A. § 30073, but by its original, pre-codification title, Section 1022.03 of the Puerto Rico Internal Revenue Code of 2011.

1    the AMT that would raise the necessary revenue.  After crunching the numbers, Treasury

2    proposed new graduated rates for the AMT's tangible-property tax – whose new top rate of

3    6.5%, a 325% increase, was designed to capture Wal-Mart PR, the biggest fish in the pond –

4    and also the elimination of a provision that had allowed the Secretary to exempt a tangible-

5    property transfer from the tax upon proof that the transfer price was equal or similar to the

6    price paid in an arm's-length transaction between unrelated parties.  These amendments to

7    the AMT were briskly enacted into law – the entire process, from introduction of the bill to

8    signing into law, took only twelve days – in May 2015 as part of Act 72 of 2015 ("Act 72").

9           Due to a pre-Act 72 statutory exemption, the tangible-property tax applies only to

10   multistate corporations and their local affiliates when they engage in an interstate transaction

11   with an out-of-state home office or related entity.  Under the old 2% rate, the AMT did not

12   cause Wal-Mart PR much concern.  But, under the new 6.5% rate, the AMT now taxes and,

13   for the foreseeable future, will tax Wal-Mart PR far more than it earns in net taxable income.

14   After all, each piece of inventory that Wal-Mart PR receives from Wal-Mart Stores will now

15   be taxed at 6.5%.  The tax applies even if Wal-Mart PR is unable to sell the inventory or ends

16   up selling it at a loss.  Already, for the tax year that ended on January 15, 2016, Wal-Mart PR

17   has paid more than $40 million in estimated income tax to Puerto Rico, around $30 million

18   of which is attributable to the newly-muscular AMT.

19          On December 4, 2015, Wal-Mart PR commenced this action by filing a complaint

20   against Secretary Zaragoza, in his official capacity, seeking, under 42 U.S.C. § 1983, an

21   injunction against continued enforcement of the AMT and a declaration that the AMT is

22   unlawful under the dormant Commerce Clause, the Equal Protection Clause, and the Bill of

23   Attainder Clauses of the United States Constitution, and also under the Federal Relations

1    Act, 48 U.S.C. § 741a.[3]  (ECF No. 1.)  Wal-Mart PR invokes our subject-matter jurisdiction

2    pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  (ECF No. 1 ¶ 10.)

3            A major preliminary issue in this case is whether we even have jurisdiction to hear it.

4    The Secretary insists that Wal-Mart PR must pay the tax and continue paying it, may pursue

5    a refund of the tax before the Treasury Department, which the parties agree would be denied,

6    and then may pursue its legal claims upon appealing the denial of its refund to local courts.

7    That is true, so long as the tax-refund procedure will afford Wal-Mart PR a plain, speedy,

8    and efficient remedy.  It will, the Secretary contends, even if Wal-Mart PR will never see its

9    money again because Puerto Rico is too broke to pay it back.  All that matters, the Secretary

10   argues, is that Wal-Mart PR will eventually receive judicial review of its legal challenges and

11   a court judgment declaring whether the tax is unlawful and should not be paid.  Consider that

12   argument for a second.  As we will see, and as the Secretary well knows, each financial

13   quarter that the AMT remains in effect will result in the remittance of over $40 million in

14   unconstitutional taxes (at least $10 million of which will be from Wal-Mart PR) to an

15   insolvent government, without any hope that the victimized taxpayers will be reimbursed in

16   the foreseeable future.  That is the very definition of an inadequate remedy.

---

[3] 42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . ."  "Corporations," like Wal-Mart PR, "are persons whose rights are protected by 42 U.S.C. § 1983."  *Des Vergnes* v. *Seekonk Water Dist.*, 601 F.2d 9, 16 (1st Cir. 1979) (citing cases); *see also Asociacion de Subscripcion Conjunta del Seguro de Responsabilidad Obligatorio* v. *Flores-Galarza*, 484 F.3d 1, 20 (1st Cir. 2007).  "For the purposes of section 1983, Puerto Rico enjoys the functional equivalent of statehood, and thus the term state law includes Puerto Rico law."  *Estades-Negroni* v. *CPC Hosp. San Juan Capestrano*, 412 F.3d 1, 4 (1st Cir. 2005); *see also Playboy Enters.* v. *Public Serv. Comm'n*, 906 F.2d 25, 31 n.8 (1st Cir. 1990) (holding that § 1983 actions against Puerto Rico officials are not precluded by *Ngiraingas* v. *Sanchez*, 495 U.S. 182 (1990), so long as the plaintiffs do not seek monetary damages).

1                                                   **I.**

2                                        **Findings of Fact**

3          From February 2 to 5, 2016, the court held an evidentiary hearing on whether we have

4    subject-matter jurisdiction to hear the case and whether the AMT is valid under federal law.

5    We expedited the hearing due to the urgency expressed by the parties and in keeping with

6    Federal Rule of Civil Procedure 57.   The transcript of the hearing is in the docket as ECF

7    Numbers 126 through 131.   Pursuant to Federal Rule of Civil Procedure 52(a)(1), these are

8    our findings of fact:

9    **A.      The Financial Status of the Commonwealth**

10         The Commonwealth of Puerto Rico is insolvent and unable to pay its debts as they

11   become due.   This, no one can doubt.   Although the Secretary refused to stipulate to the

12   Commonwealth's insolvency (ECF No, 126 at 148), the ineluctable fact that Puerto Rico is,

13   and will be, insolvent has permeated this entire litigation.   It speaks volumes that the

14   Secretary was unable to present any credible evidence to gainsay the overwhelming proof of

15   insolvency produced at the hearing.   Not a single witness even attempted to argue that the

16   Commonwealth can still pay its debts.   By the end of the hearing, the Secretary was reduced

17   to arguing that federal law requires Puerto Rico taxpayers to challenge a local tax law by

18   means of a tax-refund action "even if there is zero money to pay [them] back" at the end of

19   the process.  (ECF No. 131 at 117.)

20         The Commonwealth's debt obligations are said exceed $70 billion, an amount so

21   large that it surpasses the island's gross national product, but the exact size of the debt is not

22   publicly known because Puerto Rico has not released any audited financial statements since

23   those for Fiscal Year 2013.  (ECF Nos. 128 at 64-65, 130 at 15; Pl. Ex. 24 at 4.)  Although

1    information about the magnitude of the public debt is closely held, it is no secret that Puerto

2    Rico has already started to default on its debt.  Secretary Zaragoza admits it. (ECF No. 129 at

3    99.)  Melba Acosta-Febo ("Acosta-Febo"), President of the Government Development Bank

4    and Zaragoza's immediate predecessor as Treasury Secretary, admits it as well, specifying

5    that the Commonwealth defaulted on its debt once last fall and again at the beginning of the

6    year.  (ECF No. 126 at 124-25.)   United States Treasury Secretary Jacob J. Lew recently

7    observed that Puerto Rico "is shifting funds from one creditor to pay another and has stopped

8    payment altogether on several of its debts."  (Pl. Ex. 17 at 1.)  So far, the Commonwealth has

9    defaulted on almost $100 million of debt.  (ECF No. 130 at 34.)   The court agrees with

10   Martha Kopacz, plaintiff's expert witness "on the current and prospective financial condition

11   of the Commonwealth of Puerto Rico, including its ability to pay obligations in the future,"

12   that the mere fact that the Commonwealth did not make those debt payments is proof of its

13   "illiquidity" and its inability to "pay its debt as it becomes due."  (ECF No. 130 at 10, 35.)

14   That inability is what government insolvency is.  (ECF No. 130 at 12.)

15        The record shows that, unless the Commonwealth can restructure its debt soon, its

16   defaults will continue, growing ever more severe.  Secretary Zaragoza declared that, as a

17   matter of basic arithmetic, the Commonwealth will default later this year on its general-

18   obligation bonds despite their guaranteed priority over all other government debts under

19   Article VI, Section 8, of the Puerto Rico Constitution.  (ECF No. 130 at 100.)  This looming

20   default will occur for certain because, despite all the "extreme cash preservation measures"

21   that the government has undertaken in recent years, the Commonwealth will run out of cash

22   completely by June 30, 2016.  (ECF No. 130 at 104-05.)

1    The most conspicuous sign of Puerto Rico's ongoing insolvency are the guidelines

2    that the Puerto Rico Treasury established on December 27, 2015, pursuant to Administrative

3    Bulletin OE-2015-049, which the Governor of Puerto Rico had issued on December 8, 2015.

4    (Pl. Ex. 18.)   The Bulletin mandates the promulgation of guidelines, prioritizing certain

5    government-payment obligations over others, "to manage the cash flow and conduct the

6    disbursements of the funds available for the fiscal year."   (Pl. Ex. 18 at 6-7.)   Under

7    Treasury's guidelines, there are seven levels of priority for the disbursement of funds: 1)

8    public-debt payments guaranteed top priority under the Puerto Rico Constitution; 2) court

9    judgments related to the expropriation of real property for which a budgetary appropriation

10   has already been made; 3) provision of essential services for public health, safety, education,

11   and public welfare; 4) payroll and pension expenses; 5) income belonging to external

12   entities; 6) any expense already in the budget "necessary to guarantee the operation,

13   continuity and stability of the central government of the Commonwealth"; and 7) responses

14   to a natural disaster or other emergency situation.  (Pl. Ex. 76 at 2-3.)

15   It is uncontested that the first four and final two levels of payment priority do not give

16   any priority to a court judgment ordering the Commonwealth to pay a tax refund.  (ECF

17   Nos. 126 at 158-161; 128 at 45-49.)   It has been suggested that the fifth level of priority

18   could be construed to cover such a judgment, but the most that has been said in favor of that

19   position was that lawyers at the local Justice and Treasury Departments should "give . . . an

20   opinion" about whether that construction is correct.  (ECF Nos. 126 at 161, 128 at 49.)  The

21   court finds that these Treasury guidelines do not bestow any priority to the payment of tax

22   refunds, whether court ordered or not.

1    Under these guidelines, to receive any funds from Treasury, an "Agency Head or his

2    authorized representative" must prioritize their requests, submit only those requests that are

3    truly critical and essential, describe "the reasons for the urgency of the disbursements," and

4    certify, under penalty of perjury, that "the reason for the urgency established is personally

5    known" to the requester and that "the disbursements requested are necessary to guarantee the

6    operation, continuity and stability of the Agency."  (Pl. Exs. 76 at 5-6; 106.)  It is difficult to

7    see how an agency head could certify that paying a tax-refund judgment satisfies the above

8    criteria.  In any event, the court agrees with Kopacz, the insolvency expert, that executive

9    actions like these establish that the Commonwealth "is insolvent, because if you had enough

10   money to pay your debts as they became due, you wouldn't have to sit down and really think

11   about what [you are] going to pay, [and] what [you are] not going to pay."  (ECF No. 130 at

12   37-38.)  Treasury confirms that, due to its "extremely limited" liquidity, "the Commonwealth

13   has not been able to meet all its obligations [i]n a timely manner, and has been prioritizing

14   payments relating to essential government services and payroll."  (Pl. Ex. 9 at 4.)

15   According to Puerto Rico Assistant Secretary of the Treasury Yaimé Rullán, who

16   oversees the evaluation of disbursement requests under the new guidelines, Treasury does

17   not have enough cash on hand to grant each request.  (ECF No. 128 at 39-40, 47.)  Even

18   urgent requests that agency heads swear, under penalty of perjury, are necessary to the

19   operation, continuity, and stability of the Commonwealth are routinely denied.  When a

20   disbursement request is granted, the check is sometimes placed in a vault at Treasury and

21   kept there for months, instead of being delivered to the payee.  (ECF No. 128 at 42.)  By

22   warehousing government checks in this manner, Treasury is able to claim payment of those

23   obligations without negatively affecting – i.e., without having any funds deducted from – its

1   accounts.   (ECF No. 128 at 44.)   These facts not only prove the insolvency of the

2   Commonwealth, but the unusual measures it is taking to sustain its liquidity artificially.

3          When Assistant Secretary Rullán approves a disbursement request, the funds are

4   withdrawn from the Treasury Single Account ("the Account"), which serves as the general

5   fisc and principal operating account for Puerto Rico.  (ECF Nos. 126 at 137-38; 128 at 35,

6   40; 129 at 22; 130 at 104.)  When a taxpayer pays its taxes, the funds go directly into the

7   Account and are not segregated into another account, even when paid under protest.  (ECF

8   No. 130 at 105.)   According to Iliana Molina, the Treasury official who supervises the

9   reconciliation of the Account's book and bank balances, the Account is used for government

10  obligations of all kinds, including payment of the government's debt, payroll, pensions,

11  contracts, and every refund owed to a Puerto Rico taxpayer.  (ECF No. 128 at 25-26.)

12         When Secretary Zaragoza testified that the Commonwealth is going to run out of

13  money in June 2016, his statement was based on the Account's future bank balance.  (*See*

14  ECF No. 130 at 100-05.)  On December 31, 2015, the Account had a final bank balance of

15  only $66 million, significantly below its highest 2015 balance of $195 million, reached in

16  January, and slightly below its average 2015 balance of $67.7 million.  (ECF No. 128 at 27,

17  31; Pl. Ex. 15 at 8.)  The Account's lowest 2015 bank balance was a mere $13 million at the

18  end of June.  (ECF No. 128 at 30.)  We agree with Conway MacKenzie, the consultancy

19  hired by the Government Development Bank to perform a liquidity analysis of the Puerto

20  Rico government, that the Account's balances are "very low," especially for "the primary

21  concentration account of the Treasury," which routinely "exceeds $18.0 billion of inflows

22  and outflows" each year.  (Pl. Ex. 38 at 2, 6.)  In light of the notoriously unpredictable

1   nature, in terms of timing and fluctuation, of the inflows and outflows of a large government,

2   these bank balances are vanishingly thin.  (*See* Pl. Ex. 15 at 4.)

3       The Account's positive balances of only tens of millions of dollars are not only

4   miniscule, but illusory.  At the end of December 2015, the book balance of the Account,

5   which is more accurate than its bank balance because it takes into consideration the negative

6   float of checks in transit that have not yet been cashed, was negative $263 million – a

7   staggering difference of $329 million.[4]  (ECF No. 130 at 105; see also Pl. Ex. 15 at 8, 9 n.1.)

8   Puerto Rico was able to claim that the Account had a fictitious year-end balance of $66

9   million not only by ignoring checks in transit, but by undertaking a series of "extraordinary

10  and unsustainable liquidity measures," which preserve the appearance of liquidity for a short

11  while.  (Pl. Ex. 15 at 8-9.)  Without those measures, the bank balance of the Account at the

12  end of 2015 would have been negative $1.478 billion.  (Pl. Ex. 15 at 9.)  In other words, if

13  the Commonwealth had not undertaken those extraordinary liquidity measures, the Puerto

14  Rico government would have shut down completely by now.

15      In a January 18, 2016, report, the Working Group for the Fiscal and Economic

16  Recovery of Puerto Rico ("Working Group"), which the Governor of Puerto Rico formed by

17  executive order in 2015, documented just what these unsustainable liquidity measures are.

18  (ECF No. 130 at 19-21.)  For starters, the government has been cannibalizing itself at an

19  astonishing rate.  Puerto Rico recently borrowed $400 million from its proprietary (and, thus,

20  captive) state insurance companies and workers compensation funds, with repayment dates

21  rapidly approaching in May and June 2016.  (Pl. Exs. 15 at 7, 38 at 14.)  The government has

---

[4] This negative $263-million book balance accounts for, among other things, those Treasury disbursement checks drafted to cover a debt, but then placed in a vault at Treasury, instead of delivered to their payee, as Assistant Secretary Rullán testified is sometimes done.  (ECF No. 128 at 44.)

1    withheld $309 million in appropriations from public entities like the University of Puerto

2    Rico and the Highway and Transportation Authority.   (Pl. Ex. 15 at 7-8.)   Puerto Rico

3    "clawed back" around $163 million from the accounts of its agencies, but then immediately

4    spent it on a January 2016 public-debt obligation.   Moreover, as Antonio Weiss, Counselor

5    to Secretary Lew, noted in recent testimony before Congress, although "the Commonwealth

6    has a $46 billion pension liability funded by only $2 billion in net assets, the lowest level of

7    any major pension system in the country," these "assets, already severely depleted, are being

8    sold to fund government operations."   Testimony of Counselor Weiss, House Committee on

9    Natural   Resources   on   the   Fiscal   Crisis   in   Puerto   Rico   (Feb.   25,   2016),

10   https://www.treasury.gov/press-center/press-releases/Pages/jl0364.aspx. (*See* Pl. Ex. 15 at 7.)

11   It is evident that the government has been running out of new public resources to consume.

12        The   depth   of   the   Commonwealth's   insolvency   can   perhaps   be   measured   by   the

13   shortsightedness   of   some   of   its   liquidity   measures.   Due   to   the   connection   between   the

14   Commonwealth's timely payment of its general-obligation bond debt, which is backed by the

15   full faith and credit of the government, and its future access to bond markets, it would seem

16   natural   to   protect,   as   long   as   possible,   Puerto   Rico's   ability   to   pay   that   debt.   We   have

17   already passed that point.   The Commonwealth used to set aside $93.1 million each month

18   into a segregated account, so that there would be sufficient money to cover its semiannual

19   payments of matured general-obligation bonds.   Puerto Rico then enacted a law to halt those

20   set-asides, freeing up the $93.1 million per month to use on other bills and obligations in the

21   short term, while setting itself up for failure in the long term because the Commonwealth still

22   needs to make its general-obligation debt payments.   (ECF Nos. 126 at 135-37; 130 at 17-18;

23   Pl. Exs. 15 at 7, 38 at 14.)   Because it is no longer saving up enough money, Puerto Rico is

1   now projected to default on its June 2016 general-obligation bond payment of $700 million.

2   (ECF No. 130 at 18.)  That would mark the first step of a disorderly default.

3          The government has also extended its liquidity by declining to pay approximately

4   $330 million in taxpayer refunds.  (Pl. Ex. 15 at 7.)  In particular, the Commonwealth has

5   focused on withholding tax refunds to corporations.  Whereas, at the time of the hearing, the

6   Puerto Rico Treasury had refunded 45.1 percent of the money owed to individual taxpayers

7   from the 2014 tax year, Treasury had not yet issued a single refund to a corporation from that

8   year.  (Pl. Exs. 4, 5.)  Similarly, the government has been stretching its accounts payable to

9   vendors and suppliers by delaying payment to them by, on average, more than a quarter of a

10  year, resulting in a conservative estimate of more than $1.8 billion in outstanding liabilities at

11  the end of last year.  (Pl. Ex. 15 at 7 & n.5.)  The Working Group has cautioned that these

12  liquidity measures "have significantly increased the economic burden on taxpayers and third-

13  party suppliers" and that "continued stretching of payables will further jeopardize the

14  delivery of essential services [to the Puerto Rico government]."  (Pl. Ex. 15 at 9.)

15         These drastic liquidity measures, like check kiting, are onerous and unsustainable.

16  They are also no longer effective.  Absent a miracle, the bank balance of the Treasury Single

17  Account will plummet to negative $923 million in June 2016.  (Pl. Ex. 15 at 9.)  Secretary

18  Zaragoza agrees that Puerto Rico will run out of cash before the end of June.  (ECF No. 130

19  at 105.)  Zaragoza also confirmed that Treasury's projections about Puerto Rico's fiscal

20  health had to be downgraded in late 2015 to reflect that the Account will finish June 2016

21  with a negative balance of almost $1 billion.  (ECF No. 130 at 101-02.)  As Counselor Weiss

22  observed in his recent congressional testimony, the entire Puerto Rico government could be

23  forced to shut down at that time.

1     Puerto Rico's $1 billion deficit this year will occur despite an austerity budget of only

2     $9.8 billion in appropriations and a constitutional provision that requires that "[t]he

3     appropriations made for any fiscal year shall not exceed the total revenues, including

4     available surplus, estimated for said fiscal year."  P.R. Const., Art. VI, § 7; *see* ECF No. 130

5     at 123.   Over the next ten years, the size of this annual deficit is going to increase

6     dramatically.  The root of the problem, as President Acosta-Febo has stated, is the difficulty,

7     if not impossibility, of raising sufficient revenue from a contracting economy and a shrinking

8     population – at a rate of thousands of people emigrating each week – that is increasingly old,

9     jobless, and poor.  (Pl. Ex. 24 at 2-5.)  Without a first-world populace to pay for it, the

10    provision of first-world services and amenities becomes ever more infeasible.

11        In light of these economic and demographic changes, the Working Group projects

12    that the Commonwealth's cumulative financing gap will increase to $16.1 billion over the

13    next five years and to $23.9 billion over the next ten.  (Pl. Ex. 15 at 4.)  That projection is

14    highly conservative, however, because it assumes that the Commonwealth will succeed in

15    enacting a series of effective revenue-enhancing measures and that, by Fiscal Year 2022,

16    Puerto Rico's gross national product will reach "the long-term growth rate of the United

17    States" economy, even though Puerto Rico's "growth has been below that of the United

18    States since 2001."  (Pl. Ex. 15 at 6.)  Another analysis of the Commonwealth's budgetary

19    outlook, spearheaded by former World Bank Chief Economist Anne Krueger, estimates that,

20    without those optimistic assumptions, the Commonwealth will incur a cumulative financing

21    gap of $27.9 billion over the next five years and of $64.4 billion over the next ten.  (Pl. Ex.

22    22 at 15.)  The Working Group's own analysis largely agrees.  (Pl. Ex. 15 at 6.)  The Puerto

23    Rico Treasury, itself, projects that "annual deficits could range from $3.7 billion in fiscal

1    year 2016 to $8.2 billion in fiscal year 2025." (Pl. Ex. 9 at 9.)  The court credits these

2    projections and finds that the Commonwealth's structural budget deficits are projected to

3    worsen exponentially in the near future.

4           These structural budget deficits are crippling.  Even if the Commonwealth were to

5    win a respite from its public-debt payments, these exploding deficits, combined with the

6    government's lack of surplus, will keep the Commonwealth insolvent for years to come.

7    Puerto Rico has traditionally responded to its structural budget deficits by borrowing money

8    on the municipal bond market.  Even though Puerto Rico's economy did not begin to

9    contract until 2006, its public debt has risen every year since 2000, more than doubling in

10   size and leaving today's residents with a debt larger than our gross national product.  (Pl. Ex.

11   22 at 4, 9.)  Thus, for years, the Commonwealth took out new debt to pay its old debt.  (Pl.

12   Ex. 9 at 1.)  In fact, Puerto Rico's "expenses/expenditures [have] significantly exceed[ed] its

13   revenues in the nine year period [that] ended [on] June 30, 2014." (Pl. Ex. 9 at 6.)  Those

14   gravy days of debt financing are now over.  As Secretary Lew recently observed, "Puerto

15   Rico has been shut out of the municipal bond market for more than two years and ran out of

16   the funding sources traditionally used to finance government operations more than six

17   months ago." (Pl. Ex. 17 at 1.)

18          March 2014 was the last time that Puerto Rico was able to borrow a substantial sum

19   of money on the bond market.  The credit-rating agencies had just downgraded the

20   Commonwealth's municipal bonds to junk status.  As a result, Puerto Rico's issuance that

21   month of $3.5 billion in general-obligation bonds earned the dubious distinction of being the

22   largest municipal junk-bond offering in United States history.  (ECF No. 130 at 31.)  At the

23   time, the bonds were priced to yield an 8.75% return on a tax-exempt basis, which was,

1    Kopacz noted, "a really, really high interest rate when the rest of the market [was] down at

2    one [or] two percent."  (ECF No. 130 at 31.)  Since then, the value of the bonds has only

3    dropped, and they are now trading at a yield of 11.75%.  (ECF No. 130 at 32.)  It would be

4    economic suicide for the government to capitalize itself at such unfavorable rates.

5          When other sources of funding have run dry, the Commonwealth can usually turn to

6    the Government Development Bank ("the Bank") for assistance.  Under its charter, one of

7    the main "purposes" of the Bank is "[t]o lend money, with or without security, to the

8    Commonwealth government or to any agency . . . or political subdivision of Puerto Rico."  7

9    L.P.R.A. § 552(3)(C); *but see* 7 L.P.R.A. § 607g (limiting the Bank's power to loan money

10   to the government).  According to the Puerto Rico Treasury, the Bank "has historically

11   served as the principal source of short-term liquidity for the Commonwealth and its

12   instrumentalities."  (Pl. Ex. 9 at 21.)  The Bank is also the Commonwealth's fiscal agent and

13   financial advisor.  (ECF No. 126 at 149.)  The Bank recently extended the Commonwealth a

14   $300 million line of credit to help enhance its liquidity.  (Pl. Exs. 15 at 9 n.1; 38 at 14.)  The

15   Bank is now mired in a liquidity crisis of its own, however, further imperiling Puerto Rico's

16   financial prospects because the Bank "serves as the principal depository of the funds of the

17   Commonwealth and its instrumentalities."  (Pl. Ex. 9 at 21.)

18         Like so many aspects of the Commonwealth's finances, the Bank's financial data is

19   shrouded in secrecy.  Although Puerto Rico law requires the Bank to submit itself to regular

20   "examination and supervision by the Commissioner" of Financial Institutions of the

21   Commonwealth of Puerto Rico ("the Commissioner"), *see* 7 L.P.R.A. § 558, the Bank has

22   resisted examination since at least 2013.  In fact, the Commissioner's last comprehensive

23   exam of the Bank occurred in 2007.  (Pl. Ex. 25 at 1.)  When, in 2015, the Commissioner

1   approached the Bank about conducting a liquidity review, the Bank dragged its feet and took

2   more than six months to disclose "the minimum necessary information to produce" the

3   review.  (Pl. Ex. 25 at 1.)  The Commissioner later described the "flow of information" from

4   the Bank as "extremely slow and inadequate."  (Pl. Ex. 32 at 3.)  The Commissioner was still

5   able to evaluate the Bank's internal financials, however, focusing "particular attention on the

6   adequacy and sustainability of [its] liquidity levels."   (Pl. Ex. 25 at 1.)   What the

7   Commissioner discovered may explain why the Bank was so slow to cooperate.

8        Based on the Bank's internal information, the Commissioner found that the Bank's

9   "[l]iquidity levels are critically deficient in relation to [its] weakened financial conditions

10  caused by an elevated debt exposure and obstructed access to capital markets," rendering

11  "[t]he continued viability of [the Bank] questionable."  (Pl. Ex. 25 at 3.)  The Bank's "risk

12  tolerance limits" are "too liberal in light of [its] liquidity risk profile" and "do not provide

13  any cushion for unexpected liquidity events or contingent liabilities that require additional

14  disbursements of cash."  (Pl. Ex. 25 at 6.)  The Bank does not properly account for "off-

15  balance sheet items," like its "$1 billion [in] unfunded loan commitments" and "$1.3 billion

16  [in] standby letters of credit."  (Pl. Ex. 25 at 7.)  The Commissioner also found that the Bank

17  is currently experiencing a "liquidity shortfall" that will culminate in a shortfall of negative

18  $1.348 billion in June 2016, which, in turn, will deprive the Bank of its ability "to maintain

19  legal reserve levels."  This shortfall is due, in part, to the fact that the Bank's "[p]rojected

20  inflows from the Puerto Rico Treasury Department are significantly overstated."  (Pl. Ex. 25

21  at 3.)  In conclusion, the Commissioner found that the Bank "is insolvent."  (Pl. Ex. 33 at 2.)

22        Under Section 11 of Act 17 of September 23, 1948, Secretary Zaragoza can, if he

23  were to credit the Commissioner's insolvency finding, petition the Court of First Instance to

Civil No. 3:15-CV-03018 (JAF)                                                                -18-

1    suspend the Bank's operations and appoint a receiver.  Although the Secretary and President

2    Acosta-Febo have criticized some of the information underlying the Commissioner's

3    finding,[5] the Secretary is obviously concerned about the Bank's continuing viability.  (Pl.

4    Exs. 32, 33.)    The Puerto Rico Treasury recently and independently concluded that the

5    Bank's "financial condition has materially deteriorated and it could become unable to honor

6    all its obligations as they become due."  (Pl. Ex. 9 at 20.)  Treasury has learned that the Bank

7    "currently projects . . . that it will be unable to comply with its legal reserve requirement by

8    late in the second quarter of fiscal year 2016 and that liquidity levels during such period may

9    be insufficient to operate in the ordinary course as a depository institution as well as to honor

10   its depository and financial obligations in full."  (Pl. Ex. 9 at 21.)  Treasury has not only

11   determined that the Bank "will not be able to continue to provide [liquidity] assistance in the

12   near future," but it fears that if the Bank "were to be placed in receivership or if its liquidity

13   falls below a level necessary to operate in the ordinary course, the Commonwealth and its

14   instrumentalities may have limited access to their funds deposited at [the Bank], which could

15   in turn affect the provision of essential government services."  (Pl. Ex. 9 at 21.)

16          As of July 1, 2015, the Commonwealth had ninety-six accounts at the Bank, including

17   those accounts, exclusively funded by the Treasury Single Account, that are dedicated to

18   paying government payrolls, tax refunds, public pensions, and public schools, among other

19   things.  (Pl. Ex. 2 at 21.)  If the Bank were to enter receivership and the government were to

20   lose access to those accounts, the result would be catastrophic for the operation, continuity

21   and stability of the Commonwealth.  (*See* Pl. Ex. 9 at 21.)

---

[5] President Acosta-Febo flatly asserted that the Commissioner's report was "obviously written by someone [who] doesn't understand the [Government Development Bank]."  (ECF No. 126 at 169.)

1        As things stand today, the Commonwealth is being crushed under the weight of a

2    public debt that is larger than its gross national product, Puerto Rico's annual budget is

3    running a structural deficit that is about explode into the multibillion-dollar range, the

4    government's cash reserves are about to dry out, its credit rating is at junk status, it has

5    started to default on its debt obligations, and it has no place to turn for external funding,

6    including the possibly-insolvent Government Development Bank.  For these reasons, the

7    Puerto Rico Treasury recently reached a shocking conclusion: that "significant doubt" exists

8    about "the Commonwealth's ability to continue as a going concern."  (Pl. Ex. 9 at 37.)  At

9    the hearing, Secretary Zaragoza agreed with that dire assessment.  (ECF No. 130 at 113.)

10   Based on everything this court has seen, we agree with it as well.

11       Five months ago, President Acosta-Febo of the Government Development Bank

12   testified before the Finance Committee of the United States Senate about the financial

13   situation that the Commonwealth is facing, and her words, though stark, rang true:

14                  The fiscal, economic, and liquidity crisis in Puerto Rico has
15                  passed the tipping point.  The Legislative Assembly has
16                  declared a state of emergency, Puerto Rico has lost access to the
17                  capital markets on sustainable terms, and Puerto Rico faces an
18                  economic and liquidity crisis beyond what any jurisdiction in
19                  the United States has faced in generations.
20
21   (ECF No. 24 at 2.)  When asked at the hearing, Acosta-Febo admitted that, over the past

22   several months, Puerto Rico's crisis has only gotten worse.  (ECF No. 126 at 128-29.)

23   Kopacz, the insolvency expert, agreed completely, declaring that "the situation down here is

24   unprecedented."  (ECF No. 130 at 14.)  Her expert opinion carries great weight with this

25   court based not only upon the clear intelligence and competence she displayed during her

26   testimony, but upon the knowledge and experience she gained as the District Court's expert

1    witness for feasibility in the bankruptcy case of the City of Detroit.  *See In re City of Detroit*,

2    524 B.R. 147 (Bankr. E.D. Mich. 2014).  The court shares these views.

3          As the Commonwealth buckles, like the hull of a sinking ship, under the stress of its

4    financial mismanagement and rapidly nears the day when it may have to shutter its doors, it

5    is, as always, the people of this island who shall pay for these misfortunes most dearly.  As a

6    citizen of this community, we have seen with our own eyes the sad reality recently expressed

7    by Secretary Lew: "The worsening fiscal and economic situation means real suffering for the

8    people of Puerto Rico [as] basic healthcare, legal, and education services have been

9    impaired."   (Pl. Ex. 17 at 2.)   We have reviewed, at length, the insolvency of the

10   Commonwealth because, as will be seen, it pertains directly to our jurisdiction to hear this

11   case.  But, let no one forget, that what started as a financial crisis has since metastasized into

12   a deep humanitarian crisis requiring immediate action.[6]

13   **B.      The Structure and Purpose of the Commonwealth's Corporate AMT**

14         The Commonwealth first enacted a corporate alternative minimum income tax in

15   1987.  (ECF No. 130 at 194.)  In his brief, the Secretary stated that the purpose of the AMT

16   is "to ensure that every corporation doing business in Puerto Rico that generates, or can

17   reasonably be considered to generate, a substantial economic profit contributes to the Puerto

18   Rico fisc."   (ECF No. 116 at 1.)   Initially, the AMT mirrored the provisions of the

_____

[6] The crisis has and will hit hardest those with the least to spare – those who depend the most on government benefits and programs for their daily sustenance and well-being.  As Secretary Zaragoza once noted, the "profile of taxpayers" in Puerto Rico, as seen through their reported income, "does not appear to bear a relationship with . . . the consumption patterns on our Island."  (Pl. Ex. 13 at 3.)  That is because of the "high level of [tax] evasion," which systematically defunds the government, and also the massive "informal economy" that some estimate involves more than $20 billion in transactions each year.  (Pl. Ex. 13 at 2-3.)  A sizeable portion of that economy is likely related to the trade in illegal narcotics.  In certain sections of Puerto Rico, fine restaurants remain full, and luxury commodities still find many buyers.

1    alternative-minimum tax enacted in the United States in 1986.  (ECF No. 130 at 194.)  Since

2    then, the Legislature has rewritten the AMT "to adjust [it] to the different needs of the Puerto

3    Rico Treasury Department."  (ECF No. 130 at 194.)  According to Assistant Secretary of the

4    Treasury Víctor Pizarro, a former Chief Tax Advisor to the Puerto Rico Senate and Professor

5    of Tax at the Interamerican University of Puerto Rico, the AMT, over the past decade, has

6    been converted by amendment into "an eas[y] way [to] try to attend [to] profit shifting and

7    the potential [of] profit shifting."  (ECF No. 130 at 196.)  As a result, the AMT evolved into

8    a levy that looked less and less like an income tax, and more and more like a transfer-pricing

9    tax directed against multistate corporations.

10        Profit shifting, like it sounds, occurs when a taxpayer shifts its profits from one

11   jurisdiction to another to "[s]ecure a lower tax rate."  (ECF No. 131 at 84.)  As is relevant

12   here, it can occur whenever a local taxpayer transacts with a home office or related party in

13   another jurisdiction.  Puerto Rico law does not define what a "home office" is, but it appears

14   to be the headquarters or nerve center of the "branch engaged in trade or business in Puerto

15   Rico."  *See* 13 L.P.R.A. § 30073(b)(2)(B).  Puerto Rico law defines what a "related party" is,

16   however.  An entity and a corporate taxpayer are related when (1) they are both members of

17   the same controlled group of corporations, (2) one of them owns, directly or indirectly, 50

18   percent or more of the value of the other's stock, or (3) a single person owns, directly or

19   indirectly, 50 percent or more of the value of each of their stocks.  *See* 13 L.P.R.A. §

20   30045(b).  In other words, only when one corporation effectively owns or controls the other,

21   or when both corporations are effectively owned or controlled by a third party, are they

1    considered related parties.[7]   As Professor Stanley Langbein of the University of Miami

2    School of Law, defendant's expert witness on international taxation and transfer pricing,

3    explained, when parties are related, they are able to work together to minimize their joint tax

4    burden, by shifting profits from one party to the other, because "they are not competitors,"

5    but "part of one unit in terms of the economics of any transaction."  (ECF No. 131 at 32.)

6          For Puerto Rico, or any other taxing authority, the concern is that a corporate taxpayer

7    will "artificially deflat[e] its profits that are subject to [local] income tax by inflating the

8    profits of its foreign subsidiaries [and affiliates], which are not subject to [local] income tax."

9    *See BMC Software, Inc.* v. *Comm'r of Internal Revenue*, 780 F.3d 669, 671-72 (5th Cir.

10   2015).  When a taxpayer purchases goods or services from a related party, the setting of the

11   price for those goods or services is known as "transfer pricing."  *Id*. at 672.  "Although the

12   two parties are related, the 'transfer price' should match that of an arm's length transaction."

13   *Id*.  The arm's-length price for a transaction is the negotiated price that two similarly-situated

14   unrelated parties would set for the sale of the good if it occurred between them.  (Pl. Ex. 102

15   ¶ 11.)  "Otherwise, by inflating or deflating transfer prices, a [local] taxpaying corporation

16   could artificially increase the profits of its foreign subsidiaries [or affiliates] that are located

17   in tax havens and, at the same time, artificially decrease its income subject to [the local,

18   higher] income tax."  *BMC Software*, 780 F.3d at 672.

19         Consider a hypothetical.  Suppose a Gotham City company buys widgets from a third-

20   party supplier at $60 per unit.  The Gotham City company then sells those widgets to its

21   Puerto Rico subsidiary at $70 per unit – the "transfer price."  The subsidiary then sells the

---

[7]  Puerto Rico law also defines "related party" in terms of consanguinity, but that aspect of the
definition clearly does not apply to a corporate taxpayer.  *See* 13 L.P.R.A. § 30045(b)(5).

1    widgets to its customers at $100 per unit.  In this example, the Gotham City company makes

2    $10 of profit per unit, while the Puerto Rico subsidiary makes $30 of profit per unit, for a

3    total profit of $40.  Now, suppose that Gotham City is a tax haven that taxes corporate

4    income at only 10%, while Puerto Rico taxes it at 40%.  The Gotham City company will pay

5    $1 in income tax per unit sold, while the Puerto Rico subsidiary will pay $12 in income tax

6    per unit sold, for a combined income-tax burden of $13.

7         Because the Gotham City and the Puerto Rico corporations are related (and, thus,

8    effectively under the same control), they can, in theory, negotiate a mutually-beneficial

9    agreement whereby the transfer price is raised to, say, $90 per unit, in which case the

10   Gotham City company will make $30 of profit per unit, while the Puerto Rico subsidiary will

11   make only $10 of profit per unit, for, again, a total profit of $40 – only now, $20 of profit has

12   been shifted from Puerto Rico to Gotham City.  Under this new transfer price, the Gotham

13   City company will pay $3 in income tax per unit sold, while the Puerto Rico subsidiary will

14   pay $4 in income tax per unit sold, for a combined income-tax burden of $7, a more than

15   45% reduction.  If they wanted, the related parties could set the transfer price so high that all

16   profits are shifted to Gotham City, thereby allowing the Puerto Rico subsidiary to claim a

17   loss on the widgets and depriving the Puerto Rico Treasury of any widget-related income-tax

18   revenue.  (*See* Pl. Ex. 105 at 6-7.)

19        The problem of corporate profit-shifting by means of abusive transfer-pricing is of

20   legitimate concern to the Commonwealth.  According to the Puerto Rico Treasury, "[t]he

21   Commonwealth is dependent on a small number of corporate taxpayers to generate a

22   significant amount of the Commonwealth's tax revenues."  (Pl. Ex. 9 at 21.)  Secretary

23   Zaragoza reports that while 72 percent of the Commonwealth's tax revenues are derived

1   from income taxes, only 10 percent of taxpayers generate 78 percent of those taxes.  (Pl.

2   Ex. 13 at 2-3.)  Meanwhile, each year, 37 percent of corporations report losses and, thus, no

3   taxable income.  (Pl. Ex. 13 at 3.)  Treasury keeps a list of multistate chains doing business in

4   Puerto Rico that somehow remain open despite reporting "recurrent losses" on their tax

5   returns.  (ECF No. 130 at 73-74.)  These chain stores have piqued Treasury's interest because

6   it does not make economic sense that a company could or would remain in business here, if it

7   is actually unable to make a net positive income.  (ECF No. 130 at 74.)

8          Since 2000, the Commonwealth has had a series of regulations on its books that

9   directly and narrowly addresses the issue of profit-shifting.  These regulations allow the

10  Secretary of the Treasury to adjust the net taxable income of a corporate taxpayer by

11  targeting specific transactions between the taxpayer and a related party and determining

12  whether the transfer prices for those transactions were substantially similar to the arm's-

13  length prices that would have obtained between unrelated parties.  (*See* Pl. Ex. 63.)  If the

14  Secretary finds that a taxpayer has shifted some of its profits to a related party outside of the

15  island, the Secretary may adjust the taxpayer's net taxable income upwards, so that it will

16  "truly reflect" the taxpayer's legitimate earnings.  (Pl. Ex. 63 at 1.)  These regulations are not

17  currently being used and have not been used in a while.  (ECF No. 130 at 89-90.)  The record

18  indicates that the regulations may have fallen into disuse because they require more technical

19  skill than the Puerto Rico Treasury can efficiently deploy.  (*See* ECF No. 130 at 228-29.)

20         So, to combat the problem of profit shifting through transfer pricing, Puerto Rico

21  added new provisions to the AMT.  (ECF Nos. 116 at 1 n.2; 130 at 196.)  In 2009, the

22  Legislature imposed a tax on expenses for services rendered between related parties in order

23  to "capture the typical management fees that corporations have between related parties."

1   (ECF No. 130 at 194-195, 197.)  In 2011, a new section was added to tax the gross value of

2   tangible property transferred or sold between related parties.  (ECF No. 130 at 195.)  And, in

3   2013, the AMT was amended again – closing a "loophole" – to tax transfers of property sent

4   from a home office "that operates in other jurisdictions" to "a branch of the same corporation

5   . . . operating in Puerto Rico."  (ECF No. 130 at 195.)

6        In a letter to Representative Hernández, dated February 18, 2015, Secretary Zaragoza

7   acknowledged that these new AMT taxes were designed to combat transfer-pricing policies

8   that allow "multinational chains doing business in Puerto Rico" to shift their profits to their

9   out-of-state affiliates or home offices, and to thereby "report year after year net operating

10  losses in their subsidiaries or branches in Puerto Rico, even though their sales in Puerto Rico

11  exceed the[ir] sales in other countries."  (Pl. Ex. 13 at 22.)  By taxing these transactions,

12  Zaragoza wrote, the Commonwealth ensures "that these multinationals contribute to the

13  governmental [tax] collections."  (Pl. Ex. 13 at 22.)

14       By 2015, the AMT had come to resemble the law that exists today.  The AMT

15  imposed "a tax equal to the excess (if any) of: The tentative minimum tax for the taxable

16  year, over the regular tax for the taxable year."  13 L.P.R.A. § 30073(a). [8]  Only the excess

17  constituted the AMT, which had to be paid in addition to the regular tax.  The AMT provided

18  two measures of "tentative minimum tax," and the measure yielding the largest amount was

19  the corporation's tentative minimum tax for the year.  13 L.P.R.A. § 30073(b).  The first

20  measure, which is codified at 13 L.P.R.A. § 30073(b)(1), operated by adjusting, then taxing,

_____

[8] As stated in footnote 2, *supra*, the latest official English translation of 13 L.P.R.A. § 30073 is
from 2014.  All future references to the codified statute will be to its 2014 version.  Meanwhile, all future
references to Section 1022.03 of the Puerto Rico Internal Revenue Code of 2011 will be to the certified
English translation in Plaintiff's Exhibit 77 and ECF Number 100-3.  The latter statute is simply an up-to-
date version of the former, with its original title instead of its codified title.

1   the income earned by the corporation.  (ECF No. 130 at 200-01.)  The second measure,

2   which is codified at 13 L.P.R.A. § 30073(b)(2), taxed the gross value of goods and services

3   sold or otherwise provided to the corporate taxpayer by a related party or home office located

4   outside of Puerto Rico.

5        The second measure was comprised of two components: an expenses component,

6   added to a tangible-property component.  The expenses component imposed a 20% tax on

7   services provided to the taxpayer by a related party or home office outside Puerto Rico.  13

8   L.P.R.A. § 30073(b)(2)(A); ECF Nos. 126 at 44, 47-48; 130 at 200.  Meanwhile, the

9   tangible-property component imposed a 2% tax on the gross value of goods sold or

10  transferred to the taxpayer by a related party or home office outside Puerto Rico.   13

11  L.P.R.A. § 30073(b)(2)(B).  The value of the goods was determined by the invoice price, if

12  an invoice existed, or, if one did not, by "the fair market value of such property."   13

13  L.P.R.A. § 30073(c)(5).  It is this measure of the AMT that Wal-Mart PR is challenging.

14       The AMT statute included three important exemptions from the tangible-property

15  component of the second measure of tentative minimum tax ("the tangible-property tax").

16  First, if the taxpayer had grossed less than $10 million from its business in Puerto Rico in

17  any of the three preceding tax years, the tax did not apply.  13 L.P.R.A. § 30073(d)(1).

18  Second, if the Secretary found that the transfer price charged to the taxpayer by the related

19  party or home office was "equal or substantially similar to the [price] for which such related

20  party sells such property to an unrelated party," then the Secretary could tax the transaction

21  at a lower rate.  13 L.P.R.A. § 30073(d)(4).  Finally, if the seller or transferor was "subject to

22  income tax in Puerto Rico [on] such transaction," the transaction was exempt from the tax.

23  13 L.P.R.A. § 30073(d)(6).

1       This last exemption effectively limited the tangible-property tax to transactions

2   involving interstate commerce.  Again, the tax applies only to transactions with a "related

3   party" or "home office."  13 L.P.R.A. § 30073(b)(2).  The home office must be "located

4   outside of Puerto Rico."  13 L.P.R.A. § 30073(b)(2)(A)(ii), (b)(2)(B).  And, under this

5   exemption, the related party or home office must not be "subject to income tax in Puerto

6   Rico [on] such transaction," 13 L.P.R.A. § 30073(d)(6), which is another way of stating that

7   the related party or home office must be located outside of Puerto Rico.

8       In his brief, the Secretary is absolutely clear on this point.  The tangible-property tax

9   "applie[s] only to situations in which it [i]s needed," he writes, which is where there is a

10   "risk of . . . 'leakage' of income outside of the Commonwealth's taxing jurisdiction."  (ECF

11   No. 116 at 11-12.)  In a footnote, the Secretary is even more precise, declaring that the

12   tangible-property tax applies only to "arrangements between Puerto Rico taxpayers and their

13   cross-border affiliates."[9]  (ECF No. 116 at 12 n.18.)  The Secretary reaffirmed this position at

14   the hearing, when he conceded that the tax treats "some goods sold from outside Puerto Rico

15   differently than goods sold within Puerto Rico."  (ECF No. 130 at 82.)  He also conceded

16   that "the tax treats articles manufactured in Puerto Rico differently than it treats some articles

17   manufactured off the island."  (ECF No. 130 at 83.)

18       In April 2015, the Commonwealth was running up against a deadline to approve a

19   balanced budget for the fiscal year starting on July 1, 2015.  The Puerto Rico Constitution

---

[9] To be yet more precise, if the "cross-border" affiliate is "engaged in the operations of a trade or business in Puerto Rico," the tax will apply only if the transaction is not "effectively connected" to the affiliate's "conduct of trade or business within Puerto Rico."  *See* 13 L.P.R.A. §§ 30071(c)(5), 30441(b). In other words, the tax applies to transactions with a foreign related party only if they involve the foreign party's foreign operations.  If the transfer of tangible property occurs entirely within Puerto Rico, the transaction will be exempt from the tax because the foreign related party will be subject to Puerto Rico income tax on the transaction. *Id.*; *see also* 13 L.P.R.A. § 30073(d)(6).

1   mandates balanced budgets.  P.R. Const. art. VI, § 7.  Failure to pass a balanced budget by

2   the deadline results in the re-enactment of the prior year's budget.  The Commonwealth had

3   already reduced its expenditures to a bare minimum; so, Secretary Zaragoza testified, the

4   government was under "a lot of pressure [to] rais[e] revenue fast."  (ECF No. 130 at 123.)

5   The government needed to raise $125 million in new revenue to close the budget gap.  (ECF

6   No. 130 at 124.)  Public officials soon discovered that despite collecting "several baskets" of

7   taxes on the island, the "only basket available" for generating a large amount of additional

8   revenue was corporate income taxes.  (ECF No. 130 at 125-26.)

9           Raising excise taxes would not work because the revenue generated from such taxes

10  does not usually flow into the Treasury Single Account, the Commonwealth's main

11  operating account, but often goes "directly to the debt service [of] specific [agencies]."  (ECF

12  No. 130 at 125.)  Raising the sales tax would not work because the Legislature had already

13  rejected a proposal to raise the tax to 16% and had resolved, instead, to raise the tax only to

14  11.5%.  (ECF No. 130 at 124-25.)  And, raising individual income taxes would not work

15  because the Legislature had already promised and proposed a "dramatic reduction in

16  individual income taxes," and, therefore, did not want to go back on its word.  (ECF No. 130

17  at 125.)  These political and practical constraints led the government to focus on corporate

18  income taxes and, more specifically, on raising rates on the AMT.  At the time, bulking up

19  the AMT was viewed as a "fair option" because, Zaragoza stated, the AMT allegedly "hit[s]"

20  only those taxpayers who are not "paying enough income tax."  (ECF No. 130 at 126.)

21          Secretary Zaragoza, however, personally opposed any increase to the AMT.  (ECF

22  No. 130 at 71.)  In his February 2015 letter to Representative Hernández, he had advised the

23  Legislature that, to create "a fairer, more effective and equitable manner" of taxation, while

1  still "assur[ing] that those who today evade taxes . . . assume the portion of the burden that

2  corresponds to them," the "impact" of the AMT needed to be "minimize[d]."  (Pl. Ex. 13 at

3  2, 21.)  In particular, Zaragoza had found that the Legislature needed to cut by 25% the 2%

4  tax on interstate transfers of tangible-property between related companies or different offices

5  of the same company and to eliminate the 20% tax on expenses for interstate services

6  between them.  (Pl. Ex. 13 at 23.)  If the "purpose" of the AMT was to recapture in broad

7  terms the profits that certain "multinational chains" were suspected of shifting outside of

8  Puerto Rico, the Secretary had found that the tax was already too heavy and needed to be

9  reduced in part and eliminated in part.  (Pl. Ex. 13 at 22.)  As we noted at the beginning, the

10  Legislature rejected the Secretary's advice and moved to increase the AMT instead.

11       The Legislature tasked Treasury with figuring out how to close the budget gap "by

12  taxing the gross value of related party transfers from off the island."  (ECF No. 130 at 75.)

13  Treasury looked at the most recent tax returns "of the multinational chains . . . subject to

14  th[e] tax."  (ECF No. 130 at 75-76.)  Although it was April 2015, the "most recent" tax

15  returns that had been fully processed were from the 2012 tax year, two years earlier.  (ECF

16  No. 130 at 75, 80.)  Based on the information in those returns, Treasury proposed not only a

17  graduated rate table for the tangible-property tax, but also what the tax brackets should be.

18  Only by setting the tax brackets in advance and applying their new rates to the data in

19  taxpayers' 2012 returns was Treasury able to estimate the new revenue that could be raised.

20  (ECF No. 130 at 76, 81.)  And, Treasury predicted that, under those new rates (which were

21  later enacted), the amended tangible-property tax would come within $10 million of filling

22  the government's $125 million budget gap.  (ECF No. 130 at 77; Pl. Ex. 51 at 16.)

1          In late April 2015, Anthony Walker, Vice President of Specialty Tax at Wal-Mart

2    Stores, the Arkansas-based and Delaware-incorporated parent company of Wal-Mart PR,

3    visited San Juan with some colleagues to meet with members of the local government to

4    discuss this idea of increasing the AMT.  (ECF No. 127 at 8-9.)  In particular, Walker's team

5    met with Eduardo Bhatia, President of the Puerto Rico Senate; José Nadal-Power, Chairman

6    of the Senate Treasury Committee; Angel Rosa, Chairman of the Senate Economic

7    Development and Planning Committee; Jaime Perelló, Speaker of the Puerto Rico House of

8    Representatives; Rafael Hernández, Chairman of the House Treasury Committee; Luis Vega-

9    Ramos, a House member and major proponent of raising rates on the AMT's tangible-

10   property tax; Jenniffer González, House Minority Leader; and others.  (ECF No. 127 at 9-

11   10.)  Walker's team accepted that Puerto Rico needed to find more revenue, but they wanted

12   to voice their concern that the AMT rate hike was "unfair" because it "intentionally focused

13   on mega-retailers and Wal-Mart."  (ECF No. 127 at 10-11.)

14         Walker found that the officials he met with were mostly concerned with raising a

15   specific level of revenue.  "[I]t kept coming up in conversation," Walker testified, "that

16   we've got a budget crisis" and "[w]e've got to raise a certain amount of dollars."  (ECF No.

17   127 at 11.)  Some officials tried to justify the increase in tangible-property tax by alluding to

18   the possibility that multistate corporations were "manipulating their books" to avoid paying

19   Puerto Rico taxes.  (ECF No. 127 at 11.)  Some officials even referred to the proposed tax-

20   rate increase as "the Wal-Mart tax."  (ECF No. 127 at 13.)

21         If officials in the Puerto Rico government thought of the proposed rate increases to

22   the AMT as the Wal-Mart tax, they had good reason.  According to Wal-Mart PR's tax return

23   for the 2012 tax year, which was the return that Treasury consulted when setting the new tax

1    brackets (ECF No. 130 at 75-76), Wal-Mart PR had purchased approximately $648 million

2    of merchandise and inventory from Wal-Mart Stores that year.  (Pl. Ex. 47 at 1; Def. Ex. 21,

3    sched. A, pt. V, l. 32.)  Its net sales were around $2.98 billion.  (Pl. Ex. 47 at 1; Def. Ex. 21,

4    Form 480.20, pt. IV, l. 1.)   The proposed top tax bracket of 6.5%, on the gross value of

5    tangible-property transactions, applied to corporate taxpayers with more than $2.75 billion in

6    net sales in Puerto Rico.  Treasury knew that, based on the 2012 tax information, only Wal-

7    Mart PR met that threshold.  (ECF No. 130 at 77-80.)  Treasury also knew that, for the 2012

8    tax year, Wal-Mart PR's regular income tax was $18.57 million.  (Def. Ex. 21, Form 480.20,

9    pt. III, l. 19.)  Thus, under the new AMT rates, Wal-Mart PR's tangible-property tax for the

10   2012 tax year would have been $42.12 million, which means an AMT of at least $23.55

11   million.[10]  Since Treasury had estimated that the new rates would yield about $115 million in

12   new revenue (ECF No. 130 at 76), Wal-Mart PR was expected to generate more than one-

13   fifth of the total amount of the new tax.  The moniker "Wal-Mart tax" was, thus, appropriate.

14        Although another corporate taxpayer could, in theory, join Wal-Mart PR in the top tax

15   bracket, the Secretary admitted at the hearing that, to the best of his knowledge, "the top tax

16   rate under the tangible property component of [the AMT] is a Wal-Mart tax only."  (ECF

17   No. 130 at 80.)  This was purposeful.  Vice President Walker was on to something when he

18   found it "ironic" that, after Wal-Mart PR had reported net sales "on the island of roughly 2.9

19   to 3 billion dollars," the Commonwealth would set "the cutoff for the highest tax rate . . . just

20   slightly below the amount of sales that [Wal-Mart PR] record[s] on the island."  (ECF

---

[10] Again, a corporate taxpayer's AMT liability is "the excess (if any) of: The tentative minimum tax for the taxable year, over the regular tax for the taxable year."  13 L.P.R.A. § 30073(a).  The second measure of tentative minimum tax is the sum of the expenses and tangible-property taxes.  13 L.P.R.A. § 30073(b)(2).  Here, we are using only the tangible-property tax as a measure of tentative minimum tax.

1    No. 127 at 13.)  When Treasury designed the tax brackets, the threshold for the top bracket of

2    $2.75 billion in gross receipts (or net sales) from Puerto Rico was specifically designed to

3    capture Wal-Mart PR in that bracket.  (ECF No. 130 at 81-82.)  The top tax bracket not only

4    isolates Wal-Mart PR in a class of its own, but there was not even a crush of other high-

5    earning multistate businesses to distinguish it from.  The next highest bracket, which levies a

6    4.5% tax on tangible-property transfers, applies to corporations with between $2.0 and $2.75

7    billion in net sales in Puerto Rico.  Based on the 2012 tax numbers, there are only two

8    companies in Puerto Rico in that bracket.  (ECF No. 130 at 79.)

9           On May 18, 2015, a bill was introduced in the Legislature to, among other things,

10   amend the AMT's tangible-property tax.  The bill moved quickly, receiving no hearings and

11   little debate.  On May 21, 2015, the bill passed the House and, four days later, passed the

12   Senate.  On May 29, 2015, the bill was signed into law by the Governor, becoming Act 72 of

13   2015.  Act 72 amended the tangible-property tax in two significant ways.  First, for tax years

14   starting after December 31, 2014, Act 72 introduced the following graduated rates for the

15   tangible-property tax codified at 13 L.P.R.A. § 30073(b)(2)(B):

| If the purchaser of property has gross receipts derived from the conduct of trade or business in Puerto Rico of: | Tax rate: |
|---|---|
| Less than $10 million | Zero |
| $10 million or more, but less than $500 million | 2.5% |
| $500 million or more, but less than $1.5 billion | 3.0% |
| $1.5 billion or more, but less than $2.0 billion | 3.5% |
| $2.0 billion or more, but less than $2.75 billion | 4.5% |
| $2.75 billion or more | 6.5% |

1   (Pl. Ex. 77, § 1022.03(b)(2)(B)(i)(II).)   Second, for tax years starting after December 31,

2   2014, Act 72 eliminated the provision that had allowed the Secretary to exempt, in whole or

3   in part, a transaction from the tax upon proof that its transfer price was "equal or

4   substantially similar to or lower than the [price] for which [the] related person sells such

5   property to an unrelated person." (Pl. Ex. 77, § 1022.03(d)(4).) Treasury recommended the

6   elimination of this exemption because Puerto Rico wanted to "secure the generation of [new]

7   revenue," and it was "predictable," Secretary Zaragoza testified, that "a higher amount of

8   taxpayers" would seek the exemption under the new rates.  (ECF No. 130 at 135.)  But the

9   AMT, under these amendments, is no longer about counteracting abusive transfer pricing.

10  Instead, as Zaragoza agreed, the current goal of the AMT is "to raise as much money as

11  possible," which means "extract[ing] the tax . . . [n]o matter how clear it is that the

12  [taxpayer's] transfer pricing is appropriate." (ECF No. 130 at 93.)

13       At the hearing, Secretary Zaragoza repeatedly conceded that, as amended by Act 72,

14  the AMT is simply "a revenue raising measure." (ECF No. 130 at 83.)  He agreed that the

15  AMT "certainly is not the narrowest or most targeted way that Puerto Rico could address

16  transfer pricing abuse." (ECF No. 130 at 83.)  Indeed, the AMT no longer tries to police

17  transfer-pricing or profit-shifting.  (ECF No. 130 at 83-84, 90.)  As Zaragoza acknowledged,

18  the AMT does not address the issue of transfer-pricing in "any adequate or appropriate way"

19  because the tax "does not actually seek to identify transfer pricing problems." (ECF No. 130

20  at 94-95.)  Instead, as the Secretary agreed, the purpose of the amended AMT is "just to raise

21  money any way money c[an] be raised." (ECF No. 130 at 90.)  When asked if the

22  Commonwealth could have enacted instead a new regulation targeting specific instances of

1   transfer-pricing abuse, Zaragoza responded: "Yes.  But it would not [have] yield[ed] 125

2   million bucks in 11 months, as we needed."  (ECF No. 130 at 90.)

3          The court not only accepts the above portions of Secretary Zaragoza's testimony, but

4   admires the candor and honesty he brought to the stand.  It was refreshing.

5   **C.      Wal-Mart PR as a Corporate Subsidiary and Puerto Rico Taxpayer**

6          Wal-Mart PR is a subsidiary of Wal-Mart Stores, its Delaware-incorporated and

7   Arkansas-based parent.  (ECF Nos. 1 ¶ 8; 32 ¶ 8.)  Wal-Mart PR was incorporated in Puerto

8   Rico in 1991, began operations in 1992, and is headquartered in Caguas, Puerto Rico.  (ECF

9   No. 126 at 30, 35-36.)  As we recited at the start of this opinion, Wal-Mart PR currently

10  employs around 14,300 local residents and operates forty-eight stores in Puerto Rico,

11  including Walmart Supercenters, Walmart Discount Stores, Supermercados Amigo, Sam's

12  Clubs, and, until earlier this year, Super Ahorros.[11]  (ECF No. 126 at 32-35.)  Wal-Mart PR

13  conducts more business and trade in Puerto Rico, in terms of gross receipts, than any other

14  retailer.  (ECF No. 130 at 77-80.)

15         In recent years, Wal-Mart PR has earned "roughly 2.9 to 3 billion dollars in sales" in

16  Puerto Rico.  (ECF No. 127 at 13.)  For the fiscal year that ended on January 31, 2016, Wal-

17  Mart PR recorded net sales of more than $3 billion.  (Pl. Ex. 72 at 1.)  It buys around $1.6

18  billion of inventory from local vendors and suppliers each year.  (ECF No. 127 at 29.)  It also

19  buys more than $700 million of inventory from Wal-Mart Stores each year.[12]  (Pl. Ex 72 at

20  2.)  Wal-Mart PR's annual net taxable income is regularly tens of millions of dollars.  (Pl.

----

[11] As we stated in footnote 1, *supra*, in January 2016, Wal-Mart PR closed four Supermercados Amigo and all three Super Ahorros due to their lack of profitability and bleak financial projections.

[12] To be clear, when we refer to Wal-Mart PR's purchases of goods and services from "Wal-Mart Stores," we mean not only Wal-Mart Stores, Inc., but its entire network of subsidiaries and affiliates in the continental United States that services and transacts with Wal-Mart PR.  (*See* ECF No. 127 at 75-78.)

1   Ex. 40 at 1.)  The Puerto Rico Treasury does not suspect Wal-Mart PR of shifting any of its

2   income off of the island.  (ECF No. 130 at 96.)

3          Only the Commonwealth taxes Wal-Mart PR's income, and the Commonwealth taxes

4   it at the top corporate rate of 39%, which is comprised of a base rate of 20% and the top

5   surtax rate of 19%.  (ECF Nos. 126 at 38; 127 at 8, 77; 131 at 84.)  *See* 13 L.P.R.A.

6   §§ 30071(b); 30072(b)(2).  This represents Wal-Mart PR's regular tax liability for the tax

7   year.  Historically, Wal-Mart PR has had a regular income-tax burden that falls within $4

8   million of $20 million.  (Pl. Ex. 40 at 1.)  Before the advent of the post-Act 72 AMT and a

9   temporary gross-receipts tax that applied in 2013 and 2014, Wal-Mart PR's total income-tax

10  liability fell in that range.  Thus, for the tax year ending on January 31, 2012, Wal-Mart PR's

11  total income-tax liability was $19.9 million; the following tax year, it was $18.6 million.  (Pl.

12  Ex. 40 at 1.)  By contrast, under the amended AMT, Wal-Mart PR's estimated income-tax

13  liability for the tax year that ended on January 31, 2016, was $47.0 million, with $30.9

14  million of it attributable to the AMT.  (Pl. Ex. 40 at 1.)

15         This doubling of Wal-Mart PR's income tax liability under the AMT is due to how

16  the tangible-property tax targets the way in which large multistate retailers like Wal-Mart

17  acquire inventory.  In the retail business, profit margins, like Wal-Mart PR's, are usually

18  "razor thin."  (ECF No. 127 at 30.)  As Vice President Walker of Wal-Mart Stores crisply

19  explained, "We don't make much on each transaction," but "we do a lot of transactions."

20  (ECF No. 127 at 30.)  "Our model at Wal-Mart," Walker further explained, "is everyday low

21  cost so that we can provide everyday low pricing [to our customers]."  (ECF No. 130 at 15.)

22  Wal-Mart PR keeps its costs low by acquiring a significant amount of inventory from its

23  parent company and affiliates.  (ECF No. 127 at 17-19.)

1      Wal-Mart PR may be a very big fish in Puerto Rico, but it is small fry in the global

2   marketplace.   Consider that Wal-Mart PR's net sales of a few billion dollars each year

3   constitutes only six-tenth of one percent of the Wal-Mart family's global sales of $482

4   billion in its 2015 fiscal year.  (ECF No. 127 at 5, 18.)  The Wal-Mart family operates more

5   than 11,500 stores worldwide and averages close to 260 million customer transactions each

6   week.  (ECF No. 127 at 4.)  The Wal-Mart family works with tens of thousands vendors

7   around the world, purchasing 4.5 million unique products.   According to Vice President

8   Walker, when Wal-Mart Stores goes to buy a product, it is typically "the largest purchaser in

9   the world of that particular [product]," thereby bringing "tremendous buying power," which

10   "allows [them] to be able to negotiate for the best possible price."  (ECF No. 127 at 18.)  Due

11   to their sheer difference in size, it is "virtually impossible" for Wal-Mart PR to mimic the

12   leveraging power of Wal-Mart Stores.  (ECF No. 127 at 18.)

13      Wal-Mart PR currently purchases more than $700 million in inventory each year from

14   Wal-Mart Stores.  (Pl. Ex. 72 at 2.)  Wal-Mart PR estimates that, in terms of gross value,

15   approximately 23% of its net sales derives from inventory acquired through these related-

16   party purchases.  (ECF No. 128 at 8.)  According to Humberto Martínez-Acosta, Wal-Mart

17   PR's Director of Accounting and Control, none of the inventory acquired by Wal-Mart PR

18   from Wal-Mart Stores should come from Puerto Rico "because it doesn't make economic

19   sense to buy products that were manufactured in Puerto Rico or produced in Puerto Rico,

20   ship them to the States, and then get [them shipped] back again [to] the island."  (ECF

21   No. 128 at 7-8.)  Moreover, Wal-Mart PR conducts more business with local suppliers than it

22   does with Wal-Mart Stores, and so has no need to rely on its parent company to acquire

23   locally-produced goods.  In fact, Wal-Mart PR "spend[s] 1.6 billion dollars annually on

1  purchases sourced locally," which is more than double the amount it spends on interstate

2  related-party purchases.  (ECF No. 127 at 29.)

3        Inventory purchased from Wal-Mart Stores and inventory purchased locally are often

4  in direct competition.  For example, Wal-Mart PR's largest local supplier by far is the Puerto

5  Rico subsidiary of the Coca-Cola Company, which produces soft drinks and syrups for local

6  distribution.  (ECF No. 128 at 16; Pl. Ex. 69 at 1.)  Meanwhile, Wal-Mart PR acquires from

7  Wal-Mart Stores its private-label Sam's Choice sodas, including a cola "similar to Coca-

8  Cola."  (ECF No. 128 at 17.)  Wal-Mart PR's next largest local supplier is Suiza Dairy, a

9  Puerto Rico company that produces milk, cheese, and yogurt.  (ECF No. 128 at 16-17; Pl.

10  Ex. 69 at 1.)  Wal-Mart PR purchases similar products from Wal-Mart Stores' private Great

11  Value label.  (ECF No. 128 at 17-18.)  Not everything that Wal-Mart PR buys from Wal-

12  Mart Stores is a house brand, however.  For example, Wal-Mart PR buys a tire cleaner called

13  Cristal Tire Shine from local suppliers, while purchasing a comparable third-party product

14  called Extreme Tire Aerosol from Wal-Mart Stores.  (ECF No. 128 at 19.)

15        Plaintiff's witnesses testified that Wal-Mart Stores uses a simple four-step formula

16  when setting the transfer price for inventory sold to Wal-Mart PR.  First, Wal-Mart Stores

17  charges the "actual cost of the product" as billed by the third-party supplier.  (ECF Nos. 126

18  at 39-40; 127 at 14.)  Second, Wal-Mart Stores charges 2.54% of the product cost as a

19  handling fee.  (ECF Nos. 126 at 40; 127 at 14.)  The fee applies to each purchase that passes

20  through Wal-Mart Stores's network of distribution centers, which is where the company

21  warehouses its inventory pending their distribution.  (ECF Nos. 126 at 41; 127 at 16.)  The

22  fee is recalculated each year to mirror "the actual cost incurred to operate [their] distribution

23  center network."  (ECF Nos. 126 at 41; 127 at 16.)  The distribution centers that service Wal-

1  Mart PR are located in the continental United States, mainly in the States of Georgia and

2  Florida.  (ECF No. 127 at 75-78.)

3        Third, Wal-Mart Stores charges 6.7% of the product cost as a shipping fee.  (ECF

4  Nos. 126 at 42.)  The fee is calculated annually to reflect "the best possible pricing" that

5  Wal-Mart Stores can get from third-party shippers to transport products from its distribution

6  centers on the mainland to Puerto Rico.  (ECF Nos. 126 at 42-43; 127 at 15.)  If Wal-Mart

7  Stores fails to negotiate the lowest possible rate, Wal-Mart PR "is free to go find [a] low cost

8  provider" and contract for shipping on its own.  (ECF No. 127 at 15.)  The shipping and

9  handling fees are "literally a pass-through," and Wal-Mart Stores does not make "an extra

10  penny" from them.  (ECF No. 127 at 15.)

11        Fourth and finally, Wal-Mart Stores charges 2% of the product cost as "an upcharge

12  for profit."  (ECF Nos. 126 at 43; 127 at 14.)  The upcharge applies to each purchase by Wal-

13  Mart PR, and it is "the only profit component" in the transfer price, essentially compensating

14  Wal-Mart Stores for its procurement efforts, logistical support, and investment in Wal-Mart

15  PR.  (ECF No. 127 at 14, 17.)  Wal-Mart Stores does not apply the same upcharge to each

16  subsidiary or affiliate, but instead sets the upcharge percentage on a case-by-case basis,

17  depending "on the level of services that are being provided."  (ECF No. 126 at 44-45.)

18        Perhaps a hypothetical will illustrate how this transfer-pricing policy works.  Suppose

19  that Wal-Mart Stores learns that an electronic device is in high demand throughout this

20  hemisphere.  So, Wal-Mart Stores leverages its buying power to purchase, from a third-party

21  supplier or the manufacturer, several tens of thousands of those devices at only $100 each.

22  Wal-Mart Stores then ships the devices to its distribution centers across the mainland United

23  States.  Ultimately, Wal-Mart PR orders some of these devices from Wal-Mart Stores.  For

1    each device, Wal-Mart Stores will charge $100 for the device itself, $2.54 in handling fees,

2    $6.70 in shipping fees, and $2.00 in profit upcharge, for a total price of $111.24.  (ECF No.

3    126 at 39-43; Pl. Ex. 100 at 1.)  The AMT's tangible-property tax of 6.5% on the invoice

4    price of $111.24 will effectively add $7.23 to the final bill.  (Pl. Ex. 100 at 1.)

5           Now, Wal-Mart PR's total acquisition cost will be $118.47 for a device that Wal-Mart

6    Stores originally purchased for $100.  Unless Wal-Mart Stores was able to use its leverage

7    and integrated operations to save Wal-Mart PR more than $7.23 in cost per unit, the tangible-

8    property tax will render these sales economically inefficient.  As Professor Langbein, the

9    Secretary's expert witness, observed, if the tangible-property tax "is too high, [it] can force a

10   taxpayer or can propel a taxpayer to place all transactions with unrelated parties," including,

11   most obviously, local suppliers.  (ECF No. 131 at 21.)

12          Under the amended AMT, the amount of income tax that Wal-Mart PR must pay is

13   derived almost entirely from the 6.5% tangible-property tax on inventory coming into Puerto

14   Rico from Wal-Mart Stores's operations in the continental United States.[13]  (ECF No. 128 at

15   8-9.)  For example, for its 2016 fiscal year, Wal-Mart PR estimates that it purchased

16   approximately $714.75 million of inventory from Wal-Mart Stores, leading to a tangible-

17   property tax liability of, at 6.5%, $46.46 million.  Wal-Mart PR also estimates that it spent

---

[13] It is undisputed that Wal-Mart PR is not at risk of having to pay the AMT as defined by the first measure of "tentative minimum tax," 13 L.P.R.A. § 30073(b)(1).  Under the expenses component of the second measure of "tentative minimum tax," 13 L.P.R.A. § 30073(b)(2)(A), Wal-Mart PR is primarily liable for the information-technology and accounting services it receives from Wal-Mart Stores. (ECF No. 126 at 44-45.)  The gross value of those services is usually only in the $2-million range, and Wal-Mart PR projects that the resulting tax will remain in the $500,000 range for the foreseeable future.  (ECF No. 126 at 68-69; Pl. Ex. 72 at 2.)  Because Wal-Mart PR's profit margins are so low, Wal-Mart Stores does not charge – and, since at least 2004, has not charged – it anything to use Wal-Mart's intellectual property, including its brand name, logo, and other trademarks.  (ECF No. 127 at 22-26.)  However, under their current advance-pricing agreement, if and when "the operating margins for Wal-Mart Puerto Rico exceed 2.5 percent, then the royalties w[ill] kick in."  (ECF No. 127 at 25.)

1   approximately $2.47 million on services from Wal-Mart Stores, leading to an expenses-tax

2   liability of, at 20%, $.49 million.   Thus, Wal-Mart PR's tentative minimum tax is $46.95

3   million.  (Pl. Ex. 72 at 2.)  Meanwhile, Wal-Mart PR estimates a regular income tax of only

4   $16.02 million, resulting in an AMT of $30.93 million.  (Pl. Ex. 40 at 1.)  But, this AMT

5   amount can be misleading because it is a technical figure that subtracts the regular income

6   tax from the tentative minimum tax.  (Pl. Ex. 77, § 1022.03(a).)

7          As the above calculations make clear, the dominant figure in Wal-Mart PR's total tax

8   liability of $46.95 million is the $46.46 million tangible-property tax.  And, that is despite an

9   estimated net taxable income of only $41.12 million.  (Pl. Ex. 40 at 1.)  As Professor Richard

10  Pomp of the University of Connecticut School of Law and the New York University School

11  of Law, plaintiff's expert witness on state taxation, declared, this tangible-property tax is

12  "such a strange duck . . . because it has nothing to do with income," and so it can easily

13  "result[] in a tax that is in excess of the [taxpayer's] profits."  (ECF No. 126 at 215, 258.)

14  The court finds that this is precisely what is happening to Wal-Mart PR.

15         How can this happen?  Take the past tax year.  The financial quarter that runs from

16  November through January, encompassing Puerto Rico's long Christmas season, is the "most

17  important" one for Wal-Mart PR in terms of sales.  (ECF No. 126 at 64, 91.)  This past

18  November and December, Wal-Mart PR purchased more inventory than usual from Wal-

19  Mart Stores.  (ECF No. 126 at 62-63.)  But, instead of having a blockbuster holiday season,

20  Wal-Mart PR witnessed "a decrease in [its] sales for those two months."  (ECF No. 126 at

21  64.)  As a result, Wal-Mart PR's net taxable income dropped.  Normally, one would expect

22  Wal-Mart PR's income taxes to drop also because there is now less income to tax.  (ECF No.

23  126 at 64-65.)  But, because the AMT tracks the volume of related-party purchases instead of

1   the amount of income earned, Wal-Mart PR's tax burden actually went up, resulting in a

2   situation where a drop in taxable income was accompanied by an uptick in income tax.  (ECF

3   No. 126 at 65-66.)  This fundamental disconnection between income and "income tax" can

4   lead to some strange outcomes.

5           As we just saw, Wal-Mart PR estimates that it will pay almost $47 million in income

6   tax for the tax year that just ended, despite earning only around $41 million in net taxable

7   income, resulting in an effective tax rate of 114%.  (ECF No. 126 at 58, 89; Pl. Ex. 40 at 1.)

8   Wal-Mart PR projects that, by next year, its effective tax rate will soar to more than 450%

9   and, for the following five years, will remain above 300% due to a series of exogenous and

10  endogenous factors, including Wal-Mart's decision to raise nationwide the minimum wage of

11  its employees from, in Puerto Rico, $7.25 per hour to $10.00 per hour, starting last month.

12  (ECF No. 126 at 74-75, 200; Pl. Exs. 72; 100 at 2.)  Wal-Mart PR estimates that, under the

13  AMT, it will consistently endure after-tax losses of more than $30 million per year.  (Pl. Ex.

14  72 at 2.)  We credit these projections.

15          To mitigate the confiscatory taxes imposed under the AMT, Wal-Mart PR could work

16  to lower its operating costs, perhaps by reducing employee wages or by replacing goods

17  purchased in interstate commerce from Wal-Mart Stores with comparable goods purchased

18  from other suppliers.  But, nothing in the record indicates that Wal-Mart PR will be able to

19  reduce its tax burden under the AMT to a non-confiscatory level.  The Secretary and his

20  expert witness both claimed that the tangible-property tax serves as a "proxy" for the income

21  tax that a corporation should pay, but no one has tried to explain how this proxy, which has

22  nothing to do with income, is an appropriate measure.  (*See* ECF Nos. 130 at 84; 131 at 21.)

1      The fact that the tangible-property tax levies an "income" tax that has nothing to do

2   with reported income only makes sense if each taxpayer is shifting its income to other

3   jurisdictions through abusive transfer pricing, which is, indeed, the ground on which the

4   Secretary hopes to justify the tax.  (ECF No. 116 at 1 n.2.)  But the AMT has nothing to do

5   with transfer pricing or profit shifting.  After all, it taxes every interstate transaction between

6   related parties, instead of just those that result in illegitimate profit shifting, and it does not

7   allow the Secretary to grant any exemptions, even upon proof that a taxpayer's transfer

8   prices have all been arm's-length.  Moreover, no one has even tried to support the extreme

9   position that every taxpayer affected by the tangible-property tax engages in abusive transfer

10  pricing to a degree proportional to the tax.

11     Perry Urken, Wal-Mart PR's expert witness on transfer pricing, took the estimated

12  $47 million in taxes that Wal-Mart PR will pay under the AMT for the tax year that just

13  ended, pretended it is a tax on actual income, and then calculated what Wal-Mart PR's net

14  taxable income would have to be to warrant such a tax under the regular 39% rate.  (ECF

15  No. 128 at 114, 116.)  Urken concluded that Wal-Mart PR's net income would have to be

16  $120 million, nearly three times its estimated income of $41 million, to justify a $47 million

17  "income" tax.  (ECF No. 128 at 132-133.)  Thus, if viewed as a tax against shifting profits

18  off of the island, the AMT effectively accuses Wal-Mart PR with shifting $79 million to the

19  continental United States last tax year.  (ECF No. 128 at 133.)  That is an incredible amount.

20     If we were to take the estimated figure of $714.75 million that Wal-Mart PR spent on

21  purchases from Wal-Mart Stores, and deduct the 11.24% markup that Wal-Mart Stores has

22  applied to those goods, we would allegedly be left with the original cost of the purchased

23  goods as billed to Wal-Mart Stores by its third-party suppliers: $642.53 million.  (ECF Nos.

1    126 at 39-43; 128 at 135-36; Pl. Exs. 72 at 2; 100 at 1.)  Now, if we deduct $79 million from

2    the $714.75 million in purchases, we would be left with $635.75 million, $6.78 million less

3    than the price allegedly paid by Wal-Mart Stores for the goods themselves.

4          If Wal-Mart Stores and Wal-Mart PR have been lying about their transfer-pricing

5    policies to this outrageous degree, it should be the easiest lie to unmask.  But, when asked at

6    the hearing, Secretary Zaragoza candidly admitted that the Puerto Rico Treasury has "no

7    reason to believe that [Wal-Mart PR and Wal-Mart Stores] have been using any, what we call

8    in the tax area, base erosion techniques" or abusive profit shifting.  (ECF No. 130 at 96-97.)

9    In which case, the AMT is effectively telling the largest retailer on the island that if it wants

10   to do business in Puerto Rico, Wal-Mart Stores must sell merchandise to Wal-Mart PR at a

11   loss, cover the costs of shipping and handling for free, and forgo any return on its labor and

12   investment.  (ECF No. 128 at 136, 141-44.)  We agree with Zaragoza that a business

13   operating under those terms would be "economically irrational."  (ECF No. 130 at 97.)

14         The Secretary has not even proven that the use of transfer pricing to shift profits to

15   other parts of the United States is a problem.  As witnesses for both parties testified, the

16   continental United States is not a tax haven like the Cayman Islands are.  (ECF Nos. 127 at

17   27; 131 at 85.)  If Wal-Mart PR has managed to shift $79 million to, say, the State of

18   Arkansas, those are profits on which Wal-Mart Stores will have to pay income tax at a rate of

19   38% or 39% – namely, a 35% federal corporate income tax, plus a 3% to 4% state corporate

20   income tax.  (ECF No. 127 at 19-21, 27.)  Unless those figures, which the Secretary has not

21   disputed, are far from the mark, Vice President Walker was utterly correct when he stated,

22   "[I]t doesn't make any sense to put some elaborate scheme in place to shift profits from

23   Puerto Rico to the U.S. when essentially you're paying the same amount of tax."  (ECF

1   No. 127 at 27.)  That logic is so sound, Walker did not then need to conclude, "And so we

2   absolutely would not do that."  (ECF No. 127 at 27-28.)

3          Short of pulling out of Puerto Rico entirely, the parties have not proposed a single

4   viable solution for Wal-Mart PR's predicament under the AMT.  Professor Langbein, the

5   Secretary's taxation and transfer-pricing expert, suggested that Wal-Mart PR could try to

6   avoid the tangible-property tax by having Wal-Mart Stores book its transactions in Wal-Mart

7   PR's name.  So, Wal-Mart Stores would still negotiate with and buy goods from third-party

8   suppliers, warehouse the goods, and then contract to have the goods shipped to Wal-Mart

9   PR; but now, the transactions would all be in Wal-Mart PR's name, so that it would look like

10  Wal-Mart PR was dealing directly with these unrelated parties.  (ECF No. 131 at 62-63, 96.)

11  By this means, Langbein suggested that Wal-Mart PR could avoid payment of the tax.

12         Like Vice President Walker, we had never heard a government attempt to defend an

13  illegal tax by suggesting how impacted taxpayers could try to evade it.  (ECF No. 127 at 29.)

14  In any event, the professor's idea is a non-starter because of the AMT's anti-abuse rule,

15  which provides that "no transaction or series of transactions will be considered valid if one of

16  the main purposes is to avoid the application of this section . . . ."  (Pl. Ex. 77, § 1022.03(e).)

17  When presented with the anti-abuse rule, Professor Langbein admitted that his idea would

18  violate it, but he suggested that there still was hope for Wal-Mart PR because "anti-abuse

19  rules of this kind are haphazardly applied, to say the least."  (ECF No. 131 at 97-98.)  It is

20  passing strange – and a notion that we reject – that the Secretary would advise a taxpayer to

21  seek relief from a confiscatory tax by violating a statutory anti-abuse rule in the hope that the

22  Secretary will fail to enforce it.  Clearly, under the rule, a taxpayer cannot avoid payment of

1    the tangible-property tax on its interstate transactions with related parties by manipulating the

2    paperwork to show, falsely, that the transactions were with unrelated parties instead.

3            Professor Langbein also suggested that Wal-Mart Stores may be able to take the sting

4    out of the tangible-property tax by claiming, on its federal tax return, a foreign tax credit for

5    Wal-Mart PR's payment of the tax.  (ECF No. 131 at 44, 48-50, 95-96, 102-03.)  Langbein

6    acknowledged that the credit could be used only by Wal-Mart Stores, and thus would be of

7    no help to Wal-Mart PR.  (ECF No. 131 at 44.)  He also admitted that the "credit would not

8    be allowed . . . [i]f the IRS determined that the [AMT] as a whole or . . . the tangible property

9    component [as] an independent levy . . . was not an income tax."  (ECF No. 131 at 95-96.)

10   At the hearing, Vice President Walker explained that Wal-Mart Stores does not intend to

11   request a foreign tax credit because the tangible-property tax is, quite simply, not an income-

12   based tax.  (ECF Nos. 127 at 50-54.)  The court agrees that the tax does not is not income-

13   based.  Thus, Wal-Mart Stores, or any foreign related party with an affiliated or branch office

14   in Puerto Rico subject to the tax, cannot be faulted for not pursuing a foreign tax credit.

15           The AMT is also not a proper transfer-pricing regulation, and so the most important

16   remedy available to taxpayers faced with a questionable transfer-pricing adjustment cannot

17   be accessed here.  As Urken, the transfer-pricing expert, explained, the predominant method

18   that governments use to challenge "transfer prices put in place by multinational enterprises

19   take[s] the form of an 'adjustment,' by one tax authority, of the transfer price."  (Pl. Ex. 102

20   ¶ 12.)  For example, "if the tax authority of the importing party (Wal-Mart Puerto Rico in

21   this case) determines that the transfer price . . . is too high . . . , they may apply an adjustment

22   to lower the transfer price paid," thereby "increasing the importing party's taxable income (a

23   reduction in costs leads to an increase in computed profits, all else equal)."  (Pl. Ex. 102 ¶

1   12.)   The "global standard" for such transfer-pricing adjustments is the "arm's-length

2   principle," which "holds that controlled transactions should be priced so that their results are

3   consistent with those that would have been realized if the parties were separate, independent

4   entities."  (Pl. Ex. 102 ¶¶ 9, 11.)   Once the scrutinized transfer prices have been adjusted,

5   "[t]he tax authority will generally assess tax[es] through the application of the applicable

6   income tax rate to the increased computed taxable income base."  (Pl. Ex. 102 ¶ 12.)   That,

7   ideally, is how a transfer-pricing law should work.

8        If the taxpayer disagrees with the adjustment, it "generally has several options,

9   including appeals of the transfer pricing adjustment, attempts to incorporate the adjusted

10  transfer price into the computation of taxable income for the [related party] in the other

11  jurisdiction," and, most importantly, "the taxpayer may seek the intervention of the other

12  government."  (Pl. Ex. 102 ¶ 13.)   If a tax authority unilaterally adjusts a transfer price to

13  combat perceived profit shifting, "the result may be an inconsistent treatment of the transfer

14  price: The exporting taxpayer and the governing tax authority would value the transfer at one

15  (higher) price, while the importing country's tax authority valued the same transaction at

16  another (lower) price."  (Pl. Ex. 102 ¶ 23.)   However, if the tax authorities can agree on the

17  appropriate transfer price, the risk of double taxation, or "the inclusion of the same income in

18  the tax base by more than one tax administration," will abate.  (Pl. Ex. 102 ¶¶ 7, 23.)

19       To prevent double taxation, countries have entered into an extensive series of tax

20  treaties governing negotiations about transfer pricing disagreements that may arise between

21  two countries and the taxpayers that make transfers between them.  (Pl. Ex. 102 ¶ 20.)   Under

22  a typical treaty, the "competent authorities" of the interested jurisdictions, *i.e.*, "personnel

23  designated by [the] governments to negotiate transfer pricing when a dispute arises," will

1    collaborate to "agree on a single transfer price to eliminate . . . the risk of double taxation."

2    (ECF No. 128 at 117, 120.)   Puerto Rico and the United States have entered into a

3    comparable tax-coordination agreement.  (*See* Pl. Ex. 49.)

4         By contrast, instead of focusing on specific transactions between related parties and

5    adjusting their transfer prices to prevent illegitimate profit shifting, the AMT simply taxes

6    the products that one related party sells, or even just transfers without payment, to another

7    via interstate commerce.  Because the AMT levies a broad tax, instead of making particular

8    transfer-price adjustments that can later be scrutinized and reevaluated, "the common forums

9    that are available to taxpayers around the world to address transfer pricing adjustments made

10   by tax authorities are not available."  (ECF No. 128 at 117.)  Thus, under the AMT, the risk

11   of double taxation is omnipresent and cannot be offset.

12        Consider yet another hypothetical.  Suppose that a Gotham City company and its

13   Puerto Rico subsidiary engage in a series of transactions, involving the sale of inventory by

14   the former to the latter, that pique the interest of the Puerto Rico Treasury Department, which

15   suspects that the corporations are shifting profit to Gotham City to secure a lower tax rate.  In

16   each transaction, the Gotham City company buys a widget from a third-party supplier for $60

17   and then sells the widget to its Puerto Rico subsidiary for $90, which in turn sells the widget

18   to its customers for $100.  On each transaction, the Gotham City company reports $30 of

19   profit, and its Puerto Rico subsidiary reports $10 of profit, for a total of $40 of profit.

20        Now, suppose that the Puerto Rico Treasury subjects the transactions to an audit and

21   determines that, under the arm's-length principle, two similarly-situated unrelated parties

22   would have priced each widget at $70, instead of $90.  If the Puerto Rico Treasury decided to

23   unilaterally adjust the transfer price to reflect its audit, it would tax the Puerto Rico

1   subsidiary for $30 of profit on each transaction, instead of just $10.  Meanwhile, however,

2   the Gotham City Treasury would continue to tax the Gotham City company for $30 of profit

3   on each transaction.  After all, the Gotham City company still received $90 per widget, not

4   the $70 deemed appropriate by the Puerto Rico Treasury.  As a result, the companies are now

5   taxed for $60 of profit on a transaction that netted them only $40, resulting in $20 of double

6   taxation.  (*See* ECF No. 128 at 121-25 [similar hypothetical]; Pl. Ex. 83 [same].)

7        Under a mutual agreement procedure, the competent authorities of Puerto Rico and of

8   Gotham City could meet and agree upon an appropriate transfer-pricing adjustment for the

9   transactions.  Suppose they agree upon $75 as the arm's-length price of each widget.  The

10  two jurisdictions will then reassess income tax on their respective taxpayers based on their

11  new taxable income base.  Now, on each transaction, the Gotham City company will report

12  $15 of profit, and its Puerto Rico subsidiary will report $25 of profit, for, again, a total of $40

13  of profit, which is, indeed, the profit made when related parties purchase a widget for $60

14  and sell it to their customers for $100.

15       If, instead, Puerto Rico were simply to levy a tax on each and every transfer of goods

16  between the parties, regardless of the appropriateness of their transfer pricing, the Gotham

17  City company could not avail itself of the mutual agreement procedures.  After all, as Urken

18  would say, a broad tax on each interstate transfer between related parties "assess[es] a tax

19  independent of [an] adjustment to a transfer price or even [an] adjustment to income."  (ECF

20  No. 128 at 126.)  So, even if the competent authorities agreed on a proper transfer price, the

21  tax would still be levied and would still cause inconsistent treatment of the transfer between

22  jurisdictions.  Thus, by implementing a broad tax on every controlled interstate transfer of

23  goods, a jurisdiction effectively subjects its taxpayer and the related party to double taxation,

1   while depriving them of the resources and remedies typically available to taxpayers

2   confronting a questionable transfer-pricing adjustment.

3          If, as the cost of doing business in Puerto Rico, the Commonwealth is going to tax

4   Wal-Mart PR $4.50, or $3.00, or even $1.14 in income tax for every dollar it earns, Wal-

5   Mart PR cannot be expected to remain in business here for long.  (ECF No. 127 at 30-31.)

6   As is, multistate chains like GameStop and RadioShack are leaving, or have already left, the

7   island.   (ECF No. 126 at 192.)   Perhaps a massive retrenchment of Wal-Mart PR's

8   relationship with Wal-Mart Stores will allow it to survive the AMT's onerous regime.  But,

9   the onus is not on Wal-Mart PR to suffer under a tax if the tax is unconstitutional.  In any

10  event, retrenchment is not a viable path forward because the efficient acquisition of various

11  goods at low prices is central to Wal-Mart PR's competitive advantage and market appeal.

12  (*See* ECF No. 127 at 15.)

13         In the end, it is not our role "to pass upon [the] wisdom or fairness" of a tax, but only

14  on its validity.  *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 132 S. Ct. 2566, 2600 (2012).  We

15  nonetheless recognize the commonsense expressed by Professor Pomp: "I think confiscating

16  all of the profits of a corporation probably doesn't send the right message to the business

17  community and probably doesn't enhance the business climate here, especially for a

18  corporation that is already closing stores."  (ECF No. 126 at 257.)

19  **D.**   **The Commonwealth's Tax-Refund Action as Remedy**

20         From the start of litigation, the Secretary has contested the jurisdiction of this court.

21  (ECF No. 24.)  The Secretary argues that "the Commonwealth provides a statutory income-

22  tax-refund process that will allow Wal-Mart PR to raise any and all constitutional objections

23  to the tax and obtain a full hearing and judicial determination."  (ECF No. 116 at 3-4

1    (internal quotations omitted).)   The Secretary further argues that because this tax-refund

2    action will provide Wal-Mart PR with an adequate remedy, Wal-Mart PR "cannot avoid

3    these procedural requirements of the Commonwealth processes merely by running to federal

4    court." (ECF No. 116 at 4.)  Moreover, the Secretary contends that this court is not a proper

5    forum for Wal-Mart PR's legal claims because we cannot offer Wal-Mart PR "a complete

6    remedy," by which he means a tax refund.  (ECF No. 130 at 160.)

7            Under 13 L.P.R.A. § 30263(a), Wal-Mart PR must pay, in advance, an estimated

8    amount of AMT in four installments, starting on the fifteenth day of the fourth month of its

9    tax year and ending on the fifteenth day of the twelfth month. *See* 13 L.P.R.A. § 30263(c)(1).

10   Wal-Mart PR's tax year begins on February 1st of each year.  (*See* Def. Exs. 20 at 1, 21 at 1,

11   22 at 1, 23 at 1.)  Thus, on or before May 15, 2015, Wal-Mart PR started to pay the Secretary

12   its AMT for the tax year ending on January 31, 2016.  *See* 13 L.P.R.A. § 30263(f).

13           The record indicates that Wal-Mart PR has been making these estimated payments

14   and, based on the schedule mandated by 13 L.P.R.A. § 30263(d)(1), has already completed

15   paying its AMT for the tax year.  (ECF Nos. 126 at 9-10; 130 at 161-62.)  In his opening

16   statement, the Secretary indicated that Wal-Mart PR has been making its "estimated

17   payments thus far." (ECF No. 126 at 21.)  When Wal-Mart PR later alleged that it has "paid

18   the [estimated] tax" to the tune of $45 million, the Secretary did not dispute it.  (ECF No.

19   130 at 187.)  By law, Wal-Mart PR's payments of its estimated AMT "shall be" and are

20   "treated as payment on account of the tax for the taxable year." 13 L.P.R.A. § 30263(g).[14]

---

[14] The court rejects the contention that "plaintiff has not paid the tax that they are challenging"
because they "have paid [only an] estimated tax." (ECF No. 130 at 161.) Clearly, by law, "[p]ayment of
the estimated tax . . . shall be treated as payment on account of the tax for the taxable year." 13 L.P.R.A.
§ 30263(g). These payments were made under threat of penalty. 13 L.P.R.A. § 30263(h). And, no one

1    As the Secretary correctly argues, Puerto Rico law "requires individuals contesting an

2    imposed tax to pay the tax and then apply to the Secretary of the Treasury for a refund."

3    *Pleasures of San Patricio, Inc.*, v. *Mendez-Torres*, 596 F.3d 1, 7 (1st Cir. 2010) (citing 13

4    L.P.R.A. § 261); *see also* ECF Nos. 116 at 3-4, 8 (the Secretary arguing this fact).[15]   A

5    corporate taxpayer must pursue a tax-refund action even if it seeks to enjoin a tax statute on

6    federal constitutional grounds.  *See Pleasures of San Patricio*, 596 F.3d at 3 (plaintiff was a

7    Puerto Rico corporation seeking to enjoin a Puerto Rico tax as invalid under the Commerce

8    Clause).  "Puerto Rico requires taxpayers not only to pay the tax before seeking redress, but

9    also to in fact have suffered the economic burden of the tax" and not "pass on their tax

10   liabilities to their consumers or employees."  *Id*. at 7-9 (citing 13 L.P.R.A. § 261).

11   Assistant Secretary Pizarro testified that "the main way to ask for a refund . . . [is] on

12   the taxpayer's return" within four years of filing the return on which the contested tax was

denies that Wal-Mart PR has fully paid the estimation of its income tax, based on and including the AMT, for the tax year that ended on January 31, 2016.  The court rejects the Secretary's suggestion that this case is not yet ripe for consideration.  (*See*, *e.g.*, ECF No. 116 at 8-9.)

[15]  The Secretary has also argued, sporadically, that Wal-Mart PR does not have to initiate a tax-refund action before the Puerto Rico Treasury, but "can go directly to the Puerto Rico Court of First Instance to present its claims."  (ECF No. 24 ¶ 2.37; *see also* ECF No. 131 at 107-08.)  That argument is wrong.  As the Puerto Rico Supreme Court recently explained, under "the doctrine prohibiting injunctions when there exists an adequate remedy at law," a taxpayer may not file suit in the Court of First Instance to enjoin a tax when he "has available to him the possibility of filing a request for reimbursement before the Department of the Treasury."  *Yiyi Motors, Inc.* v. *ELA*, 177 D.P.R. 230, 278 (P.R. 2009), *quoted in Cámara de Mercadeo* v. *Acosta-Febo*, 2014 WL 1694465, *11 (T.C.A., San Juan, Mar. 25, 2014).  At the hearing, Secretary Zaragoza acknowledged that, in *Cámara de Mercadeo*, the Puerto Rico Treasury had, in fact, successfully argued against the ability of a taxpayer to bypass the administrative tax-refund action when challenging the constitutionality of a tax law.  (ECF No. 130 at 119-20; Pl. Ex. 57.)  When pressed on why his office had changed its position in this case, Zaragoza replied, "I don't have the legal expertise to determine the reasons behind the different positions."  (ECF No. 130 at 121.)

At the end of the hearing, the Secretary attempted to distinguish *Cámara de Mercadeo* and the authorities on which it relies by citing a 2013 Puerto Rico Supreme Court case, ECF No. 131 at 107-110, which turned out to be *Colón Rivera* v. *Rey Hernández*, 189 D.P.R. 1033 (P.R. 2013).  Because the Secretary did not submit to us an English translation of the decision, we may not consider it.  *See* L.Cv.R. 5(g); *Gonzalez-De Blasini* v. *Family Dep't*, 377 F.3d 81, 88-89 (1st Cir. 2004).  In any event, we read the Spanish original and found that the *Colón Rivera* case, which held that a public employee need not file an administrative complaint before initiating a political-discrimination claim under 42 U.S.C. § 1983, does not overrule or in any way detract from the clear holdings in *Cámara de Mercadeo* or *Yiyi Motors*.

1   paid.  (ECF No. 130 at 210-11.)  No other method of filing a refund claim has been presented

2   to the court.  The Secretary has acknowledged that because Wal-Mart PR's fiscal year ended

3   on January 31, 2016, under 13 L.P.R.A. § 30256(a)(1), it does not have to file a tax return

4   until May 15, 2016.  (ECF No. 130 at 163.)  Moreover, because its fiscal year recently ended,

5   Wal-Mart PR is still processing and auditing its financial information for that year.  (ECF

6   No. 127 at 53-54.)  Puerto Rico law requires corporate taxpayers to file audited financial

7   statements with their tax returns.  (ECF No. 130 at 224.)  Thus, Wal-Mart PR may not be in a

8   position to file its corporate tax return with the Puerto Rico Treasury for weeks to come.

9          The Puerto Rico Treasury Department does not have the authority to deem a tax

10   unconstitutional, but it still has to process the return of a taxpayer challenging the tax before

11   denying the taxpayer's refund claim.  (ECF No. 130 at 211, 234-35.)  In the recent past,

12   Treasury took, on average, two to three years to process a corporate tax return.  (ECF

13   No. 130 at 214.)  Treasury has since "built a plan . . . to have the returns be processed within

14   a year or less," but the plan appears to have failed.  (ECF No. 130 at 214.)  On February 4,

15   2016, Secretary Zaragoza testified, in response to a question about corporate tax returns, that

16   Treasury was "lagging behind on the processing of tax returns," that they "still ha[d]n't

17   finished processing 2013 returns," and that they were going to start processing the 2014

18   returns "[s]hortly."  (ECF No. 130 at 80.)  Meanwhile, Assistant Secretary Pizarro claimed

19   that Treasury first "started" to process 2014 corporate tax returns only in November 2015

20   and had not yet issued any refunds.  (ECF No. 130 at 215.)  Leaving aside the matter of the

21   2014 returns, the record clearly shows that the Puerto Rico Treasury is still processing

1    corporate tax returns from the 2013 tax year and that, as a result, processing a corporate

2    return often takes much longer than the year that Treasury gives itself.[16]

3            Once a tax return has been processed, the Puerto Rico Treasury must decide whether

4    "the refund [claim] needs to be audited."  (ECF No. 130 at 211.)  The court agrees with

5    Professor Pomp – it is, after all, commonsense – that when you are "one of the largest

6    taxpayers in a jurisdiction, you know you're going to be scrutinized."  (ECF No. 126 at 254.)

7    If Wal-Mart PR had challenged the AMT through a tax-refund action, the refund claim

8    related only to its payment of the AMT would be approximately $30.94 million.[17]  (Pl. Ex.

9    40 at 1.)  Since the 2011 tax year, the largest tax refund that Treasury has issued was $1.24

10   million, about 4% of the size of Wal-Mart PR's projected refund.  Meanwhile, the median

11   corporate refund each year since 2011 has ranged from only $2,360 to $10,482.  (Pl. Ex. 5.)

12   Thus, it is only reasonable to assume that Treasury would audit Wal-Mart PR's claim.

13   Treasury always audits a refund claim before paying it.  (ECF No. 130 at 213.)  And, even a

14   5% difference in the size of this refund would add up to more money than the largest tax

15   refund, corporate or individual, that Puerto Rico has granted since 2011.  (Pl. Exs. 4, 5.)

16           The Puerto Rico Treasury, however, is incapable of handling the audit.  Last year,

17   Secretary Zaragoza wrote that Treasury has only 176 auditors to review around 850,000

---

[16] The court assumes that when Secretary Zaragoza and Assistant Secretary Pizarro spoke of 2014 returns, they meant returns for the 2014 tax year that were filed in 2015.  However, if they meant returns filed in 2014, then the Puerto Rico Treasury's processing lag is a full year longer than stated in the text of this opinion.  Under Puerto Rico law, tax returns "filed on a calendar year basis shall be filed on or before April 15 following the close of the calendar year."  13 L.P.R.A. § 30256(a)(1).

[17] Wal-Mart PR's refund claim for payment of the AMT would be around $30 million because the AMT is paid only when it exceeds the taxpayer's "regular tax for the tax year," and each dollar paid in "regular tax" counts toward the AMT without being part of the AMT.  Wal-Mart PR estimates that it will pay more than $46 million in income tax to Puerto Rico for the fiscal year ending on January 31, 2016.  (Pl. Ex. 40 at 1.)  Although the amount of that tax is due entirely to the AMT, approximately $16 million of it will be attributed to "regular tax," whereas the remaining $30-odd million is attributed to the AMT.

1    annual refund claims – that is more than 4,800 per auditor, and more than ninety per auditor

2    per week (assuming no vacations).  (Pl. Ex. 13 at 4, 28.)  At the hearing, Zaragoza testified

3    that Treasury's staff has been cut in half since 1992, leaving the Department with workers

4    who are "not well paid at all" and "not that experienced."  (ECF No. 130 at 134.)  Assistant

5    Secretary Pizarro, who oversees Treasury's Audit Bureau, was even more blunt, testifying

6    that "close to 70 percent of [his] auditors . . . have very, very little experience," and that his

7    auditors are generally "not ready to engage in complex auditing procedures," do not "have

8    experience dealing with multinational[]" corporations, and still need "to develop the

9    necessary skills to know the [tax] code."  (ECF No. 130 at 206, 208.)  This dysfunction often

10   results in the non-collection of taxes.  For example, when Pizarro visited the Audit Bureau's

11   office in Ponce, Puerto Rico's second largest city, he found that the auditors there "were not

12   even considering the computation of an Alternative Minimum Tax as a potential exposure of

13   [an] audit."  (ECF No. 130 at 207.)

14        How is it that the Commonwealth's Treasury Department lacks the competence to

15   audit the local subsidiary of a multinational conglomerate?  Assistant Secretary Pizarro

16   claims that it all comes down to money.  Reflecting on the tax courses he teaches at the

17   Interamerican University, Pizarro stated that "most of [his] students are not willing to work

18   for the Treasury Department because the pay is so low."  (ECF No. 130 at 207.)  "I came to

19   find out that it's really hard to look for competent people at the pay grade that the Treasury

20   Department has," Pizarro continued, and so the Audit Bureau has had to settle for

21   "employees that . . . let's say are not the most knowledgeable."  (ECF No. 130 at 207.)

22   Moreover, "since the experience of the auditors is so little" and they "don't have the

1    technical knowledge" to evaluate transfer prices, Treasury does not audit transactions

2    between related parties for profit shifting.  (ECF No. 130 at 210.)

3           The problems at Treasury run deep.  Not only does Treasury fail to do what it should

4    do (like check to see if taxpayers are required to pay the AMT), but it does not know how to

5    do some of the things it does.  For example, before Act 72 was enacted, Puerto Rico allowed

6    corporate taxpayers to seek a partial exemption from the AMT based upon proof that their

7    transfer prices were proper under the arm's-length principle.  *See* 13 L.P.R.A. § 30073(d)(4).

8    Pursuant to that provision, Treasury processed numerous exemption requests, granting some

9    and denying others.  But, when asked, Assistant Secretary Pizarro "definitely disagree[d]"

10   with the notion that Treasury had any clue about how to evaluate those requests because, he

11   declared, "we don't have the technical knowledge to analyze transfer pricing issues."[18]  (ECF

12   No. 130 at 228-29.)  Under these circumstances, it should not surprise anyone that a tax audit

13   by Treasury can delay a refund decision for several years.  (ECF No. 130 at 213.)

14          This stultifying combination of inefficiency and incompetence at the Puerto Rico

15   Treasury is one reason why hundreds of old corporate tax-refund claims remain in limbo

16   there for years.  (Pl. Ex. 5; Def. Ex. 80; ECF No. 130 at 213.)  As of the hearing in early

17   February 2016, no corporate refund claims from the 2014 tax year had been granted yet,

18   8.7% of claims from the 2013 tax year had not yet been processed, 6.6% of claims from the

19   2012 tax year were still pending, and 5.1% of claims from the 2011 tax year remained under

20   review.  (Def. Ex. 80.)  Of those corporate tax refunds that were granted, the Treasury took,

---

[18] Assistant Secretary Pizzaro was called as a witness for the Secretary.  He was confirmed to his present post on March 2, 2015.  (ECF No. 130 at 192.)  Prior to joining Treasury, Pizarro was Chief Tax Advisor to the Puerto Rico Senate, Deputy Director of the Senate's Ways and Means Committee, and a Professor of Tax at the Interamerican University of Puerto Rico.  (ECF No. 130 at 193.)

1    on average, 252 days to issue a check to the taxpayer for the 2013 tax year, 325 days for the

2    2012 tax year, and 525 days for the 2011 tax year.  (ECF No. 130 at 214; Def. Ex. 80.)   In

3    other words, a corporate tax-refund claim has a more than one-in-twenty chance of remaining

4    in limbo at Treasury about four years after it was filed.  Of those refund claims that are

5    granted, as opposed to denied, taxpayers can expect to wait an average of eight to seventeen

6    months for the check to arrive.  Based on the current lag in processing corporate refunds, it is

7    virtually certain that a corporate taxpayer will not receive a decision from Treasury on a new

8    refund claim after nearly a full year.

9            These delays matter.  Although Treasury cannot hold a tax unconstitutional, it has to

10   deny a taxpayer's refund claim before the taxpayer can seek judicial review of any

11   constitutional challenges underlying the claim.  *Pleasures of San Patricio,* 596 F.3d at 8

12   (citing *Carrier*, 677 F.2d at 164).  It is uncontested that, each and every year that a refund

13   claim lingers before Treasury, the taxpayer must continue to pay the challenged tax.  Wal-

14   Mart PR projects that, for the foreseeable future, it will be liable for at least $40 million in

15   AMT each year – up from the approximately $30 million it paid this past year – due to a

16   projected decline in its net taxable income and, thus, regular income tax.  (Pl. Ex. 100 at 4.)

17   Thus, by law, Wal-Mart PR must pay Puerto Rico at least $10 million in estimated AMT

18   each quarter until the tax is either held unconstitutional or enjoined.  *See* 13 L.P.R.A.

19   § 30263(d)(1).  In other words, no matter what else happens, Wal-Mart PR will have to pay,

20   at the very least, an additional $40 million in estimated AMT – on top of the $30 million or

21   so that it has already paid – if it has to vindicate its federal rights through a tax-refund action.

22   After all, Treasury is currently running, at a minimum, around a one-year delay in its

23   processing of corporate tax-refund claims.  (ECF No. 130 at 215; Def. Ex. 80.)

1    Once the Puerto Rico Treasury has denied a taxpayer's claim, the taxpayer can appeal

2    Treasury's decision to the Court of First Instance.  Under the Puerto Rico Constitution, "[n]o

3    law shall be held unconstitutional except by a majority of the total number of justices" on the

4    Puerto Rico Supreme Court.  P.R. Const., Art. V, §4.  Thus, for the taxpayer to receive a

5    remedy from the Commonwealth's courts, not only must the Court of First Instance and the

6    Court of Appeals first pass judgment on the case, but the Puerto Rico Supreme Court must

7    then rule in favor of the taxpayer's claims.  Up until the day that the Supreme Court exercises

8    its constitutionally-exclusive authority to hold the tax unconstitutional, the taxpayer must

9    keep paying the tax.  Puerto Rico law provides categorically that "[a]n injunction or

10   restraining order cannot be granted . . . [t]o prevent the levying or collection of any tax levied

11   by the laws of the United States of or Puerto Rico."  32 L.P.R.A. § 3524(7).  This specific

12   provision was brought to the attention of the parties at the end of the hearing, *see* ECF No.

13   123, but the Secretary has not attempted to argue that the statute does not mean what it says,

14   thereby waiving any such argument.

15       In *Cámara de Mercadeo* v. *Acosta-Febo*, 2014 WL 1694465 (T.C.A. Mar. 25, 2014),

16   a certified English translation of which Wal-Mart PR entered into evidence as Plaintiff's

17   Exhibit 56, the Puerto Rico Court of Appeals cited 32 L.P.R.A. § 3524(7) in support of its

18   holding that because "the appellants are taxpayers under the law that they intend to impugn,"

19   "[i]t is not possible to grant them any injunctive remedy."  *Id*. at *8-9.  Instead, the Court

20   held, the taxpayers had to pay the contested tax under protest, file a tax-refund action before

21   the Treasury Department, and then pursue judicial review of their challenges as part of an

22   appeal of the denial of their refund.  *Id*. at *11-12.  Here, the question is whether a lower

23   Puerto Rico court can enjoin a tax statute upon reviewing Treasury's denial of a refund claim

1   based on a constitutional challenge to the statute.  There does not appear to be any decisional

2   law on point; nor does there appear to be any reason to write such an exception into the

3   above anti-injunction law.  Despite the passage of time, we find that an old assessment of the

4   law by Judge Torruella still stands: "Although 32 L.P.R.A. § 3524(7) has been interpreted in

5   light of universal principles of equity, we know of no case where the implementation of a

6   taxing statute has been held to fall within the exception."  *United States Brewers Asso.* v.

7   *Cesar Perez*, 455 F. Supp. 1159, 1163 (D.P.R. 1978).

8          As a result, it appears that, under the procedures that govern a local tax-refund action,

9   only the Puerto Rico Supreme Court can rule a tax statute unconstitutional and the taxpayer

10  must continue to pay the contested tax – in this case, at the forecasted rate of tens of millions

11  of dollars a year – up until that final judgment has been rendered.

12         Brian Ricchetti, an economist, performed a simple analysis to determine the time it

13  takes a tax-refund action to go from being filed before the Court of First Instance to being

14  decided, at the next stage of review, by the Court of Appeals.  Ricchetti's methodology was

15  sound.  He asked a local attorney at the firm McConnell Valdés LLC to find every Puerto

16  Rico Court of Appeals decision from 2013 to 2015 that involved a tax-refund claim.  (ECF

17  No. 127 at 89-91.)  The attorney collated relevant cases by running a WestlawNext search for

18  Court of Appeals decisions containing the word "Treasury" and the word "refund" or any of

19  its derivatives.  (Pl. Ex. 301 ¶ 4.)  The attorney looked at every decision handed down in

20  2013, 2014 and 2015, eliminating any decision that did not concern the appeal of a tax-

21  refund claim made to the Treasury Department.  This process yielded a total of twenty-five

22  cases from that three-year period.  (Pl. Ex. 301 ¶ 5.)

1     Although those numbers may seem low, they also seem right.  Over the past five

2  years, the largest corporate tax refund issued by the Puerto Rico Treasury was from the 2012

3  tax year: $1,241,467.  (Pl. Ex. 5.)  The median corporate refund that year was $10,482.  (Pl.

4  Ex. 5.)  Both figures are on the high end historically.  For the 2014 tax year, for example, the

5  largest corporate refund issued by Treasury was only $243,293, while the median corporate

6  refund was only $2,360.  (Pl. Ex. 5.)  Over the same period of time, the largest individual tax

7  refund was from the 2011 tax year: $174,438.  (Pl. Ex. 4.)  The median individual refund that

8  year was $563.  (Pl. Ex. 4.)  Those figures, too, are on the high end historically.  While these

9  are significant sums of money for most people and businesses, they are not sums that inspire

10  parties to spend tens of thousands of dollars, if not far more, on lawyers and protracted

11  litigation.  Thus, it makes sense that, over the past three years, only twenty-five local tax-

12  refund actions have been pursued up to the point of a Court of Appeals decision.

13     By analyzing those twenty-five cases, Ricchetti determined that, in recent years, the

14  average time it took a tax-refund action to go from being filed in the Court of First Instance

15  to being decided by the Court of Appeals was 737 days or 2.0 years.  (ECF No. 127 at 103.)

16  The longest time was 2,854 days or 7.8 years; the shortest, by a matter of months, was 220

17  days or 7.3 months.  (ECF No. 127 at 102; Pl. Ex. 300, Ex. 1.)  To figure out how long it

18  takes a case to go from a decision in the Court of Appeals to one in the Puerto Rico Supreme

19  Court, Ricchetti had to broaden his focus to civil cases in general because the lawyer at

20  McConnell Valdés LLC was unable to find any Supreme Court decisions from 2013 to 2015

21  that concerned a tax-refund action.  (ECF No. 127 at 103.)  So, instead, the attorney pulled

22  every civil case decided by the Supreme Court in 2015.  Using a methodology similar to the

23  one used in his first analysis, Ricchetti found that the average time it took a civil case to go

1    from a decision in the Court of Appeals to one in the Supreme Court was 589 days or 1.6

2    years.  (ECF No. 127 at 103.)   The longest time it took was 969 days or 2.7 years; the

3    shortest was 288 days or 9.6 months.  (ECF No. 127 at 103; Pl. Ex. 300, Ex. 2.)

4          When the figures from Ricchetti's two analyses are added together, we learn that, in

5    general, it takes a tax-refund case an average of 1,326 days, or 3.6 years, to travel from being

6    filed in the Court of First Instance to being decided by the Puerto Rico Supreme Court.  (ECF

7    No. 127 at 104.)  Were a taxpayer lucky enough to have his case jet through the system at the

8    fastest times recorded in recent years, it would still take a total of 508 days or 1.4 years to

9    reach final judgment.  The truly unlucky taxpayer, whose case crawled through the system at

10   the slowest speeds recorded in recent years, would wait 3,823 days or 10.5 years, during

11   which time he would have to keep paying the contested tax.  The judgment of the Puerto

12   Rico Supreme Court could still be reviewed on federal-law grounds, were the Secretary to

13   receive writ of certiorari to the United States Supreme Court.  *See* 28 U.S.C. § 1258.

14         By contrast, the latest federal-court statistics show that the median time interval from

15   filing to disposition for civil cases in this district is 12.1 months.[19]  Admin. Off. of the U.S.

16   Cts., Stat. Tables for the Fed. Judiciary, Table C-5 at 1 (for twelve-month period ending

17   June 30, 2015).  And, the median time interval from filing to disposition for cases before the

18   First Circuit is 12.7 months.  Admin. Off. of the U.S. Cts., Fed. Ct. Mgmt. Stat. Summary at

19   2 (for the twelve-month period ending June 30, 2015).  Thus, by filing its claims before this

---

[19] The court finds this 12.1-month statistic the most relevant.  Based on a sample size of only 18 cases, the median time interval for civil cases ending in trial in this district was 27.8 months.  However, this case cannot be analogized to those because the merits of this action are simple and straightforward, whereas, in our experience, the civil cases that go to trial tend to be more complicated, and we also afforded this case "a speedy hearing" under the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 57. In fact, the court was able to dispose of this case within four months of its filing.

1    court, a corporate taxpayer can expect to receive an appellate ruling on the merits in about

2    two years – around the time the taxpayer can reasonably expect the Puerto Rico Treasury

3    would take to process its tax return and refund claim.

4           Leaving the possibility of United States Supreme Court review aside, if Wal-Mart PR

5    had to pursue a tax-refund action, it would have to wait a minimum of 2.4 years and an

6    average of 4.6 years before the AMT is finally overturned as unconstitutional.  That figure

7    does not include the five-month delay that would have occurred if, instead of filing a

8    complaint in December 2015 (as it did in this case), Wal-Mart PR had to wait until around

9    May 2016 to file a refund claim with its tax return for the 2015 tax year.  Now, if Treasury

10   were to process Wal-Mart PR's refund claim at the fastest speeds in the record, it would still

11   take at least one year to deny the refund claim.  And, that one-year figure unrealistically

12   assumes that Treasury would deny Wal-Mart PR's refund without auditing it or the return.

13   The audit of the return would likely be, due to its complexity, one of the one-in-twenty audits

14   that takes Treasury more than four years to complete.  Once Treasury has denied the refund

15   claim, Wal-Mart PR can expect to wait an average of 3.6 years for the local Supreme Court

16   to rule on the constitutional challenges underlying its claim and to afford it relief at last.

17          We credit Ricchetti's analysis, although our own lengthy experience with the

18   Commonwealth court system, as both observer and practitioner, leads us to believe that it

19   would take far longer than 3.6 years to obtain a remedy in the Puerto Rico Supreme Court.

20          At the end of the process, a corporate taxpayer with a meritorious constitutional claim

21   against a local tax statute will finally have a judgment from the Puerto Rico Supreme Court

22   that invalidates the law and orders a refund of any unconstitutional taxes paid.  Due to the

23   insolvency of the Commonwealth, however, the taxpayer will encounter a host of obstacles

1   to executing the judgment.  As far back as June 2010, for example, the Puerto Rico Supreme

2   Court, after invalidating a law under which the plaintiffs had paid luxury-vehicle fees, called

3   for "judicial creativity" in fashioning a remedy that "will allow the restitution of the money

4   to the taxpayers" without "affect[ing] the public funds to the extreme."  *Herrero* v. *ELA*, 179

5   D.P.R. 277, 309 (P.R. 2010); Pl. Ex. 58 (certified translation of part of the opinion).  The

6   Court called for this "creativity" out of concern that "[a]n immediate disbursement of the

7   funds involved could erode even further the already diminished funds of the state."[20]  *Id.*

8        Puerto Rico has since enacted the Special Fiscal and Operational Sustainability Act of

9   2014, ___ L.P.R.A. § ___.   Under Section 28 of that law, a court cannot order the

10  Commonwealth to pay, in "a lump sum," any "final and binding judgments . . . regardless of

11  the nature of the judgment."  (Pl. Ex. 6 at 97-98.)  Thus, for example, the law provides that

12  "[i]f the amount owed by the Commonwealth . . . is equal to or less than one hundred

13  thousand dollars ($100,000), it may be paid off through a one (1) to three (3) year payment

14  plan from the time the payment obligation becomes final and binding."  (Pl. Ex. 6 at 98.)  As

15  is relevant here, "[i]f the judgment owed by the Commonwealth . . . exceeds twenty million

16  dollars ($20,000,000), the payment plan applicable thereto shall be fixed during the drawing

17  up of the budget following the date on which the payment obligation becomes final and

18  binding, taking into consideration the fiscal consideration, and said payment plan shall never

19  exceed an annual sum of three million dollars."  (Pl. Ex. 6 at 99.)

20       The law also provides that "[i]f there were no funds available to honor the payment

21  plan during a specific fiscal year, it shall be postponed for the following fiscal year, thus said

---

[20] We wonder, of course, how "judicial creativity" can protect the rights of a wronged taxpayer when what he is due is quite clear – a refund of the taxes he never should have had to pay.

1    payment plan shall be automatically extended for the number of unpaid installments."  (Pl.

2    Ex. 6 at 100.)   The law provides further that the Commonwealth "shall not make any

3    payment whatsoever unless the creditor of the judgment provides an official certification

4    issued by the pertinent agency stating that the creditor has no outstanding debt with the

5    Department of the Treasury."  (Pl. Ex. 6 at 100.)   In the event that the "creditor" has an

6    outstanding debt, "the amount of said debt shall be deducted from the total amount to be

7    paid," unless the creditor is administratively contesting the amount of the debt, in which case

8    the Commonwealth "shall refrain from making any payment whatsoever until the review

9    process has concluded."  (Pl. Ex. 6 at 100.)   The Secretary does not contest that this law will

10   apply to any final judgment that Wal-Mart PR might achieve through the local courts.

11          So, if the Puerto Rico Treasury could deny Wal-Mart PR's tax-refund claim only one

12   year after it was filed (which we found improbable), if the Court of First Instance could

13   preliminary enjoin the AMT immediately upon reviewing that denial (which we found is not

14   the case), and if the injunction could remain in effect until the Puerto Rico Supreme Court,

15   exercising its exclusive constitutional power, invalidates the AMT years from now, it is

16   possible that Wal-Mart PR would be entitled to a tax refund of only $70 million, comprised

17   of the $30 million in AMT it has already paid and the $40 million it will pay while its refund

18   claim is pending before Treasury.   Again, the court finds this scenario unrealistically

19   conservative and contrary to local law, but it is also the best outcome that Wal-Mart PR can

20   hope for under the tax-refund action.  If the administrative denial of its refund claim takes

21   longer than one year (which it most assuredly will) or if the Court of First Instance cannot

22   enjoin the tax (which it apparently cannot), Wal-Mart PR will simply have to pay more AMT

1    over to the Commonwealth in the hope that, eventually, the Commonwealth will refund the

2    money pursuant to a court judgment.

3            Under the Special Fiscal and Operational Sustainability Act of 2014, however, Puerto

4    Rico must enact a "payment plan" under which it may pay off that court judgment at a rate of

5    no more than $3 million per year.  (Pl. Ex. 6 at 99.)  Secretary Zaragoza acknowledged that

6    this $3-million limit would remain in force, even if the Commonwealth had the money to pay

7    off the entire judgment at once.  (ECF No. 130 at 106.)  Thus, under the best-case scenario

8    for the best-case scenario, the Commonwealth would take twenty-four years to satisfy a $70-

9    million judgment.  But, Puerto Rico can refuse to "honor the payment plan" whenever it

10   finds there are "no funds available" that year.  (Pl. Ex. 6 at 100.)  And, under Treasury's

11   recent guidelines, which prioritize some government payment obligations over others, no

12   provision has been made to prioritize the payment of a court judgment ordering a tax refund.

13   (*See* Pl. Ex. 76.)  Moreover, Treasury does not have enough money right now to grant every

14   urgent request that an agency head has sworn, under penalty of perjury, is necessary to the

15   operation, continuity and stability of the Commonwealth.  (ECF No. 128 at 39-40, 47.)

16   Because Puerto Rico will stay insolvent for the foreseeable future, its payments toward Wal-

17   Mart PR's tax refund would likely be "postponed" indefinitely.  (*See* Pl. Ex. 6 at 100.)

18           Additionally, because it is predictable that a large and complex corporation like Wal-

19   Mart PR will regularly contest Treasury's tax assessments, Puerto Rico will have to "refrain

20   from making any payment whatsoever until [each] review process has concluded."  (Pl. Ex. 6

21   at 100.)  But, Treasury is incapable of "engag[ing] in complex auditing procedures" and

22   "dealing with multinationals."  (ECF No. 130 at 208.)  Also, a Treasury tax audit can take

23   years to complete.  (ECF No. 130 at 213; Pl. Ex. 5; Def. Ex. 80.)  Thus, it is possible that a

1   corporation like Wal-Mart PR will always have a tax assessment under review.  In sum, the

2   Special Fiscal and Operational Sustainability Act effectively makes any tax-refund judgment

3   by a Puerto Rico court in favor of Wal-Mart PR virtually impossible to execute.

4        The Secretary has argued that the court need not worry about Puerto Rico's ability to

5   "pay Wal-Mart PR's refund" because "Wal-Mart PR will be able to obtain a timely and

6   commensurate credit on its tax returns" under Section 6021.02 of the Puerto Rico Internal

7   Revenue Code of 2011.  (ECF No. 116 at 6.)  That statute, which is codified at 13 L.P.R.A.

8   § 33022, provides in relevant part: "When a payment in excess of any taxes imposed by

9   §§ 30041 and 31001 et seq. of this title has been made, the amount of such payment in excess

10  shall be credited . . . against any taxes imposed by this Code or the installment thereof which

11  is then enforceable, and any remainder shall be immediately refunded to the taxpayer."  13

12  L.P.R.A. § 33022(a)(1).  Late last year, the court ordered the Secretary to promptly file any

13  "regulations indicating that a credit is applicable" to Wal-Mart PR if a local court were to

14  order a tax refund.  (ECF No. 39 at 1.)  The Secretary did not file any regulations with us,

15  and we have not discovered any on our own.

16       There are several problems with the Secretary's argument.  First, the AMT is one of

17  the "taxes imposed by §§ 30041 . . . et seq. of this title," and so payment of the AMT will

18  never be "in excess of [those] taxes."  *See* 13 L.P.R.A. § 33022(a)(1).  If the Puerto Rico

19  Supreme Court were to overturn the AMT as unconstitutional, earlier payments of the AMT

20  would still have been toward one of the "taxes imposed by §§ 30041 . . . et seq. of this title."

21  *See id.*  Next, even if the statute allowed payments of the AMT to be credited to the taxpayer

22  upon the invalidation of the AMT, the overpayment credit is limited in amount to "any taxes

23  . . . then enforceable," with "any remainder" going to a refund.  *See id.*  According to Wal-

1    Mart PR's current projections, Wal-Mart PR's regular income-tax burden will be under $7

2    million each year for the foreseeable future.  (Pl. Ex. 100 at 4.)  Even if we were to doubt

3    those projections and triple its tax burden, that would still leave Wal-Mart PR in the position

4    of needing to collect approximately $50 million through a refund under the best of

5    circumstances.  Finally, the Secretary's argument ignores how the recent Special Fiscal and

6    Operational Sustainability Act constrains the government's ability to craft how it satisfies a

7    court judgment.  The Act, which covers "all final and binding judgments," specifies that

8    when the judgment award "exceeds twenty million dollars," the Commonwealth may not pay

9    or credit the holder of that judgment more than "an annual sum of three million dollars."  (Pl.

10   Ex. 6 at 97, 99-100.)  Once again, a remedy under the judgment would take decades.

11           At the hearing, Assistant Secretary Pizarro suggested that, aside from any court-

12   ordered remedy, Wal-Mart PR could also avail itself of the tax credit codified at 13 L.P.R.A.

13   § 30202.  Because the official English translation has not been updated to account for recent

14   amendments, plaintiff submitted a certified translation of the current statute at ECF No. 100-

15   7.  This particular tax credit allows taxpayers to credit the AMT they have paid in prior years

16   against their regular income tax for the current tax year, if their regular income tax exceeds

17   their AMT for the year.[21]  However, the credit is limited to "25 percent of th[e] difference"

18   between the regular income tax and the AMT for that year.  (ECF No. 130 at 218.)  Like the

---

[21] This is how Assistant Secretary Pizarro described the tax credit at the hearing.  (ECF No. 130 at 218-20.)  The actual statute setting forth the credit does not define it in a meaningful way.  Subsection (a) of the statute provides that there shall be a "minimum tax credit."  13 L.P.R.A. § 30202(a).  Subsection (b) of the statute then defines the "minimum tax credit" as the cumulative AMT imposed over every prior tax year, minus "the amount allowable as a credit under subsection (a) for such prior taxable years."  13 L.P.R.A. § 30202(b).  By defining the credit in terms of the credit, the statute fails to define anything.  Pizarro avoided this problem by defining the credit in terms of subsection (c) of the statute, which limits the credit to 25% of the difference between the taxpayer's regular income tax and its AMT when the former exceeds the latter.  See 13 L.P.R.A. § 30202(c).

1   last tax credit we discussed, this credit suffers from the problem that the Special Fiscal and

2   Operational Sustainability Act now governs how the government can satisfy a court

3   judgment.  Even if that were not the case, the credit would pay off the judgment only six or

4   so million dollars at a time, given how low Wal-Mart PR's regular income tax is projected to

5   be.  (*See* Pl. Ex. 100 at 4.)  And, the credit might disappear entirely upon the passage of a

6   new AMT.  Yet again, the remedy would take, at best, decades to complete.

7           In sum, the court finds that, if Wal-Mart PR had to vindicate its federal rights by

8   means of a tax-refund action, Wal-Mart PR would have to keep paying several tens of

9   millions of dollars in AMT to Puerto Rico, while it is virtually certain that, under present

10  circumstances and law, Puerto Rico would not fully refund that money for decades, if at all.

11                                              **II.**

12                                  **Conclusions of Law**

13          Pursuant to Federal Rule of Civil Procedure 52(a)(1), our conclusions of law are:

14  **A.      The Court has Subject-Matter Jurisdiction under the Butler Act**

15          The court holds that we have subject-matter jurisdiction of this case.  Our holding is

16  based on the simple fact that the Commonwealth of Puerto Rico is insolvent and that federal

17  law does not require a taxpayer with a meritorious claim to contest a local tax by means of a

18  tax-refund action, which will require him to keep paying the tax at least until he can seek

19  judicial review, unless the local government can provide him with an actual refund at the end

20  of the process, "reversing the detriment the tax imposed upon him."  *See Pleasures of San*

21  *Patricio*, 596 F.3d at 8.  The court recognizes that the Butler Act's jurisdictional bar is high,

22  but we also recognize that it is not absolute.  If ever a case were to fall under the exception

23  that courts have read into the Butler Act, this is it.

1    "[T]he party invoking subject matter jurisdiction . . . has the burden of proving by a

2    preponderance of the evidence the facts supporting jurisdiction." *Meléndez-García* v.

3    *Sánchez*, 629 F.3d 25, 40 (1st Cir. 2010) (ellipsis in original) (*quoting Padilla-Mangual* v.

4    *Pavía Hosp.*, 516 F.3d 29, 31 (1st Cir. 2008)).  Wal-Mart PR has met this burden.[22]

5         The Butler Act states in relevant part: "No suit for the purpose of restraining the

6    assessment or collection of any tax imposed by the laws of Puerto Rico shall be maintained

7    in the United States District Court for the District of Puerto Rico."  48 U.S.C. § 872.  The

8    Act is an "analog" of the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, "applicable to

9    Puerto Rico."  *Hibbs* v. *Winn*, 542 U.S. 88, 109 n.11 (2004); *see also Pleasures of San*

---

[22] Counsel for the Secretary seemed to believe that this court could decide the jurisdictional issue without receiving any facts in evidence.  At the first proceeding in this case, counsel impressed on us the Commonwealth's need for expedition, arguing vociferously that it would be unacceptable if the Secretary waited two years for a judgment from this court, only to learn that federal jurisdiction did not exist.  (ECF No. 37 at 15.)  Therefore, pursuant to Federal Rule of Civil Procedure 57, we strove mightily to provide the parties with a speedy hearing, informing them that if they had "any question, if there [wa]s any dispute, the doors of [our] chamber [we]re open 24/7 to deal with this [case]. . . . Day or night. No matter what."  (ECF No. 37 at 53.)  One need only look at the speed with which we addressed every issue that later arose to know that we meant what we had said.

At one point, but only one, counsel moved us to slow the pace of litigation to allow for a more "ordered and rational discovery process."  (ECF No. 53 at 2.)  But, counsel did not ask for extra time to pursue further discovery of Wal-Mart for purposes of determining our jurisdiction, the main area in which the Secretary might have needed it.  No, counsel argued that "the four corners of the complaint in tandem with the parties' respective briefs amply suffice[d] to evaluate the jurisdictional challenge."  (ECF No. 53 at 2.)  Instead, counsel stated that he needed more time for "the discovery required concerning the merits of Wal-Mart's claims and to be ready for a trial . . . on the merits."  (ECF No. 53 at 2.)  That request did not make sense.  Few, if any, facts about Wal-Mart were relevant to the legality of the AMT.  And, most of the materials that the Secretary needed to uphold the law should have already been in his hands.  So, we denied counsel's request on the ground that we would "not delay the proceedings in this pressing matter for no reason."  (ECF No. 58 at 7.)  If counsel had asked for more time to pursue further discovery for purposes of the jurisdictional inquiry, our response might have been different.

If the AMT were a tax directed only to Wal-Mart's specific situation, then prolonged discovery about the financial innards of not just Wal-Mart PR, but its parent company and worldwide affiliates, may have been relevant and proper.  But, the AMT is a tax of general application, and so we advised counsel against wasting his time and resources on data perhaps relevant to a transfer-pricing audit of Wal-Mart PR, but inappropriate to "a federal-court challenge to the tax as illegal on its face."  (ECF No. 58 at 4.)  Counsel may rest assured, however, that all the data in the world about Wal-Mart would not have altered our holding on jurisdiction.  That holding is predicated largely on the undeniable insolvency of the Commonwealth, which is information that the Secretary has, it appears, long known about.

1   *Patricio,* 596 F.3d at 5.  "The two statutes employ different language (*i.e.* the [TIA] includes

2   an express exception that the Butler Act lacks), but have been construed *in pari materia*."  *Id.*

3   (alteration in original) (quotation marks omitted) (*quoting United Parcel Serv., Inc.* v.

4   *Flores-Galarza*, 318 F.3d 323, 330 n.11 (1st Cir. 2003)).  "For this reason, we apply the

5   Butler Act in the same manner as the TIA."  *Id.* (*citing Carrier Corp.*, 677 F.2d at 164).

6   "The TIA limits the jurisdiction of a federal court to entertain a suit seeking to enjoin the

7   levying or collection of a state tax where 'a plain, speedy and efficient remedy' exists in state

8   court."  *Id.* (*quoting Carrier*, 677 F.2d at 164).

9          "Two conditions must, therefore, be satisfied before the Butler Act will deprive a

10  federal court of jurisdiction: First, the suit must attempt to restrain the assessment or

11  collection of a Puerto Rico tax; and, second, local courts must provide the plaintiff a plain,

12  speedy, and efficient remedy."  *Id.*  The First Circuit Court of Appeals has long held that "the

13  Butler Act cannot preclude the enjoinment of a Commonwealth's tax where a clear violation

14  of [federal law] is established, and where there exists no plain, speedy and efficient remedy

15  in the local forums."  *U.S. Brewers Ass'n* v. *Perez*, 592 F.2d 1212, 1213 (1st Cir. 1979); *see*

16  *also Coors Brewing Co.* v. *Mendez-Torres*, 678 F.3d 15, 18-19 (1st Cir. 2012).  The parties

17  agree that the action seeks to enjoin a Puerto Rico tax.  The only question is whether, at

18  present, the Commonwealth can offer Wal-Mart PR a plain, speedy, and efficient remedy.

19  Put another way, if we are to bar our courthouse doors to taxpayers contesting the validity of

20  a local tax, the Butler Act "requires [Puerto Rico] to provide [them] with a swift and certain

21  remedy when they resist tax collections."  *See Hibbs*, 542 U.S. at 108 n.10.

22          Under the Butler Act, the standard remedy afforded to a taxpayer is a tax-refund

23  action before the now-insolvent Puerto Rico Treasury, followed by judicial review of the

1    taxpayer's claims before the local courts.  *Pleasures of San Patricio,* 596 F.3d at 7-8.  The

2    Secretary argues that this tax-refund action is precisely the remedy that Wal-Mart PR should

3    be forced to pursue.  (ECF No. 116 at 3-4.)  "State refund actions that allow protesting

4    taxpayers the opportunity for state judicial review of their constitutional and federal claims

5    generally constitute a plain, speedy, and efficient remedy."  *Id*. at 7 (*citing California* v.

6    *Grace Brethren Church*, 457 U.S. 393, 416-17 (1982)). "Of course 'generally' does not mean

7    'always.'"  *Newman* v. *Krintzman*, 723 F.3d 308, 314 (1st Cir. 2013).  Any "uncertainty

8    concerning a State's remedy may make it less than 'plain'" under the Butler Act, thereby

9    "lift[ing] the bar to federal-court jurisdiction."  *Rosewell* v. *La Salle National Bank*, 450 U.S.

10   503, 516-17 (1981) (*quoting Tully* v. *Griffin, Inc.*, 429 U.S. 68, 76 (1976); *then citing Twp. of*

11   *Hillsborough* v. *Cromwell*, 326 U.S. 620, 625-26 (1946)).

12          A "supposed remedy" is not "at all 'certain' or 'complete'" if the insolvency of the

13   party from whom monetary relief is sought renders that party judgment-proof.  *PHL Variable*

14   *Ins. Co.* v. *The P. Bowie 2008 Irrevocable Tr.*, 718 F.3d 1, 11 (1st Cir. 2013).  That is why

15   the United States Supreme Court has long maintained that a local tax-refund action does not

16   constitute a plain, adequate, or complete remedy when the taxing authority is unable "to

17   respond to the judgment."  *Matthews* v. *Rodgers*, 284 U.S. 521, 528 (1932) (*citing Arkansas*

18   *Bldg. & Loan Ass'n* v. *Madden*, 175 U.S. 269, 274 (1899)).  Of relevance here, the rule of

19   *Matthews* v. *Rodgers* permits – indeed, requires – federal jurisdiction when a state's remedy

20   is rendered uncertain or incomplete by virtue of the state's insolvency.

21          In *Stewart Dry Goods Company* v. *Lewis*, 287 U.S. 9 (1932) (per curiam), for

22   example, the Supreme Court reviewed the ruling of a three-judge district court that had

23   summarily dismissed a challenge to a state tax on the ground that the state's tax-refund

Civil No. 3:15-CV-03018 (JAF)                                                    -71-

1    action had offered the plaintiffs "an adequate remedy at law." *Id*. at 10.  The Supreme Court

2    unanimously reversed the ruling and reinstated the challenge because the plaintiffs'

3    complaint had alleged that, due to a "lack of funds in the Treasury," millions of dollars in

4    warrants against the state's General Fund had gone unpaid, sometimes for years, and that a

5    successful tax-refund action would only result in yet another warrant against the Fund.  *Id*. at

6    11.  The state had denied those allegations in its answer to the complaint, but the Supreme

7    Court still remanded the case, instructing the trial court to hold an evidentiary hearing to

8    determine whether, in light of the state's poor finances, the tax-refund action would actually

9    provide the plaintiffs with "a certain, reasonably prompt and efficacious remedy."  *Id*.

10           On remand, the District Court presided over an evidentiary hearing and found that

11   "the uniform practice of the treasurer of the [state] has been to pay warrants issued by the

12   auditor for the refund of taxes when presented, and in advance of outstanding interest-

13   bearing warrants."  *Stewart Dry Goods Co.* v. *Lewis*, 7 F. Supp. 438, 440 (W.D. Ky. 1933).

14   The District Court found further "that the present state treasurer has followed the practice of

15   keeping himself in [a] financial position to refund all taxes which are paid under legal

16   protest, and that he will be in a position to and will do so with reference to the taxes involved

17   in these actions in [the] event it shall be finally determined that such taxes were illegally

18   collected, notwithstanding the fact that there [are currently] outstanding . . . approximately

19   $15,000,000 of interest-bearing warrants against the general expenditure fund, out of which

20   fund" all refunds are paid.  *Id*.  Despite this promising news, the trial court held that the tax-

21   refund action did "not afford that certainty necessary to repel [federal] equity jurisdiction"

22   because no law "giving its sanction to [the state treasurer's] practice" could be identified and,

23   "if refunds . . . are not given preference, it is uncertain when they would be paid."  *Id*.  And

Civil No. 3:15-CV-03018 (JAF)                                                                          -72-

1   so, the three-judge District Court found that it had jurisdiction, and it proceeded to resolve

2   the plaintiffs' challenge to the tax statute on the merits.  *Id*.

3        The case was again appealed to the Supreme Court, where, after noting the earlier

4   dispute over whether federal jurisdiction existed, the Court implicitly affirmed the trial

5   court's finding of jurisdiction by acknowledging that finding and then promptly turning to

6   the merits of the challenge, holding the state tax law unconstitutional under the Equal

7   Protection Clause.  *Stewart Dry Goods Co.* v. *Lewis*, 294 U.S. 550, 552, 556 (1935).  The

8   Supreme Court's decision to proceed to the merits, after having noted the trial court's

9   jurisdictional finding, is significant because the Hughes Court of that era took seriously its

10  duty to confirm, *sua sponte*, federal jurisdiction.  *See*, *e.g.*, *Texas* v. *Florida*, 306 U.S. 398,

11  405 (1939) ("While the exceptions do not challenge the jurisdiction of the Court, . . . the duty

12  which rests upon this Court to see to it that the exercise of its powers be confined within the

13  limits prescribed by the Constitution make it incumbent upon us to inquire of our own

14  motion whether the case is one within its jurisdiction.") (*citing Minnesota* v. *Hitchcock*, 185

15  U.S. 373, 382 (1902)); *United States* v. *Corrick*, 298 U.S. 435, 440 (1936) ("if the record

16  discloses that the lower court was without jurisdiction this court will notice the defect,

17  although the parties make no contention concerning it . . . for the purpose of correcting the

18  error of the lower court in entertaining the suit.").  Thus, we can conclude that the Supreme

19  Court had found the trial court's findings of fact in favor of its jurisdiction sufficient to deem

20  the state's tax-refund action inadequate to the task of providing taxpayers with a certain,

21  reasonably prompt and efficacious remedy.

22       Although both *Stewart Dry Goods* cases were comity-based decisions handed down

23  by the Supreme Court before the enactment of the Tax Injunction Act in 1937, the principles

1    set forth in them apply to the Tax Injunction Act and the Butler Act.  In *Adams County* v.

2    *Northern Pacific Railway Company*, 115 F.2d 768 (9th Cir. 1940), for example, the Ninth

3    Circuit Court of Appeals held that a state tax-refund action "was not 'plain, speedy and

4    efficient'" under the Tax Injunction Act "and that the trial court did not err in assuming

5    jurisdiction of . . . injunction proceedings," where the trial court had found that "some of the

6    defendant counties are insolvent and that in consequence a judgment for plaintiff in such an

7    action would, as to such counties, result only in the issuance of uncollectible warrants."  *Id.*

8    at 776.  In holding that the insolvency of some of the defendant counties made the state's tax-

9    refund remedy uncertain, the Ninth Circuit specifically affirmed the trial court's finding that

10   because the State Constitution gave payment "preference to other specified mandatory and

11   emergency expenses," the plaintiff "would not receive a substantial portion of any sum paid

12   under protest in the event of success in the refund action."  *Id.* (internal quotations omitted).

13   The Ninth Circuit also recounted and relied on the Supreme Court's holding in the first

14   *Stewart Dry Goods* case to reach its own holding that the insolvency of a jurisdiction renders

15   its tax-refund action an inadequate remedy under the Tax Injunction Act.  *Id.*

16          There is, understandably, little recent case law on the effect of a jurisdiction's

17   insolvency on the adequacy of its tax-refund action as a remedy.  Since the immediate

18   aftermath of the Great Depression, the United States has not seen many large jurisdictions,

19   like the Commonwealth of Kentucky in *Stewart Dry Goods* or several counties in the State of

20   Washington in *Adams County*, go insolvent or bankrupt.  That may be why the current

21   insolvency of Puerto Rico feels, in so many ways, sui generis.  But, it is not.  And, these

22   precedents, one controlling, the other persuasive, help guide us through the thicket of what it

1    means for local taxpayers, seeking to vindicate fundamental federal rights, when it is known

2    that a local tax-refund action can no longer provide actual refunds.

3           More recently, the United States Supreme Court has connected the Tax Injunction Act

4    to the case law concerning comity and equity that preceded it.  In *Fair Assessment in Real*

5    *Estate Association, Inc.* v. *McNary*, 454 U.S. 100 (1981), the Court held that the Tax

6    Injunction Act had an "antecedent basis in the comity principle of *Matthews* v. *Rodgers*" and

7    that there is "no significant difference . . . between remedies which are 'plain adequate, and

8    complete,' as that phrase has been used in articulating the doctrine of equitable restraint, and

9    those which are 'plain, speedy and efficient,' within the meaning of [the Tax Injunction

10   Act]." *Id*. at 105, 116 n.8.  "Both phrases refer to the obvious precept that plaintiffs seeking

11   protection of federal rights in federal courts should be remitted to their state remedies if their

12   federal rights will not thereby be lost."  *Id*. at 116 n.8.   Later, the Supreme Court

13   unanimously held that the Tax Injunction Act "may be best understood as but a partial

14   codification" of the preexisting comity principle.  *Nat'l Private Truck Council* v. *Okla. Tax*

15   *Comm'n*, 515 U.S. 582, 590 (1995).

16          Finally, in *Pleasures of San Patricio, Inc.* v. *Mendez-Torres*, 596 F.3d 1 (1st Cir.

17   2010), the First Circuit recognized that federal law will not force a taxpayer to litigate his

18   legal challenges to a local tax in a refund action if the taxpayer cannot receive an actual tax

19   refund at the end of the day.  The Court acknowledged that "the requirement of a plain,

20   speedy, and efficient remedy in state court is only a procedural one and is, therefore, satisfied

21   merely when 'certain procedural criteria' are met," namely providing "'a taxpayer with a full

22   hearing and judicial determination at which she may raise all constitutional objections to the

23   tax' and may therefrom seek review before the Supreme Court."  *Id*. at 7 (internal quotations

1    omitted) (*quoting Rosewell*, 450 U.S. at 515 n.19, 522).  At the same time, the Court held

2    that a tax-refund action "fails to provide . . . an adequate remedy" whenever a "taxpayer

3    prevails in his challenge of the tax," but does not "obtain[] a refund, reversing the detriment

4    the tax imposed upon him."  *Id*. at 8.  That is precisely the situation we have in this case.

5            As found above, the Commonwealth is insolvent and will continue to be insolvent for

6    the foreseeable future.  By the end of June 2016, Puerto Rico is projected not only to run out

7    of cash, but to have a nearly $1 billion deficit in the Treasury Single Account, its main

8    operating account.   Secretary Zaragoza, himself, predicts that the government will soon

9    default on its general-obligation bonds, despite their priority of payment over all other

10   expenditures under Article VI, Section 8, of the Puerto Rico Constitution, and their close

11   relationship to Puerto Rico's credit rating and its access to bond markets. Whereas the

12   Commonwealth used to fund its debt payments with new debt spending, Puerto Rico can no

13   longer turn to the traditional municipal bond market to finance itself, and the Government

14   Development Bank is possibly insolvent as well.

15           Due to this intractable liquidity crisis, the Puerto Rico Treasury has promulgated, at

16   the behest of the Governor, official guidelines under which agencies must prioritize their

17   disbursement requests because, even after prioritization, Treasury does not have enough

18   money to grant each urgent request, even those that are allegedly necessary to the operation,

19   continuity and stability of the agency.  These guidelines do not give any priority to a court

20   judgment ordering payment of a tax refund.  As a result, it can be said with certainty that the

21   Commonwealth will not be able to provide Wal-Mart PR with an actual refund at the end of

22   its tax-refund process.  And, the timely payment of a refund is the fundamental promise, the

1   guaranteed quid pro quo, given to a taxpayer forced to litigate its claims by paying the tax

2   under protest and seeking judicial review later in local courts.

3        We hope and will work toward the day that the Commonwealth can pull itself out of

4   insolvency, stand on its own two feet, and look ahead to a bright future.  But even if that day

5   were to arrive at the dawn of the next decade, which is the soonest that Wal-Mart PR can

6   realistically expect to receive relief from the Commonwealth courts, the Special Fiscal and

7   Operational Sustainability Act mandates that Wal-Mart PR will receive payment of its tax

8   refund – by then, tens of millions of dollars, if not more than $100 million – at a slow drip of

9   only three million dollars a year, so long, however, as the Commonwealth has enough money

10  to honor a non-prioritized disbursement and Wal-Mart PR is not challenging a new tax

11  assessment or other debt owed to the government.  Even if Puerto Rico were to pay (or even

12  credit) Wal-Mart PR the maximum amount allowed under the Act of $3 million per year,

13  Wal-Mart PR would still have to wait decades to receive its full tax refund.

14       The exact size of Wal-Mart PR's eventual refund, if it were forced to pursue its

15  claims through a refund action – whether it be $70 million or $100 million or more – does

16  not matter to our analysis.  What does matter is that Wal-Mart PR would have to keep paying

17  the AMT on a quarterly basis until the AMT is finally enjoined, which, we know, cannot

18  happen at least until Wal-Mart PR seeks judicial review of its claims and perhaps until the

19  Puerto Rico Supreme Court holds the AMT unconstitutional.  We found that, based on the

20  current backlog and processing times at the Puerto Rico Treasury, Wal-Mart PR cannot

21  expect to appear before the Court of First Instance until at least one year after it has filed its

22  tax return and refund claim, which itself will likely not happen for another month or so.

1    Even then, our one-year projection was based on the fastest processing times in the record for

2    an unaudited claim, which Wal-Mart PR's assuredly would not be.

3        All the while, we found that Wal-Mart PR would have to pay an estimated AMT of

4    about $10 million each quarter.  Thus, if Wal-Mart PR had to pursue a tax-refund action, it

5    would effectively force Wal-Mart PR to keep paying tens of millions of dollars, if not far

6    more, in illegal taxes to the Commonwealth's insolvent Treasury Department, without any

7    hope of seeing that money refunded until, at best, decades from now.  It is clear that the

8    parties have long known this.  This is why Wal-Mart PR has sought redress in federal court,

9    and why the Secretary has been arguing that no set of facts on the ground can render Puerto

10   Rico's tax-refund action inadequate under the Butler Act.

11       The Secretary contends that our "focus on the availability of a refund ignores the

12   [purely] *procedural* nature of the remedy that must be provided by the Commonwealth,"

13   namely "an opportunity for Wal-Mart [PR] to be heard."  (ECF No. 116 at 5.)  The Secretary

14   repeated a version of this argument at the hearing when his counsel affirmed that, under their

15   understanding of the case law, Puerto Rico's tax-refund procedure remains adequate "even if

16   there is zero money to pay back" any of the AMT that Wal-Mart PR has remitted and will

17   continue to remit.  (ECF No. 131 at 117.)  The Secretary's extreme position on how this

18   court must evaluate the sufficiency of the Commonwealth's proposed remedy is based on a

19   vast misreading of the case law and of *Rosewell* in particular.  (*See* ECF No. 116 at 3 n.6.)

20       In *Rosewell* v. *La Salle National Bank*, 450 U.S. 503 (1981), the Supreme Court held

21   that the tax-refund action enacted by the State of Illinois provided taxpayers with a plain,

22   speedy and efficient remedy for challenges to local taxes, even though, by statute, a

23   successful challenger would not receive any interest on the taxes refunded.  Not only did the

1   Court decline to find the tax-refund action inadequate simply because it did not award

2   interest on a refund, but the Court also declined to decide whether taxpayers have a federal

3   right to receive such interest.  Instead, what mattered to the Court – and what made the action

4   an adequate remedy – was that taxpayers "could assert this right in the state-court

5   proceedings."  *Id*. at 515.  The Court underscored that there was "no question that under the

6   Illinois procedure, the [Illinois] court w[ould] hear and decide any federal claim."  *Id*. at 517.

7   Because Illinois's tax-refund procedure provided taxpayers with "the 'legal means to recover

8   a right . . . or obtain redress for . . . a wrong'" in a plain, speedy, and efficient manner, it was

9   sufficient for purposes of the Tax Injunction Act.  *Id*. at 516 (*quoting* Webster's New Int'l

10  Dictionary of the Eng. Language 2106 (2d ed. 1934) (definition of "remedy")).

11         Relying primarily on that case, the Secretary argues that a jurisdiction's tax-refund

12  action need only meet "certain minimal *procedural* criteria" to shut the doors of a federal

13  courthouse.  (ECF No. 116 at 6 n.12.)  By reading certain excerpts of case law out of context,

14  the argument might seem plausible at first blush.  However, in *Rosewell* and the cases that

15  later construe it, whenever a tax-refund action is deemed an adequate remedy, it is clearly

16  assumed that if the local court were to order the local government to pay a tax refund, the

17  refund would be paid, in full, in a timely manner.  Anything less would be inadequate.

18         In *Rosewell* itself, when the Supreme Court held that Illinois's tax-refund procedure

19  was adequate – because, under it, a "court will hear and decide any federal claim," including

20  whether a taxpayer, who has paid a tax under protest, "has any 'federal right' to receive

21  interest" on a refund – the holding was obviously predicated on the necessary condition that

22  if an Illinois court found a federal right to interest and then ordered the State to pay a refund

23  with interest, the State would timely pay a refund with interest.  450 U.S. at 515, 517.  That

1    underlying condition was made explicit in the language the Court used to frame both the

2    issue in the case and its ultimate holding.

3          At the beginning of its opinion, the Court asked "whether an Illinois remedy which

4    requires property owners contesting their property taxes to pay under protest *and if*

5    *successful obtain a refund without interest in two years* is 'a plain, speedy and efficient

6    remedy' within the meaning of the [Tax Injunction] Act."  *Id.* at 505 (emphasis added).

7    Then, at the end of its opinion, the Court held that "Illinois' legal remedy *that provides*

8    property owners paying property taxes under protest *a refund without interest in two years* is

9    'a plain, speedy and efficient remedy' under the Tax Injunction Act."  *Id.* at 528 (emphasis

10    added).  Thus, bookending *Rosewell*'s discussion of its procedural interpretation of the

11    phrase "plain, speedy and efficient remedy" are clear reminders that procedures are sufficient

12    only insofar as they lead to their desired effect.  In *Rosewell*, the Illinois procedure, although

13    it provided a refund without interest, was found sufficient because, if a taxpayer succeeded in

14    his challenge to taxes paid under protest, the government would "provide[]" and the taxpayer

15    would "obtain" a "refund without interest in two years."  *Id.* at 505, 528.  Moreover, as noted

16    above, it was clearly assumed that if the Illinois court found that interest is also warranted as

17    a matter of federal law, interest would also be provided and obtained.  As then-Circuit Judge

18    Anthony M. Kennedy once wrote for the Ninth Circuit, "A state remedy is not plain, within

19    the meaning of the Tax Injunction Act, if there is uncertainty regarding its availability or

20    effect."  *Ashton* v. *Cory*, 780 F.2d 816, 819 (9th Cir. 1986) (citing cases).

21          Accordingly, the court rejects the Secretary's claim that Puerto Rico's tax-refund

22    action can provide a "plain, speedy and efficient remedy," if it is unable to "pay a refund."

23    (ECF No. 116 at 4.)  Instead, we agree with Dean Chemerinsky that "if a state law provided

1   that a successful challenger to a state tax law could recover a maximum of $1, no matter how

2   much was improperly taken, . . . surely that would be enough to justify concluding that the

3   state remedy is not plain or efficient."  Erwin Chemerinsky, *Federal Jurisdiction* 788 (6th ed.

4   2012).  Here, as outlined above, due to the Commonwealth's ongoing and future insolvency,

5   and the laws and regulations that have been enacted in response, payment of any refund to

6   Wal-Mart PR is uncertain for the foreseeable future.  And, if payment is ultimately made, it

7   would take decades to complete.  Such a remedy is not plain, speedy, or efficient.

8          By necessity, any finding of federal-court jurisdiction under the Butler Act is fact-

9   specific.  Our conclusion that jurisdiction exists here is based on the detailed factual record

10  we received at the hearing.  With luck and hard work, Puerto Rico's fiscal circumstances will

11  improve and a bright new horizon will emerge.  But, that day has not yet come.  The nature

12  of Wal-Mart PR's claims also played a role in our decision.  The sheer size of Wal-Mart

13  PR's AMT liability ensured that, under the Special Fiscal and Operational Sustainability Act,

14  Treasury's payment of a court-ordered refund would take decades to complete.  Additionally,

15  the AMT is projected to confiscate a multiple of Wal-Mart PR's taxable income each year

16  for the foreseeable future, thereby placing the corporation in a position that even Secretary

17  Zaragoza recognized would force most businesses to close.  (*See* ECF No. 130 at 74-75.)

18  Lest we repeat ourselves unduly, this list of considerations is incomplete. Future federal

19  courts will have to determine whether the circumstances they encounter, in the cases then

20  before them, also allow for subject-matter jurisdiction under the Butler Act.

21         In sum, we look back to the stark comment of Government Development Bank

22  President Melba Acosta-Febo to the United States Senate that "Puerto Rico faces an

23  economic and liquidity crisis beyond what any jurisdiction in the United States has faced in

1    generations." (ECF No. 24 at 2.)  We think of her testimony at the hearing that in the months

2    since she made that comment, the situation in Puerto Rico has only gotten worse.  (ECF No.

3    126 at 128-29.)  When asked about President Acosta-Febo's comment, Martha Kopacz, the

4    insolvency expert, agreed, adding that "the situation down here is unprecedented." (ECF No.

5    130 at 14.)   The insolvency crisis is so dire that the Puerto Rico Treasury Department

6    recently stated that they have "significant doubt" about "the Commonwealth's ability to

7    continue as a going concern," an assessment that Secretary Zaragoza, the defendant, agrees

8    with.  (ECF No. 130 at 113; Pl. Ex. 9 at 37.)

9           The case law is clear that if a jurisdiction forces a taxpayer to pay unconstitutional

10   taxes under protest, but then fails to refund those taxes upon the taxpayer's victory in court,

11   the remedy is inadequate for purposes of the Butler Act.  The record from the hearing is clear

12   that the Commonwealth, due to its insolvency and the laws and regulations it has enacted in

13   response, cannot be counted on to refund, for decades, the several tens of millions of dollars,

14   if not more, that Wal-Mart PR has paid and will pay in unconstitutional AMT.  Thus, the

15   local remedy provided to Wal-Mart PR by the Commonwealth is, effectively, the continued

16   payment of tens of millions of dollars in taxes that should never have been levied in the first

17   place, threatening Wal-Mart PR's very ability to continue operating, in return for declaratory

18   and injunctive relief years later, and a court-ordered refund more worthless than the warrants

19   at issue in *Stewart Dry Goods* and *Adams County*.  That is not a remedy, but a cynical means

20   of extracting more unconstitutional revenue from an innocent taxpayer without the deterrent

21   effect of having to pay the money back in the near future.  If ever a case fell into the

1    exception to the Butler Act, this is it.  We hereby reject the Secretary's arguments against our

2    jurisdiction and also deny his motion to dismiss for want of jurisdiction.[23]  (ECF No. 24)

3    **B.      <u>The AMT Violates the Dormant Commerce Clause</u>**

4            In Count I of the complaint, Wal-Mart PR contends that the AMT violates the

5    dormant Commerce Clause and should be enjoined and declared unlawful pursuant to 42

6    U.S.C. § 1983.  (ECF No. 1 ¶¶ 67-71.)  "Commerce Clause violations may be redressed

7    under 42 U.S.C. § 1983."  *Adams* v. *Watson*, 10 F.3d 915, 917 n.4 (1st Cir. 1993) (*citing*

8    *Dennis* v. *Higgins*, 498 U.S. 439, 443-51 (1991)).

9            The tangible-property tax in the AMT taxes two different categories of transaction.

10   First, it taxes a mere "transfer" of goods, even when the transfer occurs without charge,

11   "from a home office located outside of Puerto Rico to a branch engaged in the trade or

12   business in Puerto Rico."  (Pl. Ex. 77, §1022.03(b)(2)(B).)  Second, it taxes the sale of goods

13   between "related" parties.  (Pl. Ex. 77, §1022.03(b)(2)(B).)  The tax applies only if the

14   "seller" or "transferor" is not subject to Puerto Rico income taxes on the transaction, but the

15   buyer is.  (Pl. Ex. 77, §1022.03(d)(6).)  In other words, the tax applies only to "cross-border"

16   sales or transfers by an out-of-state company to its local branch office or affiliate.  (*See* ECF

17   No. 116 at 12 n.18.)  In his brief to the court, the Secretary concedes that the tax "applies

18   only where the risk of [the] 'leakage' . . . of income outside of the Commonwealth's taxing

19   jurisdiction . . . is present."  (ECF No. 116 at 11-12.)  Although it has not been the center of

20   attention, the same framework holds true for the expenses tax in the AMT, which also targets

---

[23] Due to the clear inadequacy of the state remedy, as set forth in this opinion, we also find that principles of comity do not deprive us of jurisdiction.

1   only "cross-border" transactions between an out-of-state corporation and its local branch

2   office or affiliate.  (Pl. Ex. 77, §1022.03(b)(2)(A).)

3        "The Commerce Clause grants Congress power to 'regulate Commerce . . . among the

4   several States.'"  *Comptroller of the Treasury* v. *Wynne*, 135 S. Ct. 1787, 1794 (2015)

5   (ellipsis in original) (*quoting* U.S. Const. art. I, § 8, cl. 3).  "These 'few simple words . . .

6   reflected a central concern of the Framers that was an immediate reason for calling the

7   Constitutional Convention: The conviction that in order to succeed, the new Union would

8   have to avoid the tendencies toward economic Balkanization that had plagued relations

9   among the Colonies and later among the States under the Articles of Confederation.'"  *Id*.

10  (ellipsis in original) (*quoting Hughes* v. *Oklahoma*, 441 U.S. 322, 325-326 (1979)).

11  "Although the Clause is framed as a positive grant of power to Congress," the United States

12  Supreme Court has "consistently held this language to contain a further, negative command,

13  known as the dormant Commerce Clause, prohibiting certain state taxation even when

14  Congress has failed to legislate on the subject.'"  *Id.* (*quoting Oklahoma Tax Comm'n* v.

15  *Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).  "By prohibiting States from discriminating

16  against or imposing excessive burdens on interstate commerce without congressional

17  approval, it strikes at one of the chief evils that led to the adoption of the Constitution,

18  namely, state tariffs and other laws that burdened interstate commerce."  *Id.* (*citing Fulton*

19  *Corp.* v. *Faulkner*, 516 U.S. 325, 330-31 (1996)).

20       Under Supreme Court precedent, "the dormant Commerce Clause precludes States

21  from 'discriminat[ing] between transactions on the basis of some interstate element.'"  *Id.*

22  (alteration in original) (*quoting Boston Stock Exch.* v. *State Tax Comm'n*, 429 U.S. 318, 332

23  n.12 (1977)).  Here, "'discrimination' simply means differential treatment of in-state and out-

1    of-state economic interests that benefits the former and burdens the latter." *United Haulers*

2    *Ass'n* v. *Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (*quoting*

3    *Oregon Waste Sys., Inc.* v. *Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994)).  For example, "a

4    State 'may not tax a transaction or incident more heavily when it crosses state lines than

5    when it occurs entirely within the State.'" *Wynne*, 135 S. Ct. at 1794 (*quoting Armco Inc.* v.

6    *Hardesty*, 467 U.S. 638, 642 (1984)).  "Nor may a State impose a tax which discriminates

7    against interstate commerce either by providing a direct commercial advantage to local

8    business, or by subjecting interstate commerce to the burden of 'multiple taxation.'" *Id.*

9    (*quoting Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959)).

10         To determine whether a tax is discriminatory, "we must consider 'not the formal

11    language of the tax statute but rather its practical effect,' . . . the economic impact of the tax."

12    *Id.* at 1795-96 (*quoting Complete Auto Transit* v. *Brady*, 430 U.S. 274, 279 (1977).  If an

13    income tax taxes a certain type of transaction more heavily when it occurs interstate instead

14    of intrastate, the State cannot remedy this discrimination by offering taxpayers "a credit

15    against the 'state' portion of the income tax" or even "against income taxes paid to other

16    States" because "[t]he critical point is that the total tax burden on interstate commerce is

17    higher, not that [the State] may receive more or less tax revenue from a particular taxpayer."

18    *Id.* (*citing Armco*, 467 U.S. at 642-45.)  "A discriminatory [tax] is 'virtually per se invalid.'"

19    *Dep't of Revenue* v. *Davis*, 553 U.S. 328, 338 (2008) (*quoting Oregon Waste Sys.*, 511 U.S.

20    at 99).  This "'virtually per se rule of invalidity' . . . can only be overcome by a showing that

21    the State has no other means to advance a legitimate local purpose" than the discriminatory

22    tax.  *United Haulers Ass'n*, 550 U.S. at 338-39 (*quoting Philadelphia* v. *New Jersey*, 437

23    U.S. 617, 624 (1978); *then citing Maine* v. *Taylor*, 477 U.S. 131, 138 (1986)).

1        Puerto Rico's AMT, on its face, clearly discriminates against interstate commerce.

2    As we found earlier, the tangible-property and expenses taxes apply only to multistate

3    corporations and their local affiliates.  The taxes apply only to "cross-border" transactions

4    with their out-of-state home office or related company.  A local company that is not "related"

5    by ownership or control to an out-of-state corporation does not have to pay the tangible-

6    property tax or the expenses tax, period.  By design, the AMT does what it is not supposed to

7    do: "tax a transaction or incident more heavily when it crosses state lines than when it occurs

8    entirely within the State.'"  *Wynne*, 135 S. Ct. at 1794 (*quoting Armco Inc.* v. *Hardesty*, 467

9    U.S. 638, 642 (1984)).  The Secretary even concedes that the tax applies only to transactions

10   "between Puerto Rico taxpayers and their cross-border affiliates."  (ECF No. 116 at 12 n.18.)

11   The court believed Professor Pomp when he wrote, in his expert report, "In my nearly forty

12   years in the field [of state taxation], rarely have I seen a statute that is as facially

13   discriminatory as the [AMT]."  (Pl. Ex. 101 at 6.)  Because the AMT facially discriminates

14   against interstate commerce, it is "virtually per se invalid."  *Dep't of Revenue*, 553 U.S. at

15   338 (*quoting Oregon Waste Sys.*, 511 U.S. at 99).

16       Any multistate corporation hit by the tax has "an incentive . . . to opt for intrastate

17   rather than interstate economic activity."  *Wynne*, 135 S. Ct. at 1792.  The corporation could

18   also avoid the tax by transacting instead with unrelated out-of-state parties.  This gap in the

19   AMT's coverage does not save it from being discriminatory.  That the tax does not burden

20   transactions with unrelated foreign parties is not a saving grace, but a practical recognition of

21   the fact that even discrimination has its limits when you are an island reliant on imports.  If

22   the Commonwealth had taxed all cross-border transactions, local retailers would have been

23   devastated and the cost of living here would have ballooned, crippling local access to the

1    vital goods that Puerto Rico residents buy and use every day.  As Secretary Zaragoza noted

2    in his letter to Representative Hernández, "[M]ost of the assets that are sold in Puerto Rico

3    are imported to the Island," and "75% of the monetary value of said imports are introduced

4    to Puerto Rico by 211 importers, which, in their majority, are also retailers."  (Pl. Ex. 13 at

5    7.)  It would have been foolish to levy a tariff on every import to the island.  So, instead, as

6    Zaragoza further noted, the AMT targets only "multinational chains doing business in Puerto

7    Rico," like Wal-Mart PR.  (Pl. Ex. 13 at 22.)

8           If it is not already plain that the AMT is discriminatory, the "internal consistency" test

9    clearly identifies it as such.  The test "looks to the structure of the tax at issue to see whether

10   its identical application by every State in the Union would place interstate commerce at a

11   disadvantage as compared with commerce intrastate."  *Wynne*, 135 S. Ct. at 1803 (*quoting*

12   *Oklahoma Tax Comm'n*, 514 U.S. at 185).  "By hypothetically assuming that every State has

13   the same tax structure, the internal consistency test allows courts to isolate the effect of a

14   defendant State's tax scheme," letting us "distinguish between (1) tax schemes that

15   inherently discriminate against interstate commerce without regard to the tax policies of

16   other States, and (2) tax schemes that create disparate incentives to engage in interstate

17   commerce . . . only as a result of the interaction of two different but nondiscriminatory and

18   internally consistent schemes."  *Id*. (*citing Armco*, 467 U.S. at 645-46).  "The first category

19   of taxes is typically unconstitutional; the second is not."  *Id*. (*citing Armco*, 467 U.S. at 644-

20   46).  "Tax schemes that fail the internal consistency test will fall into the first category"

21   because "'any cross-border tax disadvantage that remains after application of the [test]

22   cannot be due to tax disparities' but is instead attributable to the taxing State's discriminatory

23   policies alone."  *Id*. (*quoting* Mason, *Made in America for European Tax: The Internal*

1  *Consistency Test*, 49 Boston College L. Rev. 1277, 1310 (2008)).  The AMT fails the internal

2  consistency test coming out of the gate.

3        If every State and Territory in the Nation enacted the AMT, multistate companies and

4  conglomerates would be burdened exclusively.  Perhaps the most obvious example of this

5  would be a large retailer like Wal-Mart, which ships inventory to local stores from central

6  warehouses, but the tax burden would be felt by any multistate corporation or conglomerate

7  whose business model depends on the routine transfer of property across state lines.  Each

8  time a home office or parent company sent new inventory to sell or new resources to use to a

9  branch office or local subsidiary in another state, the transfer would be taxed, even if no

10 money exchanged hands.  (*See* Pl. Ex. 77, § 1022.03(c)(5).)  But, if money did change hands

11 and an invoice was generated, the sale would be taxed at "the total amount charged for the

12 property included in the invoice," regardless of whether the price was high, low, or spot on in

13 comparison to the price of the inventory in an arm's-length transaction between unrelated

14 parties.  (Pl. Ex. 77, § 1022.03(c)(5), (d)(4).)  Meanwhile, this nationwide AMT would not

15 directly affect transactions between unrelated parties or purely intrastate activity.

16        Under this hypothetical, the flow of interstate commerce would no longer be free.

17 Instead, part of the flow would hit a speed bump each time it crossed state lines because of

18 the disruptive interference of each jurisdiction's AMT.  And, by attacking only the business

19 models of multistate corporations and conglomerates, the AMT would continually penalize

20 those taxpayers for their functional integration, centralized management, and economies of

21 scale, which normally are valued because they "reduce costs" by "eliminat[ing] duplication

22 of effort and assets."  *See Princo Corp.* v. *Int'l Trade Comm'n*, 616 F.3d 1318, 1335 (Fed.

23 Cir. 2010) (en banc).  Indeed, the "integration of resources creates economic efficiencies that

1    cannot be achieved by [other means]." *See SCFC ILC, Inc.* v. *Visa USA, Inc.*, 36 F.3d 958,

2    963 (10th Cir. 1994). Thus, even though the AMT does not impede every aspect of interstate

3    commerce, it is deeply pernicious in its focus on those business models that promise and

4    promote the greatest efficiency. If you are a jurisdiction in desperate need of new revenue,

5    raising taxes on only large multistate businesses might seem smart, if it were not also illegal.

6    But, if every jurisdiction got in on that game, the economic outcome for the Nation would be

7    catastrophic due to its unwarranted discrimination against efficient interstate commerce.

8            The AMT is a legislative money grab pure and simple, funding the personal account

9    of Puerto Rico's insolvent Treasury from the presumably deeper pockets of large multistate

10   corporations and their local affiliates. The Secretary has proffered a single legitimate local

11   purpose that the AMT allegedly advances: The prevention of "base erosion and profit

12   shifting," of the "'leakage' of income outside of the Commonwealth's taxing jurisdiction."

13   (ECF No. 116 at 1 n.2, 14.) In essence, the Secretary claims that the AMT combats transfer-

14   pricing arrangements that shift income and profits off of the island, thereby eroding the local

15   tax base. Never mind that, in Wal-Mart PR's case, the idea does not even make sense

16   because Wal-Mart Stores has its income taxed at virtually the same rate as Wal-Mart PR's.

17          The Secretary's proffered purpose is utterly belied by the record. Start by looking at

18   the AMT itself. The tangible-property tax applies to a transaction regardless of whether the

19   transfer price is appropriate. If Wal-Mart PR could prove to the Secretary that the inventory

20   it buys from Wal-Mart Stores is, for whatever reason, priced at a level "lower than the [price]

21   for which [Wal-Mart Stores] sells such property to an unrelated person," thereby shifting

22   income and profits *to the island*, the 6.5 percent tax would still apply. (*See* Pl. Ex. 77, §

23   1022.03(d)(4).) Most damning of all is the fact that the tax applies even if the inventory is

1  transferred to the island free of charge, thereby bringing value into Puerto Rico *without any*

2  *offsetting payment*.  (*See* Pl. Ex. 77, § 1022.03(d)(4).)  As the Secretary readily admitted on

3  the stand, the AMT has nothing to do with transfer pricing and everything to do with raising

4  revenue quickly in the middle of a devastating fiscal crisis on an island with a poor, limited,

5  and shrinking tax base.  (ECF No. 130 at 89-90, 94-95, 112-13.)

6        The fact that the AMT has nothing to do with base erosion and profit shifting can be

7  gleaned from how the tax came about.  As Secretary Zaragoza testified, the Legislature, back

8  in April 2015, needed to enact a new budget quickly, had to close a $125 million financing

9  gap, was "really running against time," and thus was under "a lot of pressure [to] rais[e]

10  revenue fast."  (ECF No. 130 at 123-24.)  Therefore, the Puerto Rico Treasury Department

11  crafted an AMT that would "yield 125 million bucks in 11 months, as we needed."  (ECF

12  No. 130 at 90.)  Treasury crafted the AMT's new tax brackets so that the highest bracket

13  would capture the biggest fish in the pond, Wal-Mart PR, and all the brackets, working

14  together, would generate the necessary revenue.  (ECF No. 130 at 79-82.)  No one involved

15  appears to have been concerned about profit shifting or transfer pricing or even, it appears,

16  constitutionality.

17        Treasury, itself, was the party that proposed the elimination of the provision that had

18  allowed the Secretary to exempt transactions from the tangible-property tax upon proof that

19  the price of the transaction had complied with the arm's-length principle.  At the hearing,

20  Zaragoza agreed with the statement that the new AMT "really isn't about transfer pricing at

21  all," but is "about raising money," and that since the Commonwealth simply wanted "to raise

22  as much money as possible," the tax was designed to apply to a transaction "[n]o matter how

23  clear it is that the transfer pricing is appropriate."  (ECF No. 130 at 93.)  Vice President

1   Walker of Wal-Mart Stores came face to face with this motivation when he visited Puerto

2   Rico, hoping to have a discussion about how to enact a fair and appropriate tax, and instead

3   learned that the public officials here "were more focused on hitting a number," on "rais[ing]

4   a certain amount of dollars," because of the "budget crisis."  (ECF No. 127 at 10-11.)

5         Aside from raising a lot of revenue quickly, the only other rationale that the Secretary

6   has given for the actual tax brackets under the tangible-property tax came from the testimony

7   of Puerto Rico Assistant Secretary of the Treasury Víctor Pizarro, who claimed that the

8   graduated rates intend to capture the marginal profits that might be generated by "economies

9   of scale" as a business's "gross income . . . increases."  (ECF No. 130 at 220-21.)  We shall

10  ignore the economic wisdom of such a tax, and instead hold that the generation of additional

11  revenue from those who may have some extra profit to take does not justify the

12  Commonwealth's decision to apply this tax only to the cross-border transactions of multistate

13  corporations and conglomerates.

14        It is telling that the Secretary has not even tried to argue that the Commonwealth "has

15  no other means to advance [its] legitimate local purpose" than the discriminatory AMT.  *See*

16  *United Haulers Ass'n*, 550 U.S. at 338-39.  Instead, the Secretary asserts that the tax is

17  merely "reasonably necessary to . . . ensur[e] that there is no 'leaking' of income outside of

18  the Commonwealth's taxing jurisdiction."  (ECF No. 116 at 11.)  Not only does the Secretary

19  get the standard of scrutiny wrong, but it is worth repeating that the Secretary's argument

20  was critically undermined when the Secretary, himself, took the stand and admitted, over and

21  again, that the AMT has nothing to do with base erosion or profit shifting.  Even if the AMT

22  had something to do with those purposes, the Secretary also admitted that narrower, more

23  tailored, and less burdensome means exist to promote them.  (ECF No. 130 at 83-84.)

1        For example, the Commonwealth has regulations in place that authorize the Puerto

2    Rico Treasury to conduct a traditional transfer-pricing audit of interstate transactions

3    between related parties and to adjust specific transfer prices, if necessary, to recapture profits

4    and income improperly shifted outside of Puerto Rico.  (*See* Pl. Ex. 63.)  These regulations

5    are not arcane.  The Secretary knows about them.  (ECF No. 130 at 89-91.)  The local

6    business community knows about them.  *See* KPMG, *Global Transfer Pricing Review:*

7    *Puerto Rico* (April 2012).  The Secretary even agrees that using the regulations to adjust

8    specific inappropriate prices "certainly would be a much more . . . narrow and targeted

9    approach to actual transfer pricing abuse than a broad tax on the value of all transferred

10   goods."  (ECF No. 130 at 90.)  However, Treasury chooses not to use these regulations.  In

11   fact, according to Zaragoza, Treasury has neither audited, nor adjusted, the transfer prices of

12   a single Puerto Rico taxpayer throughout his tenure there.  (ECF No. 130 at 89-90, 94.)

13       Assistant Secretary Pizarro has complained that the Puerto Rico Treasury Department

14   does not have the knowledge, expertise, or competence "to analyze transfer pricing issues."

15   (ECF No. 130 at 206-08, 228-29.)  This court has credited that testimony.  But, Treasury's

16   present need not be its future.  As Professor Pomp noted, Puerto Rico could take advantage

17   of the tax-coordination agreement it has with the United States, which was enacted precisely

18   so that the signatories will help each other "prevent avoidance or evasion of [their] respective

19   fiscal laws."  (ECF No. 126 at 226; *see also* Pl. Ex. 49 [copy of agreement].)  Under Article

20   7, Paragraph 7, of that agreement, the United States agreed that they would, "to the extent

21   feasible, extend to [Puerto Rico] assistance in [its] tax administration matters," including in

22   the "training of personnel . . . and development and improvement of tax administration

23   systems and procedures."  (Pl. Ec. 49 at 7.)  Professor Pomp also suggested that Puerto Rico

1    could join the Multistate Tax Commission, which "has a joint audit program where it will

2    audit a taxpayer on behalf of its member states" and "a transfer pricing project . . . where [it]

3    will make available to its members specialists in transfer pricing."  (ECF No. 126 at 228.)

4            Professor Pomp's suggestions strike us as excellent examples of how Puerto Rico can

5    strengthen its Treasury Department, so that it can ultimately implement appropriately and use

6    effectively the transfer-pricing regulations it already has.  At the hearing, Assistant Secretary

7    Pizarro indicated that turning to these external entities for help was "a harder way" of dealing

8    with transfer pricing than what Puerto Rico is currently doing.  (ECF No. 130 at 231.)  But,

9    what Puerto Rico is currently doing, though easy, is unconstitutional.  The Commonwealth

10   may not rely on such illegal means to fund itself, even when in a pinch.

11   **C.      <u>The AMT Violates the Federal Relations Act</u>**

12           In Count II of the complaint, Wal-Mart PR alleges that the AMT violates the Federal

13   Relations Act, 48 U.S.C. § 741a.  (ECF No. 1 ¶¶ 72-75.)  Taxpayers subject to a tax levied in

14   violation of the Federal Relations Act can challenge the tax in federal court.  *See Coors*

15   *Brewing Co.* v. *Mendez-Torres*, 562 F.3d 3, 23 (1st Cir. 2009) (reinstating taxpayer's § 1983

16   claim challenging tax as violative of Federal Relations Act), *abrogated on other grounds by*

17   *Levin* v. *Commerce Energy*, 560 U.S. 413 (2010); *see also Coors Brewing*, 678 F.3d at 20

18   (noting that taxpayer's Federal Relations Act claim had been brought under § 1983); *San*

19   *Juan Trading Co.* v. *Sancho*, 114 F.2d 969 (1st Cir. 1940) (affirming trial court judgment

20   that had overturned tax as violative of Federal Relations Act and ordered that Puerto Rico

21   pay the taxpayer-plaintiff a refund).[24]

---

[24] To be clear, the court finds that the Federal Relations Act creates a statutory right that can be individually enforced under 42 U.S.C. § 1983.  *See generally San Juan Trading Co.*, *supra*.  After all, like

1          The Federal Relations Act provides that Puerto Rico may levy taxes on "articles,

2    goods, wares, or merchandise . . . as soon as the same are manufactured, sold, used, or

3    brought into the island: *Provided*, That no discrimination be made between the articles

4    imported from the United States or foreign countries and similar articles produced or

5    manufactured in Puerto Rico." 48 U.S.C. § 741a.  The First Circuit has observed that, in

6    providing this limited tax power, "Congress expected that the government of Puerto Rico

7    would make 'use of [it] so as not to unnecessarily place any barriers in the way of the free-

8    trade conditions now existing' between Puerto Rico and the mainland United States, 'which

9    is [a] principal factor in the progress and prosperity of Puerto Rico.'"  *United Parcel Serv.*,

10   318 F.3d at 334 (*quoting* H.R. Rep. No. 1370, at 2 (1926); *then quoting* S. Rep. No. 1011, at

11   2 (1926)).  Although the statute authorizes Puerto Rico to levy certain kinds of taxes, the

12   Secretary does not claim that it broadens the Commonwealth's legislative authority under the

13   dormant Commerce Clause.  Instead, he argues that "Wal-Mart PR's cause of action under

14   the Federal Relations Act is . . . coterminous with its claim under the Commerce Clause."

15   (ECF No. 116 at 2 n.3.)

16         The court finds that the AMT violates the Federal Relations Act for the same reasons

17   it violates the dormant Commerce Clause.  Since the Act envisions a dichotomy between

18   "articles imported from the United States or foreign countries" and "similar articles produced

19   or manufactured in Puerto Rico," 48 U.S.C. § 741a, we wish to underscore that the AMT

20   discriminates against interstate commerce not only because it taxes "a transaction or incident

21   more heavily when it crosses state lines than when it [does not]," but because its "practical

---

the dormant Commerce Clause, the Federal Relations Act creates obligations binding on Puerto Rico,
which are judicially enforceable, intended to benefit plaintiffs like Wal-Mart PR, who are subject to a
discriminatory tax in violation of the Act. *See Dennis*, 498 U.S. at 448-49.

1    effect" is the economic protection of goods produced or manufactured locally.  *See Wynne*,

2    135 S. Ct. at 1794-95 (*quoting Armco*, 467 U.S. at 642; *then quoting Complete Auto Transit*,

3    430 U.S. at 279).   At the hearing, Wal-Mart PR's Director of Accounting and Control

4    testified that, in his experience, almost none of the inventory that Wal-Mart PR purchases

5    from its affiliates in the continental United States is made in Puerto Rico.  (ECF No. 128 at

6    7.)  His explanation for why that is so was not only broad enough to apply to every taxpayer

7    impacted by the AMT, but eminently reasonable.  "[I]t doesn't make economic sense to buy

8    projects that were manufactured . . . or produced in Puerto Rico, ship them to the States, and

9    then get [them shipped] back again [to] the island," he stated.  (ECF No. 128 at 7-8.)

10        Under the Jones Act, 46 U.S.C. § 50101 *et seq*., all maritime transport of cargo to and

11   from Puerto Rico must "be carried by vessels that are (1) owned by U.S. citizens and

12   registered in the United States, (2) built in the United States, and (3) operated with

13   predominantly U.S. citizen crews."  *United States* v. *Lebrón-Caceres*, __ F. Supp. 3d __, __,

14   2016 WL 183651, *8 n.15 (D.P.R. Jan. 14, 2016) (*citing* 46 U.S.C. § 55102).  As a matter of

15   basic economics, the Jones Act's limitation on the supply of vessels available to serve and

16   compete in the Puerto Rico shipping market necessarily "causes prices in that market to be

17   higher than they otherwise would be."  *See Novak* v. *United States*, 795 F.3d 1012, 1024 (9th

18   Cir. 2015) (Friedland, J., concurring).  These artificially-inflated prices and their effect on the

19   cost of goods in Puerto Rico are well known to anyone who lives here.  Thus, a Puerto Rico

20   corporation would never turn to a supplier on the mainland to buy local goods.  Instead, if a

21   Puerto Rico corporation wanted to buy a Puerto Rico product, the corporation would turn to a

22   local supplier, instead of its home office or affiliate in the continental United States.  After

23   all, the mere cost of shipping the product off and then back to the island would likely

1   consume all of the savings or efficiencies that might normally accrue to transacting with the

2   out-of-state home office or related party.

3          Thus, the court finds that we can extrapolate from the experience of Wal-Mart PR to

4   conclude that the AMT does, indeed, have the effect of protecting goods produced or

5   manufactured in Puerto Rico because virtually all of the goods whose importation the AMT

6   targets have been produced or manufactured outside of Puerto Rico.   Indeed, Secretary

7   Zaragoza admitted to this when he agreed, at the hearing, that the AMT "treats articles

8   manufactured in Puerto Rico differently than it treats some articles manufactured off the

9   island."  (ECF No. 130 at 83.)  This is in direct contravention of 48 U.S.C. § 741a.

10         Our holding that the AMT violates the Federal Relations Act is not redundant in light

11  of our holding under the dormant Commerce Clause for one simple reason.  As of today,

12  under controlling precedent, the Commerce Clause applies to Puerto Rico.  *Trailer Marine*

13  *Transp. Corp.* v. *Rivera Vazquez*, 977 F.2d 1, 7 (1st Cir. 1992).  But, as Judge Boudin wrote

14  for the First Circuit, "If the government of Puerto Rico were nothing other than the alter ego

15  or immediate servant of the federal government, then the dormant Commerce Clause

16  doctrine would have no pertinence, for a doctrine designed to safeguard federal authority

17  against usurpation has no role when the federal government itself is effectively the actor."

18  *Id*. at 8.  Whether the Commonwealth of Puerto Rico does, in fact, exercise any sovereignty

19  independent of the federal government has lately been challenged and is currently up for

20  consideration.  *See El Pueblo de P.R.* v. *Sánchez Valle,* 192 D.P.R. 594 (P.R. 2015), *cert.*

21  *granted*, 136 S. Ct. 28 (2015).  If the United States Supreme Court issues a ruling that

22  unmoors the dormant Commerce Clause from this island, our holding as to the Federal

23  Relations Act will stand as an independent ground for invalidating the AMT.

1   **D.**   <u>**The AMT Violates the Equal Protection Clause**</u>

2          In Count III of the complaint, Wal-Mart PR contends that the AMT violates the Equal

3   Protection Clause and must be enjoined and declared invalid under 42 U.S.C. § 1983.  (ECF

4   No. 1 ¶¶ 76-80.)  "[T]he protections accorded by either the Due Process Clause of the Fifth

5   Amendment or the Due Process and Equal Protection Clauses of the Fourteenth Amendment

6   apply to residents of Puerto Rico," and may be enforced under § 1983.  *Examining Bd. of*

7   *Eng'rs, Architects & Surveyors* v. *Flores de Otero*, 426 U.S. 572, 600-01 (1976).

8          It is well-established law that "[l]egislatures have especially broad latitude in creating

9   classifications and distinctions in tax statutes."  *Amour* v. *City Indianapolis*, 132 S. Ct. 2073,

10  2080 (2012) (*quoting Regan* v. *Taxation With Representation of Wash.*, 461 U.S. 540, 547

11  (1983).  A "classification neither involving fundamental rights nor proceeding along suspect

12  lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship

13  between the disparity of treatment and some legitimate governmental purpose."  *Id.* (ellipsis

14  in original) (*quoting Heller* v. *Doe*, 509 U.S. 312, 319-320 (1993)).   On the other hand,

15  "arbitrary and irrational discrimination violates the Equal Protection Clause under even our

16  most deferential standard of review."  *Bankers Life & Cas. Co.* v. *Crenshaw*, 486 U.S. 71, 83

17  (1988.  Here, the AMT violates the Equal Protection Clause because it is both arbitrary in its

18  discrimination and not rationally connected to a legitimate governmental purpose.

19         In the context of abusive transfer pricing and illegitimate profit shifting, a relevant

20  difference distinguishes interstate transactions between related parties and other transactions

21  because only the former can use transfer prices to shift profit outside of a jurisdiction.  By

22  contrast, in the context of an indiscriminate tax on transactions that has nothing to do with

23  profit shifting and everything to do with revenue generation, as is the case with the AMT,

1    there is no difference that justifies discriminating between controlled interstate transactions

2    and other transactions.  There is no difference that justifies imposing a risk of double taxation

3    and the burden of revenue generation under the AMT on only those taxpayers who engage in

4    the former transactions, but not on those who engage in only the latter.  After all, "[t]he

5    distinction between them bears no relation to the statutory purpose" of revenue generation.

6    *See Williams* v. *Vermont*, 472 U.S. 14, 24 (1985) (citing *Zobel* v. *Williams*, 457 U.S. 55, 61

7    (1982)).  Thus, imposing the tangible-property tax only on taxpayers engaging in interstate

8    controlled transactions is "wholly arbitrary" under the Equal Protection Clause.  *See id*. at 23.

9           Even if the distinction is not arbitrary, it is not rationally related to a legitimate state

10   purpose.  In his brief, the Secretary contended that the AMT helps prevent base erosion and

11   profit shifting.  But, as we have now repeated many times, both the record and the tax law

12   itself utterly belie that claim.  Indeed, as Secretary Zaragoza affirmed and reaffirmed at the

13   hearing, the AMT has nothing to do with identifying or curing problematic instances of

14   transfer pricing.  Instead, the AMT's sole purpose is revenue generation.  That is why, he

15   admitted, the Treasury Department – in fact, *his* Treasury Department – urged the

16   Legislature to eliminate the exemption for transactions with arm's-length prices.  In fact, the

17   AMT does bear any relationship to proper measures of profit or income.  Instead, it taxes the

18   gross value of tangible property that large multinational corporations and their local affiliates

19   buy or receive from an out-of-state home office or related party.  If the purchase of the

20   property results in a loss of income for the taxpayer, no matter.  The tax still applies.  This is

21   why Professor Pomp called the tangible-property tax "such a strange duck" as an "income"

22   tax because, in reality, "it has nothing to do with income," and so can easily "result[] in a tax

23   that is in excess of the [taxpayer's] profits."  (ECF No. 126 at 215, 258.)

1    The mere generation of tax revenue cannot be a legitimate state purpose under equal

2    protection analysis because "acceptance of [that] contention . . . would eviscerate the Equal

3    Protection Clause in this context."  *See Metro. Life Ins. Co.* v. *Ward*, 470 U.S. 869, 882

4    (1985).  After all, if revenue generation was a legitimate purpose under the Equal Protection

5    Clause, "then any discriminatory tax would be valid if the State could show it reasonably was

6    intended to" raise revenue, which is, one would assume, a purpose of every tax.  *See id.*

7    In sum, we hold that the AMT violates the Equal Protection Clause because its facial

8    discrimination against multistate businesses engaging in controlled interstate transactions is

9    arbitrary and serves no legitimate state purpose.

10   **E.      The AMT Does Not Violate the Bill of Attainder Clauses**

11   In Count IV of the complaint, Wal-Mart PR alleges that the AMT violates the Bill of

12   Attainder Clauses and should be enjoined and declared unconstitutional pursuant to 42

13   U.S.C. § 1983.  (ECF No. 1 ¶¶ 81-84.)  Plaintiffs may protest violations of those clauses

14   under 42 U.S.C. § 1983.  *See*, *e.g.*, *Charles* v. *Rice*, 28 F.3d 1312 (1st Cir. 1994) (federal

15   prohibition); *Upshaw* v. *McNamara*, 435 F.2d 1188 (1st Cir. 1970) (state prohibition).

16   "The prohibitions on 'Bills of Attainder' in Art. I, §§ 9-10," of the United States

17   Constitution "prohibit legislatures from singling out disfavored persons and meting out

18   summary punishment for past conduct."  *Lynce* v. *Mathis*, 519 U.S. 433, 439 n.12 (1997)

19   (*citing United States* v. *Brown*, 381 U.S. 437, 456-62 (1965)).  The prohibition in Article I,

20   Section 9, is only "applicable to Congress" and thus is of no relevance here.  *See Nixon* v.

21   *Adm'r of Gen. Servs.*, 433 U.S. 425, 468 n.30 (1977).  Meanwhile, the prohibition in Article

22   I, Section 10, providing "that '[n]o State shall . . . pass any Bill of Attainder,'" is only

23   "applicable to the States."  *Id.* (alterations in original) (*quoting* U.S. Const. art. I, § 9, cl. 3).

1    The Commonwealth of Puerto Rico, however, is a Territory, not a State, of the United States.

2    *Harris* v. *Rosario*, 446 U.S. 651, 651 (1980) (per curiam); *see also Lebrón-Caceres*, *supra*.

3         It appears to be an open question whether the Bill of Attainder Clause in Article I,

4    Section 10, applies to Puerto Rico.  The United States Supreme Court has "never held that

5    the Commonwealth of Puerto Rico is entitled to all the benefits conferred" and limitations

6    placed "upon the States under the Constitution." *Puerto Rico* v. *Branstad*, 483 U.S. 219, 229

7    (1987); *see also United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 268 (1990).  To this day,

8    "[o]nly 'fundamental' constitutional rights are guaranteed to inhabitants of . . . territories."

9    *Id*. (*quoting Balzac* v. *Porto Rico*, 258 U.S. 298, 312-13 (1922)).  In 1965, the Supreme

10   Court, quoting James Madison, forcefully indicated that the prohibition of legislative

11   attainder is fundamental to government: "Bills of attainder . . . are contrary to the first

12   principles of the social compact, and to every principle of sound legislation." *Brown*, 381

13   U.S. at 444 n.18 (*quoting The Federalist*, No. 44, p. 351 (Hamilton ed. 1880)).  But, nine

14   years later, a three-judge District Court, sitting in Puerto Rico, noted that several subsequent

15   scholars and authorities had held that, under the so-called Insular Cases, the Constitution's

16   "protections against bills of attainder . . . [are] inapplicable to unincorporated territories" like

17   Puerto Rico.  *Montalvo* v. *Colon*, 377 F. Supp. 1332, 1338 (D.P.R. 1974) (per curiam).  The

18   District Court, however, reviewed the precedents and found that "the proposition has no

19   actual case support" because "the cases cited say nothing about bills of attainder." *Id*.  The

20   Court, itself, did not opine on whether the protections against attainder apply here.

21        This court does not need to settle the issue.  The Secretary does not contest Wal-Mart

22   PR's assumption that the Bill of Attainder Clause constrains the Puerto Rico's Legislature.

1  (*See* ECF No. 116 at 14-15.)  And, assuming that the clause does apply to Puerto Rico, the

2  AMT, for all its faults, is not a bill of attainder.

3       A "bill of attainder" refers to "a law that legislatively determines guilt and inflicts

4  punishment upon an identifiable individual without provision of the protections of a judicial

5  trial." *Selective Serv. Sys.* v. *Minnesota Pub. Interest Research Grp.*, 468 U.S. 841, 846-47

6  (1984) (*quoting Nixon*, 433 U.S. at 468).  "In deciding whether a statute inflicts forbidden

7  punishment, [the Supreme Court] ha[s] recognized three necessary inquiries: 1) whether the

8  challenged statute falls within the historical meaning of legislative punishment; 2) whether

9  the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be

10 said to further nonpunitive legislative purposes'; and 3) whether the legislative record

11 'evinces a congressional intent to punish.'"  *Id.* at 852 (*citing and quoting Nixon*, 422 U.S. at

12 473, 475-76, 478).  "The Supreme Court has struck down statutes on bill of attainder grounds

13 only five times in the nation's history."  *Elgin* v. *United States Dep't of the Treasury*, 641

14 F.3d 6, 19 (1st Cir. 2011) (Stahl, J., concurring) (citing cases).

15      In a colloquial sense, one could say that the AMT punishes multistate corporations

16 and their Puerto Rico affiliates for engaging in interstate trade with their home office or

17 related company.  More specifically, one could say that the AMT punishes Wal-Mart PR by

18 placing the threshold for the highest tax bracket just below the floor of Wal-Mart PR's recent

19 level of gross receipts.  (ECF Nos. 127 at 13; 130 at 78-82.)  The statement resonates with

20 greater force upon hearing Secretary Zaragoza agree that, at present, "the top tax rate under

21 the tangible property component of [the AMT] is a Wal-Mart tax only," and listening to a

22 Wal-Mart executive state that, to his face, local officials called the new AMT tax brackets

23 "the Wal-Mart tax."  (ECF Nos. 127 at 13; 130 at 80.)  Even worse, the AMT is, as Professor

1    Pomp stated, a "confiscatory tax" when applied to Wal-Mart PR because the AMT is "a tax

2    that into the foreseeable [future] is going to take all of their profits."  (ECF No. 126 at 233,

3    263.)  We, however, must deal with the legal, not the colloquial, meaning of punishment.

4         "That burdens are placed on citizens by [a government] authority does not make those

5    burdens punishment."  *Selective Service Sys.*, 468 U.S. at 851 (*citing Nixon*, 433 U.S. at 470).

6    Even "the severity of a sanction is not determinative of its character as punishment."  *Id*.

7    (*citing Flemming* v. *Nestor*, 363 U.S. 603, 616 & n.9 (1960)).  Instead, to be punishment, the

8    purpose of the burden must be "retribution for past events" or the deterrence of "future

9    misconduct."  *Id*. (*citing Brown*, 381 U.S. at 458-59).  Puerto Rico, however, is not punishing

10   Wal-Mart PR for any past or future misdeed; none at all.  In fact, Secretary Zaragoza was

11   perfectly candid that the Puerto Rico Treasury has "no reason to believe that [Wal-Mart PR]

12   ha[s] been using any . . . base erosion techniques" or inflated transfer-pricing either to shift

13   profits off of the island or to avoid local taxes.  (ECF No. 130 at 96-97.)  If there have been

14   public accusations of such behavior, they appear completely baseless.  At best, they have

15   been used to make palatable to the public and perhaps certain members of the Legislature a

16   tax statute that serves no legitimate purpose whatsoever to offset its patent discrimination.

17        Here, what condemned the tax under the dormant Commerce Clause and the Equal

18   Protection Clause now saves it.  The record shows that the AMT can reasonably be said to

19   further nonpunitive goals, namely, in the words of Secretary Zaragoza himself, "yield[ing]

20   125 million bucks in 11 months, as we needed."  (ECF No. 130 at 90.)  The Commonwealth

21   did not wish to punish Wal-Mart PR for past transfer-pricing abuses because the

22   Commonwealth did not suspect Wal-Mart PR of any such abuses.  Instead, in enacting the

23   tax, the government was simply looking for some fast money, and it settled on multistate

1   corporations as the taxpayers best connected to the deep pockets of money that exist in the

2   continental United States.  In sum, this tax was not punishment.  It is opportunism.

3         The record shows that the government's opportunism has not been limited to an AMT

4   that is so blatantly unconstitutional that the Secretary hardly defended it in this litigation.  On

5   October 22, 2015, Alejandro J. García-Padilla, the current Governor of Puerto Rico, testified

6   before the Committee on Energy and Natural Resources of the United States Senate.  He was

7   there, in part, to ask for federal assistance with the Commonwealth's debt.  He was also

8   there, he said, to clear up "a misconception about the availability of reliable and up-to-date

9   financial information regarding Puerto Rico's finances and its financial crisis."  (Pl. Ex. 109

10  at 4.)  The Governor argued that the alleged "unavailability" of this information was "a 'red

11  herring' resulting from disinformation being propagated by those with vested interests in

12  seeing Congress defer taking action so as to force Puerto Rico into a disorderly default."  (Pl.

13  Ex. 109 at 4-5.)  He asserted that, "in the last six months, Puerto Rico has been more

14  transparent about its financial situation than at any point in its history," and that "any

15  suggestion that Puerto Rico is not doing everything it can to provide up-to-date and accurate

16  information to creditors, this Congress or the general public is simply not true."  (Pl. Ex. 109

17  at 5, 7.)  His testimony to the Senate ended with this plea: "I urge you to maintain your focus

18  on Puerto Rico's fiscal emergency; the future of 3.5 million Americans depends on what you

19  do next."  (Pl. Ex. 109 at 8.)  It also depends on what Puerto Rico does next.

20        As any observer of the fiscal emergency knows quite well, we are still awaiting the

21  release of the Commonwealth's audited financial statements for Fiscal Year 2014, which

22  ended on June 30, 2014.  The Governor addressed the topic in his Senate testimony, alleging

23  that "[t]he issuance of our financial statements has taken longer than expected in large part

1    due to . . . the additional tests that our auditors are conducting regarding liquidity and other

2    variables." (Pl. Ex. 109 at 6.)  In later comments to the press, the Governor was more blunt,

3    accusing the auditors, the firm KPMG, of "delay[ing]" its work and calling on KPMG "to

4    comply with its contractual obligations." (Pl. Ex. 12 at 1.)  The Governor's accusations led

5    other officials to demand an explanation from KPMG as to why it was delaying release of the

6    audited financials, as if KPMG had something to gain from the delay.  (Pl. Ex. 12 at 1.)

7         At the hearing, KPMG's lead partner on the audit of Puerto Rico's 2014 financial

8    statements, Ernesto Aponte, appeared upon being subpoenaed.  (ECF No. 128 at 65, 78.)  In

9    his testimony, Aponte pointed out the obvious: that the Commonwealth must first draft and

10   deliver its financial statements to KPMG before KPMG can audit them.  (ECF No. 128 at

11   65.)  To help the Commonwealth draft these statements, KPMG has been providing a digital

12   spreadsheet called a PBC list, with "PBC" standing for "Provided By Client," that sets out

13   what the Commonwealth needs to provide to KPMG, so that KPMG can conduct its audit.

14   (ECF No. 128 at 66-67.)   KPMG has been delivering a copy of this spreadsheet to the

15   Governor's administration "at the end of every week." (ECF No. 128 at 110.)

16        As of December 21, 2015, the Governor's administration had not yet turned over to

17   KPMG dozens of items about the Commonwealth's finances, some of which KPMG had

18   been requesting for more than a year.  (ECF No. 128 at 68-69; Pl. Ex. 8.)  Needless to say,

19   until the Puerto Rico government hands over all of its financial statements, KPMG cannot

20   complete its audit.  And, as Aponte testified, "I cannot force our clients to get [us] the

21   information." (ECF No. 128 at 110.)  Thus, whenever he blamed KPMG for being the root

22   cause of the delays in the release of the Commonwealth's 2014 audited financial statements,

1    the Governor was speaking falsely.  (ECF No. 128 at 72-73.)  After all, it was the Governor's

2    administration that was slow-walking the process, not KPMG.

3              Following the Governor's false accusations, Aponte and the managing partner of

4    KPMG's San Juan office requested a meeting with Secretary Zaragoza.  (ECF No. 72.)  At

5    the meeting, on December 10, 2015, Aponte told Zaragoza that it was unacceptable that the

6    Governor was publicly blaming KPMG for delaying the release of the audit.  After all, the

7    government had not yet provided KPMG with a completed draft of its financial statements

8    from Fiscal Year 2014, which, by then, had ended almost eighteen months earlier.  (ECF No.

9    128 at 77, 84; Pl. Ex. 12 at 2-3.)  All that the government had turned over was "a very, very

10   preliminary document" that "certainly did not meet the minimum expectations of KPMG."

11   (ECF No. 128 at 88.)  In response, Juan Flores, the Undersecretary of the Treasury, showed

12   Aponte a draft of some basic financial statements.   The draft "included a number of

13   disclaimers about the content of the information, including the fact that the 2014 audits of

14   certain component units . . . ha[d] not been completed yet, [and] therefore the draft financial

15   statements were assembled using unaudited information."  (Pl. Ex. 12 at 3.)

16             Due to the reputational harm that the Governor's blame-shifting was causing KPMG,

17   the firm's members told Zaragoza and Flores that the administration needed to stop making

18   false statements about why the audit was delayed.  (Pl. Ex. 12 at 2.)  Indeed, the only reason

19   why KPMG has been unable to finish its audit of Puerto Rico's 2014 financial statements is

20   that the government has still not disclosed all of the necessary information to KPMG.  (ECF

21   No. 128 at 84; Pl. Ex. 12 at 2-3.)  Despite KPMG's request, the Governor has continued to

22   mislead the public about why the Commonwealth's audited financial statements have not yet

23   been released.  (ECF No. 128 at 82.)

1    Amongst the information that the Commonwealth had refused to disclose to KPMG

2    was its "going concern" memo, which is Treasury's evaluation of whether the government

3    has sufficient resources "[t]o continue to pay its obligations when they become due." (ECF

4    No. 128 at 77, 84, 86-88; Pl. Exs. 9; 12 at 2.) Upon receiving the memo, KPMG must decide

5    whether "doubt" exists "about the ability of the [Commonwealth] to continue as a going

6    concern." (ECF No. 128 at 86.) Aponte acknowledged that a simple way to prevent KPMG

7    from drawing that conclusion is to refuse to disclose the memo. (ECF No. 128 at 89.)

8    On January 11, 2016, only three weeks before the hearing in this case began, the

9    Governor's administration finally provided KPMG with the memo. (ECF No. 128 at 89.)

10   The memo was inaccurately dated June 30, 2014, the last day of Fiscal Year 2014. (ECF No.

11   128 at 91.) In the memo, as we noted earlier, Treasury concludes that, due to the many

12   insolvency and debt issues that plague Puerto Rico, there is "significant doubt [about] the

13   Commonwealth's ability to continue as a going concern." (Pl. Ex. 9 at 37.) Many reasons

14   could be easily given for why the Commonwealth might wish to delay both the disclosure

15   and the auditing of that memo and its conclusions.

16   At the hearing, Secretary Zaragoza corroborated Aponte's testimony, admitting that

17   the Commonwealth had not yet provided KPMG with everything that it needed to complete

18   its audit of the government's 2014 financial statements. (ECF No. 130 at 108-09.) He also

19   admitted that the Commonwealth's actions had precluded KPMG from issuing their own

20   evaluation of whether the Puerto Rico government remains a going concern. (ECF No. 130

21   at 109.) Again, Zaragoza was admirable in his candor and honesty.

22   There is no reason for the current administration to keep suppressing the day when the

23   true state of its finances is known. Nor is there any reason to blame KPMG for the delayed

1    release of the 2014 audit financials when the administration, itself, is at fault.  Perhaps some

2    in the administration believe that there is a benefit to limiting the amount of information

3    released to the public and other stakeholders about the state of Puerto Rico's finances.  But,

4    as Martha Kopacz, the insolvency expert, correctly noted, if Puerto Rico hopes to restructure

5    its debt through private negotiations, it must realize that "the creditors have a very different

6    view of the world" and it is "going to be hard to get them to accept the kind of haircut that's

7    being proposed" when there is "just not enough information out there."  (ECF No. 130 at 62.)

8          On February 10, 2016, Senator Orrin G. Hatch, Chairman of the United State Senate

9    Committee on Finance, sent Governor García-Padilla a letter due to the fact that "Congress is

10   considering ways to assist Puerto Rico in light of Puerto Rico's economic and financial

11   challenges."   Letter from Sen. Hatch to Gov. García-Padilla (Feb. 10, 2016) at 1.[25]

12   "Unfortunately," the Senator observed, "it has been challenging to acquire recent verifiable

13   financial information about Puerto Rico's financial condition."  *Id.*  Senator Hatch proceeds

14   to ask the Governor a series of questions in the hope of "obtain[ing] information that will

15   prove useful to Congress and other stakeholders as we continue to work to find measures to

16   assist the people of Puerto Rico as the government of Puerto Rico continues to face financial

17   and transparency challenges."  *Id.*  The questions themselves, which fill more than seven

18   pages, show how little is currently known about the Commonwealth's finances.  According

19   to a floor speech by Senator Hatch on March 17, 2016, Governor García-Padilla failed to

20   respond to the letter, leaving all of us without answers to some very basic questions.  Press

---

[25]   The letter is available online at http://www.finance.senate.gov/imo/media/doc/
Hatch%20Pushes%20for%20Current%20Financial%20Statements%20from%20Puerto%20Rico.pdf  (last
visited on Mar. 21, 2016).

1    Release, U.S. Sen. Comm. on Fin., *Hatch Says Responsible Solutions Needed for Puerto*

2    *Rico's Debt Crisis* (March 17, 2016).[26]  Meanwhile, the crisis in Puerto Rico deepens.

3            For years now, the Commonwealth has been running away from the truth about its

4    fiscal health.  The deep-seated refusal of several Administrations to own up to and correct the

5    structural imbalances in our economy has brought us to the point of crisis.  As Puerto Rico

6    steps gingerly into an uncertain future, we should not forget Justice Brandeis' sage advice:

7    "Publicity is justly commended as a remedy for social and industrial diseases.  Sunlight is

8    said to be the best of disinfectants."  L. Brandeis, *Other People's Money* 62 (Nat'l Home

9    Libr. Found. ed. 1933), *quoted in Buckley* v. *Valeo*, 424 U.S. 1, 67 (1976).  As we, ourselves,

10   noted at an earlier stage of this litigation, "government transparency is critical to maintaining

11   a functional democratic polity, where the people have the information needed to check public

12   corruption, hold government leaders accountable, and elect leaders who will carry out their

13   preferred policies."  (ECF No. 95 at 9, *quoting Hamdan* v. *United States Dep't of Justice*,

14   797 F.3d 759, 769-70 (9th Cir. 2015).)

15                                              **III.**

16                          **Final Matters and the Journey Ahead**

17           The court hereby permanently enjoins and declares invalid, under both federal

18   constitutional and statutory law, section 1022.03(b)(2) and (d) of the Puerto Rico Internal

19   Revenue Code of 2011, which is codified at 13 L.P.R.A. § 30073(b)(2) and (d).  Those

20   subsections of the AMT statute comprise the second measure of "tentative minimum tax,"

21   which consists of the tangible-property tax and the expenses tax, and the list of exemptions to

---

[26] The press release is currently available online at: http://www.finance.senate.gov/chairmans-news/hatch-says-responsible-solutions-needed-for-puerto-ricos-debt-crisis (last visited on March 21, 2016).

1    the tangible-property tax.  The injunction shall go into effect immediately.  The Puerto Rico

2    Secretary of the Treasury and all of his or her subordinates must stop all levying, collection,

3    and enforcement of the AMT under the enjoined subsections, including as an estimated

4    payment under 13 L.P.R.A. § 30263 and any other applicable section.

5         "A district court has broad discretion to fashion an appropriate equitable remedy, but

6    the relief imposed should be 'no more burdensome to the defendant than necessary to

7    provide complete relief to the plaintiffs.'"  *United Parcel Serv.*, 318 F.3d at 337 (*quoting*

8    *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979)).  At the end of the hearing in this case, we

9    informed the parties that if they wanted to file any additional briefing or argumentation, we

10   would consider it.  (ECF No. 131 at 120).  Now that more than seven weeks have passed

11   without a submission from either party, we will wait no longer.  We find the scope of the

12   injunction appropriate because it immediately invalidates the tangible-property tax and the

13   expenses tax, including related exemptions.  We have included these exemptions within the

14   scope of the injunction and declaration of invalidity because they are integral to what makes

15   the law unconstitutional, especially the exemption for intrastate transactions.  (*See* Pl. Ex. 77,

16   § 1022.03(d)(6).)  At the same time, it is clear that the Puerto Rico Legislature intended to

17   enact an AMT and, since there has been no complaint about the first measure of tentative

18   minimum tax, we leave intact the AMT as measured under section 1022.03(b)(1) of the

19   Puerto Rico Internal Revenue Code of 2011, which is codified at 13 L.P.R.A. § 30073(b)(1).

20        The Commonwealth is in dire need of more transparency.  The people of Puerto Rico

21   must no longer be kept in the dark.  Those who are aware of the situation we are in must no

22   longer hide from it.  The people deserve to know the truth about how we got to where we are,

23   and we can go from here.  The residents of the island most affected by this crisis deserve the

1   very transparency whose absence helped caused the crisis.  All of us, but especially those in a

2   position of public trust, must be honest about the situation we are in and the mistakes that

3   each of us has made, so that we can move forward to a brighter future.  Only then can we

4   "embrace the best of all of the alternatives" that present themselves.  (ECF No. 130 at 46.)

5        Only a rededication to competency in government, honesty in administration, and

6   absolute transparency in our affairs can carry us forward.  Otherwise, Puerto Rico, like a ship

7   in a storm with a hull already buckling, cannot be salvaged in any known manner or form.

8   The analogy to a sinking ship is appropriate.  If the ship is lost, disaster will follow for those

9   onboard.  So, quite simply, our ship cannot and will not be lost.  This is what every member

10  of our society should work, as a team, to achieve.  The journey ahead will be difficult, but,

11  together, we can weather the storm.

12  **IT IS SO ORDERED.**

13  San Juan, Puerto Rico, this 28th day of March, 2016.

14                                          S/José Antonio Fusté
15                                          JOSE ANTONIO FUSTE
16                                          U. S. DISTRICT JUDGE
17
18